# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

ADVERSARY NO. 08-01135

USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

v.

WELLS FARGO BANK, N.A.

# EXPERT REPORT

OF

COLIN A. JOHNS, CPA, CFF, CFE, CA

## I. Introduction

The opinions expressed in this report and portions of the information presented in the accompanying exhibits are my present opinions subject to the following reservations. Amendments or additions to this report and the accompanying exhibits may be required as indicated herein or as a result of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, the testimony of any other witness in deposition or at trial, and any other calculations for pre-judgment or post-judgment interest or any other relief deemed appropriate by the court.

I anticipate using at trial selected exhibits attached to this report, documents reviewed in connection with their preparation, enhanced graphic versions of selected exhibits included in this report (i.e., redrafted to improve their presentation quality) and/or additional graphics illustrating concepts in this report.

## II. Assignment

I have been retained, through my employer, Hemming Morse, Inc., Certified Public Accountants, Litigation and Forensic Consultants ("HMI"), by Diamond McCarthy LLP, counsel for USA Capital Diversified Trust Deed Fund, LLC ("DTDF") to render an expert opinion with respect to the following:

A. Whether and to what extent the services (including banking and wire transfer) provided by Wells Fargo Bank ("WFB") to USA Commercial Mortgage Company ("USACM")[1], 10-90, Inc. ("10-90") and Mountain Vista, Inc. ("Mountain Vista") substantially assisted the fraud and breaches of fiduciary duties that caused harm to DTDF.

B. The amount of damages suffered by DTDF as a result of WFB's substantial assistance of the fraud and breaches of fiduciary duties referenced above.

## III. Summary of Opinions

A. WFB's provision of services to 10-90 and Mountain Vista substantially assisted the direct misappropriation and looting of DTDF funds.

B. WFB's provision of services to USACM as the mortgage servicer to DTDF's investments substantially assisted the fraud and breaches of fiduciary duties that caused harm to DTDF by allowing the Culpable

[1] For purposes of this report, the term "USACM" has been used to describe USACM, including the Investors Trust and Collection Trust Accounts.

Insiders to conceal and thereby continue to perpetrate the fraudulent scheme.

C. But for WFB's substantial assistance, DTDF would not have suffered the damages described herein. As detailed below, WFB's provision of felonious transfers between the Investors Trust account and Collection Trust account concealed large negative balances in the Collection Trust account and thereby the underlying Ponzi scheme. WFB's further provision of wire transfer services to 10-90 and Mountain Vista substantially facilitated the direct looting of DTDF.

D. As a result, DTDF suffered substantial damages of between $3,823,159 and $82,329,443 from 2001 to 2006. These damages calculations are shown on a quarterly basis on the attached Exhibit 1.

## IV. Summary of Expert Qualifications

I am a Certified Public Accountant, licensed in the State of California, a Certified Fraud Examiner, and the President of HMI, a 100+ person accounting firm. My work in the accounting profession includes experience as an auditor and as a consultant. My expert qualifications, including my testimony in the last four years and the publications I have authored in the last ten years, are described in Exhibit A to this report.

I have been a certified public accountant for more than 20 years. During that time I have worked on more than 200 complex litigation matters. Many of these have required the analysis of transactions and/or of the financial statements of companies, both public and private.

I am a member of the California Society of Certified Public Accountants ("CalCPA"). Since 2001 I have served on its statewide Accounting Principles and Auditing Standards Committee. I have also served on its statewide Litigation Services Steering Committee since 2006. This Steering Committee provides guidance to the approximately 400 members of its four Operating Sections – Business Valuation, Economic Damages, Fraud and Family Law. For two years I was Chair of its 200 member Economic Damages Section.

I am also a member of the American Institute of Certified Public Accountants ("AICPA") and I hold its Certified in Financial Forensics ("CFF") credential. I was one of the authors of the AICPA's Business Valuation and Forensic & Litigation Services Section Practice Aid 06-04, Calculating Lost Profits.

My firm has been compensated for my review and analysis in this matter at my standard hourly rate, which is currently $450 per hour. Others have assisted me in

my work and my firm has been compensated for their work at their standard hourly rates.

## V. Evidence Considered

In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field. Those sources are identified in Exhibit B to this report. I have also relied on my own professional judgment and expertise gathered during the more than 30 years I have been in public accounting and the more than 20 years that I have analyzed transactions and financial statements that were the subject of legal disputes.

## VI. Discussion of Opinions

### A. Background

<u>USA Commercial Mortgage Company</u>

1. USA Commercial Mortgage Company ("USACM") was organized under Nevada law on February 28, 1989[2].

2. USACM's business activities included the brokering and servicing of loans to real estate developers. The basic model used by USACM was to raise monies from outside investors which were then used to fund loans to borrowers. The interest of these investors in the loans funded was secured by the recording of a deed of trust against the underlying real estate. USACM would also service the loan on behalf of the investors.

3. Under Nevada law USACM was required to establish two trust accounts[3] through which these activities were to be accomplished:

   a. A trust account was to be used to receive the monies raised from investors and, when sufficient monies had been raised, to fund a particular loan;

   b. A trust account was to be used to receive principal, interest and other payments on the loans from the borrowers and, after deduction of the servicing and other fees due to USACM, to remit payments to the investors.

---

[2] USACM 1998 Audited Financial Statements, Note 1.
[3] Nevada Revised Statutes, 645B.175.

4. Initially, USACM did not have the required two trust accounts and operated with only an operating account and a collection account[4].

5. In December 1997 the State of Nevada Financial Institutions Division ("FID") performed an examination of USACM and cited USACM for various violations of laws and regulations, including: (1) not appropriately naming the collection account to indicate the money did not belong to USACM; and (2) not having a separate and appropriately named investor trust account used only to receive and disburse investor funds[5].

6. In response to this examination report USACM renamed its collection account as the Collection Trust account. However, when the FID performed its next examination in early 1999 it again cited USACM for not having a separate investor trust account[6].

7. From that point forward USACM maintained two accounts with WFB, titled "USA Commercial Mortgage Co Investors Trust Account" (the "Investors Trust") and "USA Commercial Mortgage Co Collection Trust Account" (the "Collection Trust").

8. Nevada law required that the monies in these two trust accounts were to be kept separate and not to be commingled[7] either between each other or with any other monies.

9. In February 2000 DTDF was formed[8] by the principals of USACM as a vehicle through which USACM could raise investment funds from Nevada residents for the purpose of funding loans secured by real estate. With DTDF the individual investors did not have a direct interest in a loan. Instead, they purchased a membership interest in DTDF. DTDF in turn then invested in loans originated and serviced by USACM. The DTDF vehicle facilitated the ultimate scheme by allowing the Culpable Insiders to more easily aggregate and loot investor funds.

10. Contained within the May 2002 DTDF Prospectus were certain restrictions on the manner in which DTDF's funds could be invested. These included:

---

[4] Deposition of Victoria Loob, July 31, 2009, Page 165, Lines 22 through 24.
[5] State of Nevada, Financial Institutions Division, 1997 Examination Report. 005-MISC-2082 through 005-MISC-2088.
[6] State of Nevada, Financial Institutions Division, 1999 Examination Report. 488-0843 through 488- 0850.
[7] Nevada Revised Statutes, 645B.175.
[8] DTDF 2001 Audited Financial Statements, Note 1. BM0002303-13.

a. All loans in which DTDF invested were to be secured by first deeds of trust on real property[9].

b. The amount of a loan was generally not to exceed certain loan-to-value percentages based on the appraised value of the underlying property[10].

c. No loans were to be made by DTDF to the Manager (USA Capital Realty Advisors, LLC ("USACRA")) or to any of its affiliates, except for any financing as part of a sale of real estate owned as a result of foreclosure[11].

d. Until such time as DTDF reached its maximum capitalization of $100 million, no loan (or interest in a loan) was to exceed $20 million[12].

e. Once DTDF reached its maximum capitalization of $100 million:

   i. No one loan, or interest in a loan, was to exceed 15% of all of DTDF's loans outstanding at the time of the loan[13]; and

   ii. No more than 25% of DTDF's loans outstanding at any time were to be made to a single borrower, together with any affiliates of such borrower[14].

11. In February 2001 USACM formed USA Capital First Trust Deed Fund, LLC ("FTDF") as a vehicle through which it could raise investment funds from investors throughout the United States for the purpose of funding loans secured by real estate. With FTDF, as with DTDF, the individual investors did not have a direct interest in a loan. Instead, they purchased a membership interest in FTDF. FTDF in turn then invested in loans originated and serviced by USACM. WFB served as the subscription escrow agent for FTDF[15].

---

[9] DTDF Prospectus, May 28, 2002 – Lending Standards and Policies, Section 1. DIV.00019663.
[10] DTDF Prospectus, May 28, 2002 – Lending Standards and Policies, Section 3. DIV.00019663.
[11] DTDF Prospectus, May 28, 2002 – Lending Standards and Policies, Section 8. DIV.00019664.
[12] DTDF Prospectus, May 28, 2002 – Lending Standards and Policies, Section 10. DIV.00019665.
[13] Ibid.
[14] Ibid
[15] Deposition of Eileen Sechrist, September 9, 2009, Page 25, Lines 4 through 7.

<u>USACM and DTDF file for Bankruptcy Protection</u>

12. In April 2006 DTDF, USACM and certain related entities filed for bankruptcy protection as a result of the gross misconduct of certain insiders.

13. Among other wrongful conduct USACM's former Chairman and CEO, Thomas Hantges ("Hantges"), and its former President, Joseph Milanowski ("Milanowski"), (collectively, the "Culpable Insiders"), misappropriated DTDF's money to, among other things:

   a. fund entities in which they held an indirect ownership interest through USA Investment Partners ("USAIP");

   b. cover shortfalls in the Collection Trust account;

   c. purchase interests in loans that were in default; and,

   d. fund other obligations of related entities.

14. As a result of these actions by the Culpable Insiders, DTDF suffered tens of millions of dollars in losses.

## B. The Fraud Perpetrated by the Culpable Insiders[16]

1. Within the portfolio of loans that USACM was servicing there were a number of loans that were in default or not performing. The Culpable Insiders took a number of steps to conceal this fact and to perpetuate the impression that these problems did not exist.

2. In fact, the Culpable Insiders marketed both to USACM's direct lenders and to the DTDF investors the fact that "since 1989 USA Capital has placed over 41 billion in trust deeds on behalf of clients, without ever losing a dime of investors' principal"[17].

3. The Culpable Insiders distributed checks for interest payments to investors regardless of whether the underlying borrowers had made

[16] The Bankruptcy Court has found as a part of the confirmation of the Plan of Reorganization that there was fraud – see, for example, Transcript of Proceedings of Motion to Dismiss Adversary proceeding for Lack of Subject-Matter Jurisdiction, in USACM Liquidating Trust, et al v. Wells Fargo Bank, N.A., September 30, 2008.

[17] DTDF Marketing Material. 002-MISC-0366.

payments to the Collection Trust[18]. As a result, shortfalls[19] were experienced in the Collection Trust because insufficient funds were being collected from the borrowers to cover these payments.

4. The cash shortfalls in the Collection Trust were covered in a number of ways, including, but not limited to, the following:

a. With the assistance of WFB, funds were transferred from the Investors Trust to the Collection Trust.

b. Funds were transferred from DTDF to the Collection Trust, including one transfer made with WFB's assistance through the 10-90 account.

c. When loans were paid off by borrowers the principal was not remitted to the investors as principal payments, but rather it was used to fund shortfalls. The Culpable Insiders made it appear as if the loan was still outstanding and the amount remitted to the investors was calculated as if only interest payments had been made by the borrower.

d. Amounts collected from borrowers which should have been remitted to DTDF were, at the direction of the Culpable Insiders, withheld by USACM and not paid to DTDF from the Collection Trust account.

5. The actions described above were designed to perpetuate the false impression that USACM was not experiencing defaults in the loans that it had originated and thereby to encourage additional funds being invested by the outside investors and members of DTDF as well as to satisfy the marketing promises that investors never lost a dime of principal.

6. Over time as the number of non-performing loans increased these cash shortfalls in the Collection Trust grew in magnitude. From early 2003 through early 2006 the monthly interest payments to investors being processed through the Collection Trust account grew from less than $3 million per month to approximately $9 million per month. By December 2002, as discussed in more detail below, the Culpable Insiders had caused checks totaling more than

---

[18] USACM's internal systems automatically generated these checks each month. Deposition of Victoria Loob, July 31, 2009, Page 138, Lines 6 through 12.

[19] For the purposes of this report "shortfalls" are defined as being insufficient funds available in the Collection Trust to make the payments due to investors.

$11 million to be withheld from DTDF to cover the shortfalls in the Collection Trust account.

7. The manner in which the Culpable Insiders covered these cash shortfalls was in essence a classic Ponzi scheme, whereby either new money from investors, payments on performing loans, or monies misappropriated from DTDF were used to cover payments to investors on the non-performing loans.

8. In addition, the Culpable Insiders caused DTDF's monies to be used for purposes that were prohibited under the restrictions imposed on the investment of those funds per DTDF's Prospectus.

9. In particular, DTDF's monies were misappropriated to fund entities in which the Culpable Insiders held an equity interest or were otherwise connected to.

10. The most egregious example of this activity was the use of DTDF's monies to fund an alleged "loan" to an entity called 10-90. At the time of the initial funding of this purported loan there was in fact no such 10-90 entity. In reality, DTDF's monies recorded as being a part of this loan were sent to USAIP or to entities in which USAIP held an interest or to fund obligations of other entities. By the time DTDF filed for bankruptcy protection the principal balance outstanding on the purported 10-90 loan was in excess of $55 million and there was substantial unpaid accrued interest.

<u>Unremitted Collections from Borrowers</u>

11. At least as early as January 2002 the Culpable Insiders were misappropriating DTDF's monies by holding Collection Trust checks payable to DTDF and not remitting those checks to DTDF. These checks represented amounts due to DTDF for principal and/or interest payments received from borrowers on loans in which DTDF had an interest. The Culpable Insiders also caused collections payable to other parties to be held from at least 2002 through 2006.

12. DTDF's outside auditors discovered the existence of the unremitted collections during their audit as of December 31, 2001 and included the following disclosure in the notes to DTDF's 2001 audited financial statements:

"Note 9. Subsequent events

USA Commercial Mortgage Company, an affiliate of the Fund manager, has been designated by the Fund manager to service its mortgage loan investments. As of May 23, 2002, USA Commercial Mortgage had collected approximately $7,000,000 of interest and principal on the Fund's mortgage loans that has not yet been remitted to the Fund. This amount represents unsecured advances that Mortgage has committed to repay to the Fund with interest at an annual rate of 20%[20]."

13. The 2001 audited financial statements containing this disclosure were included within the May 2002 DTDF Prospectus.

14. The approximately $7 million in the DTDF 2001 financial statements consisted of the following four checks[21]:

a. Check # 29443 dated January 5, 2002

This check was in the amount of $2,661,674.38 and related to amounts collected by USACM in December 2001. As of January 7, 2002 the closing balance on the Collection Trust account was $2,364,323.31[22]. As a result, if this check had been deposited at that time the account would have had a negative balance of $(297,351.07). This check cleared the Collection Trust account on June 12, 2002[23].

b. Check # 30035 dated February 5, 2002

This check was in the amount of $1,321,641.60 and related to amounts collected by USACM in January 2002. As of February 5, 2002 the closing balance on the Collection Trust account was $1,444,941.84[24]. As a result, if this check and check number 29443 had been deposited at that time the account would have had a negative balance of $(2,538,374.14). This check cleared the Collection Trust account on June 11, 2002[25].

[20] DTDF Audited 2001 Financial Statements. BM0002303-13.
[21] Email stream May 18, 2002 through May 24, 2002. BM0003046-47.
[22] USACM Collection Trust Bank Statement, January 31, 2002. WF000710.
[23] USACM Collection Trust Bank Statement, June 30, 2002. WF000744.
[24] USACM Collection Trust Bank Statement, February 28, 2002. WF000718.
[25] USACM Collection Trust Bank Statement, June 30, 2002. WF000744.

c. Check # 31331 dated April 5, 2002

This check was in the amount of $658,493.01 and related to amounts collected by USACM in March 2002. As of April 5, 2002 the closing balance on the Collection Trust account was $675,938.17[26]. As a result, if this check and check numbers 29443 and 30035 had been deposited at that time the account would have had a negative balance of $(3,965,870.82). This check cleared the Collection Trust account on June 13, 2002[27].

d. Check # 31890 dated May 6, 2002

This check was in the amount of $2,311,156.48 and related to amounts collected by USACM in April 2002. As of May 6, 2002 the closing balance on the Collection Trust account was $4,349,531.83[28]. As a result, if this check and check numbers 29443, 30035 and 31331 had been deposited at that time the account would have had a negative balance of $(2,603,433.64). This check cleared the Collection Trust account on July 25, 2002[29].

e. The total of these four checks was $6,952,965.47.

15. As indicated by the dates on which these checks cleared the Collection Trust account at WFB, these four checks (dated between January 5, 2002 and May 6, 2002) were not released until June and July 2002.

## C. The Services Provided by WFB Substantially Assisted the Fraud and Breaches of Fiduciary Duties

1. The services provided by WFB assisted the Culpable Insiders in wrongfully commingling funds of the Investors Trust and Collection Trust accounts. These services enabled the Culpable Insiders to quickly transfer funds between the two trust accounts to cover cash shortfalls in the Collection Trust in order to fund its monthly commitments. Thus, these services facilitated and concealed the Culpable Insiders' fraud and Ponzi scheme by enabling the Culpable Insiders to use new money received from investors to make purported principal and interest payments to other investors.

[26] USACM Collection Trust Bank Statement, April 30, 2002. WF000734.
[27] USACM Collection Trust Bank Statement, June 30, 2002. WF000744.
[28] USACM Collection Trust Bank Statement, May 31, 2002. WF000742.
[29] USACM Collection Trust Bank Statement, July 31, 2002. WF000752.

2. At times WFB also permitted the Collection Trust account to operate with a negative balance even though this on its face was an indication that the account was not being operated in compliance with its stated purpose. On certain of these occasions Wells Fargo paid monies to investors out of the Collections Trust account that were attempting to be drawn against insufficient funds instead of rejecting them.

3. The combination of these services allowed monthly interest and principal checks to be sent out to the investors on a timely basis, thereby not only assisting the Culpable Insiders in furthering their fraudulent scheme but also masking the true state of affairs in USACM's loan portfolio.

4. WFB's provision of wire transfer services to 10-90 and Mountain Vista made it possible for the Culpable Insiders to move funds misappropriated from DTDF quickly, avoid any holds, and thereby effectively disguise the nature of these transactions. These transactions evidenced signs of money laundering and assisted in concealing the misappropriation of the funds.

## D. Improper Activity that was Evident in the WFB Accounts

1. As described below, commencing at least as early as 2000 there were clear indications that were evident within the WFB accounts as to some of the Culpable Insiders' improper activities.

<u>The $11.425 million Transfer</u>

2. In September 2002 the Collection Trust received a wire transfer for $10,089,259.02 in payment of a loan to Double Diamond Ranch ("DDR")[30]. This was recorded as being the payoff of this loan.

3. On October 2, 2002 the Collection Trust generated five checks payable to DTDF each in the amount of $2,060,788.93. The check stubs all identify the amounts being paid as being partial principal payments and interest on the DDR loan[31].

4. Also in October 2002 the Collection Trust received a payment on the Redhills at The Pueblo loan ("Pueblo"). On November 5, 2002

[30] USACM Collection Trust September 30, 2002 Bank Statement. 918-0029468.
[31] USACM Collection Trust Check Numbers 34524, 34525, 34527, 34528 and 34529. 918-0009715 through 918-0009717.

the Collection Trust generated a check payable to DTDF for $1,116,743.19[32] representing a principal payment amount due to DTDF on the Pueblo loan of $354,600.00 and October interest payments due to DTDF of $762,143.19[33].

5. The payments received on the DDR and Pueblo loans were used to pay other obligations and, therefore, there was not sufficient funds in the Collection Trust account to cover the payments due to DTDF on those loans.

6. The Culpable Insiders caused these six checks to continue to be held and not paid through the end of 2002. All of these checks appear as being outstanding on the Collection Trust's bank reconciliations as of November 30, 2002[34] and December 31, 2002[35].

7. As of December 31, 2002 the balance on the Collection Trust account was $1,101,277.78 ($29,079.00[36] + $1,072,198.78[37]) and was therefore still insufficient to cover these outstanding checks.

8. The six checks payable to DTDF were deposited in the DTDF account on December 31, 2002.

9. In order to allow these checks to clear, and thereby avoid potential questions from its auditors as to why they were still outstanding, the Culpable Insiders caused a circular transfer of funds to occur, as detailed below, whereby additional DTDF monies were used to generate a sufficient balance in the Collection Trust to allow these checks to be deposited by DTDF. These transactions, which played on the timing for processing checks between banks, evidenced an attempted check kiting.

10. On January 2, 2003 a check was generated from the DTDF account at Nevada State Bank payable to the Investors Trust for $11.425 million[38]. This check was deposited in the Investors Trust account

[32] USACM Collection Trust Bank Reconciliation, November 2002. 746-0820.
[33] DTDF General Journal Entry, December 31, 2002. 896-2301.
[34] USACM Collection Trust Bank Reconciliation, November 2002. 746-0820.
[35] USACM Collection Trust Bank Reconciliation, December 2002. 746-0887.
[36] USACM Collection Trust December 31, 2002 Bank Statement. WF000805.
[37] USACM Collection Trust December 31, 2002 Bank Statement. WF000798.
[38] DTDF Check Number 12727. 390-CHKS-3808.

on January 2, 2003[39]. WFB gave immediate credit for the entire $11.425 million in the Investors Trust account[40].

11. On the same day a check was generated from the Investors Trust account at WFB payable to the Collection Trust for $11.425 million[41]. This check was deposited in the Collection Trust account on January 2, 2003[42]. WFB gave immediate credit for the entire $11.425 million in the Collection Trust account[43].

12. This transfer of funds between the Investors Trust and the Collection Trust was an improper transaction under the Nevada Revised Statutes as it represented commingling of the funds in the two trust accounts.

13. The six checks payable to DTDF that had been deposited in the DTDF account on December 31, 2002, cleared the Collection Trust account on January 2, 2003[44], as a result of this circular transaction.

14. However, on January 6, 2003 DTDF's check to the Investors Trust account was returned for non-sufficient funds in DTDF's account[45]. This caused the Investors Trust account to have a negative balance of $(10,562,360.37) on that date[46]. Eventually, on January 8, 2003 $11.425 million was wired from DTDF's account to the Investors Trust account[47].

15. The $11.425 million transferred from DTDF to the Investors Trust was recorded as being the funding of a purported loan to 10-90[48].

---

[39] USACM Investors Trust Deposit Slip dated January 2, 2003. 856-1845.
[40] USACM Investors Trust January 31, 2003 Bank Statement. WF001694-98; Deposition of Eileen Sechrist, September 9, 2009, Page 37, Line 11.
[41] USACM Investors Trust Check Number 1398. 668-0818.
[42] USACM Collection Trust Deposit Slip. 668-0818.
[43] USACM Collection Trust January 31, 2003 Bank Statement. WF000806-17; Deposition of Eileen Sechrist, September 9, 2009, Page 37, Line 11.
[44] USACM Collection Trust January 31, 2003 Bank Statement. WF000810.
[45] DTDF Returned Check. 856-1846; WFB Notice of Returned Item. 856-1847.
[46] There should never have been a negative balance on the Investors Trust account as the Investors Trust account was supposed to function as a conduit for monies received from investors to fund loans originated by USACM.
[47] DTDF January 31, 2003 Bank Statement; USACM Investors Trust January 31, 2003 Bank Statement. WF001695.
[48] DTDF 2003 General Ledger. 827-0489.

The 10-90 and Mountain Vista Accounts

16. In or around December 2002 David Fogg ("Fogg"), at the request of Milanowski, formed two entities, 10-90 and Mountain Vista[49].

17. In March 2003 Fogg established bank accounts for these two entities at the Temecula, California branch of WFB[50].

18. Between March 2003 and November 2004 these accounts were used by the Culpable Insiders as conduits to transfer millions of dollars of DTDF's money to USAIP. These transfers represented, with the exception of the fees charged by WFB, almost the entire activity in these accounts during that period.

19. Both of the accounts were opened with an initial deposit of $1,000[51]. Thereafter, over the course of a twenty-one month period a series of forty-four wire transfers were made from DTDF's bank account at Nevada State Bank to the 10-90 account. These transfers totaled $23.3 million. Either on the same day or within a matter of a few days, an almost identical amount was transferred from the 10-90 account to the Mountain Vista account. Again, either on the same day or within a matter of a few days, an almost identical amount was transferred from the Mountain Vista account to the USAIP account at Commerce Bank.

20. No legal documents were executed relative to the advances from DTDF to 10-90 until a promissory note was executed in August 2004[52]. This promissory note, which was backdated to April 12, 2002, reflected a total amount due to DTDF of $40 million[53]. This higher dollar amount reflected on the promissory note was because other amounts had been transferred from DTDF to USAIP or other related or third party entities, that had not flowed through the 10-90 bank account[54].

21. 10-90 and Mountain Vista were entities established with no underlying business purpose and were designed solely to facilitate the looting of DTDF. Fogg testified at his deposition that other

[49] Deposition of David A. Fogg, March 11, 2009, Page 59, Line 19 through Page 60, Line 20.
[50] Deposition of David A. Fogg, March 11, 2009, Page 70, Line 13 through Page 71, Line 14.
[51] 10-90 Inc. March 31, 2003 Bank Statement. Wells05377; Mountain Vista Inc. March 19, 2003 Bank Statement. Wells05276.
[52] Deposition of David A. Fogg, March 11, 2009, Page 112, Line 9 through Page 113, Line 3.
[53] Deposition of David A. Fogg, March 11, 2009, Page 112, Line 19 through Page 113, Line 7.
[54] Deposition of David A. Fogg, March 11, 2009, Page 113, Line 5 through Page 115, Line 11.

than receiving these monies and transferring them on, neither 10-90 nor Mountain Vista engaged in any other business[55].

22. Of the $23,328,000 transferred to the 10-90 account from DTDF, $22,545,000, or 96.6%, was forwarded in this manner to the Mountain Vista account. This activity is shown in the attached Exhibit 9.

23. In turn, 100% of the amount transferred from 10-90 to the Mountain Vista account, $22,545,000, was then transferred to the USAIP account. This activity is shown in the attached Exhibit 10.

24. On at least two occasions the monies transferred to USAIP were almost immediately wire transferred from USAIP to the Collection Trust account at WFB:

a. On May 9, 2003 $1.85 million was wire transferred from DTDF to 10-90[56]. On May 12, 2003 the identical amount was transferred to Mountain Vista[57] and was transferred to USAIP on May 13, 2003[58]. On the same day USAIP wire transferred $1.85 million to the Collection Trust account at WFB[59].

b. On January 12, 2004 $1.5 million was wire transferred from DTDF to 10-90[60]. On January 13, 2004 the identical amount was transferred to Mountain Vista[61] and was transferred to USAIP on the same day[62]. On January 15, 2004 USAIP wire transferred $1.5 million to the Collection Trust account at WFB[63]. The Culpable Insiders used this money from DTDF to cover shortfalls in the Collection Trust account. Without this transfer the balance on the Collection Trust account would have been $(54,735.68) and $(89,321.32) on January 15 and January 16, respectively.

---

[55] Deposition of David A. Fogg, March 11, 2009, Page 58, Line 18 through Page 59, Line 11.
[56] DTDF May 30, 2003 Bank Statement; 10-90 Inc. May 31, 2003 Bank Statement. Wells05381.
[57] 10-90 Inc. May 31, 2003 Bank Statement. Wells05382; Mountain Vista Inc May 19, 2003 Bank Statement. Wells05280.
[58] Mountain Vista Inc May 19, 2003 Bank Statement. Wells05281.
[59] USACM Collection Trust Account May 31, 2003 Bank Statement. WF000863.
[60] DTDF January 30, 2004 Bank Statement; 10-90 Inc. January 31, 2004 Bank Statement. Wells05397.
[61] 10-90 Inc. January 31, 2004 Bank Statement. Wells05398; Mountain Vista Inc January 21, 2004 Bank Statement. Wells05296.
[62] Mountain Vista Inc January 21, 2004 Bank Statement. Wells05297.
[63] USACM Collection Trust Account January 31, 2004 Bank Statement. WF000997.

25. In addition, after one $783,000 transfer from DTDF to the 10-90 account in April 2003, $782,608 was transferred from the 10-90 account to USACM's Collection Trust account at WFB[64].

26. After the final wire transfers between these accounts in November 2004 there was no activity in either account other than fees charged by WFB until the accounts were closed in May 2006.

27. On their face, there was no legitimate business reason for these transactions to be structured and processed in this manner.

<u>Transfers of Funds between the Trust Accounts</u>

28. As stated above, one of the ways in which the Culpable Insiders covered shortfalls in the Collection Trust was to transfer monies from the Investors Trust to the Collection Trust.

29. These transfers were in contravention of Nevada law governing these accounts which prohibited the commingling of funds in these trust accounts.

30. These transfers assisted the Culpable Insiders in making payments to investors when USACM had not received payments from borrowers. Specifically, these transfers enabled the Culpable Insiders to use money from new investors to make purported interest and principal payments to other investors.

31. Between March 7, 2003 and December 14, 2005 there were thirty-nine transfers between the Investors Trust and the Collection Trust accounts, many of which were wrongfully used to cover shortfalls in the Collection Trust as discussed below and as shown on the attached Exhibit 11.

<u>March 2003</u>

32. In March 2003 USACM made four transfers from the Investors Trust account to the Collection Trust account:

a. On March 7, 2003 a book transfer[65] was executed transferring $225,000 from the Investors Trust to the Collection Trust[66]. After

[64] DTDF April 30, 2003 Bank Statement; 10-90 Inc. April 30, 2003 Bank Statement. Wells05379-80; USACM Collection Trust Account April 30, 2003 Bank Statement. WF000851.
[65] As defined by WFB, a book transfer refers to a transfer between two WFB accounts housed in the same relationship.
[66] Wire Transfer Confirmation. 764-0344.

this transfer the balance on the Collection Trust account was $90,062.83[67]. Without this transfer the balance on the Collection Trust account would therefore have been $(134,937.17).

b. On March 11, 2003 a book transfer was executed transferring $250,000 from the Investors Trust to the Collection Trust[68]. After this transfer the balance on the Collection Trust account was $(634,730.70)[69]. Without this transfer the balance on the Collection Trust account would therefore have been $(884,730.70).

c. On March 13, 2003 a book transfer was executed transferring $100,000 from the Investors Trust to the Collection Trust[70]. After this transfer the balance on the Collection Trust account was $(106,179.55)[71]. Without this transfer the balance on the Collection Trust account would therefore have been $(206,179.55).

d. On March 14, 2003 a book transfer was executed transferring $150,000 from the Investors Trust to the Collection Trust[72]. After this transfer the balance on the Collection Trust account was $20,015.00[73]. Without this transfer the balance on the Collection Trust account would therefore have been $(129,985.00).

e. The total of these four book transfers from the Investors Trust account to the Collection Trust account was $725,000. Without these transfers the Collection Trust account would have run substantial negative balances on the following business days, as shown on the attached Exhibit 12-2:

| | | |
|---|---|---|
| i. | March 7 | $( 134,937.17); |
| ii. | March 10 | $( 281,576.51); |
| iii. | March 11 | $(1,109,730.70); |
| iv. | March 12 | $( 552,177.34); |
| v. | March 13 | $( 681,179.55); |
| vi. | March 14 | $( 704,985.00). |

33. Later in March 2003, once sufficient borrower payments had been received by the Collection Trust, USACM made two transfers back

[67] USACM Collection Trust Bank Statement, March 31, 2003. WF000848.
[68] Wire Transfer Confirmation. 764-0341.
[69] USACM Collection Trust Bank Statement, March 31, 2003. WF000848.
[70] Wire Transfer Confirmation. 764-0348.
[71] USACM Collection Trust Bank Statement, March 31, 2003. WF000848.
[72] Wire Transfer Confirmation. 764-0345.
[73] USACM Collection Trust Bank Statement, March 31, 2003. WF000848.

to the Investors Trust account from the Collection Trust account, rather than making the appropriate payments to the investors:

a. On March 17, 2003 a book transfer was executed transferring $500,000 back from the Collection Trust to the Investors Trust[74].

b. On March 18, 2003 a book transfer was executed transferring $225,000 back from the Collection Trust to the Investors Trust[75].

c. The total of these two book transfers from the Collection Trust account to the Investors Trust account was $725,000, thereby repaying the funds wrongfully transferred from the Investors Trust account.

34. Without WFB's wrongful provision of transfers between the trust accounts, the Collection Trust account would have run ongoing, substantial negative balances, as described above. If WFB had not processed these March 2003 transfers between the trust accounts nor permitted the Collection Trust account to be overdrawn, the 419 checks totaling $1,853,612.21[76] paid through the ACH system on March 7, 2003[77] could not have been processed on that date. As shown on the attached Exhibit 12-3, sufficient funds to cover this ACH transaction would not have been present in the account until March 14, 2003, thereby creating a delay of seven days in the processing of these payments.

35. Alternatively, even if some portion of these checks had been processed through creating a smaller ACH transaction, then some combination of the remaining checks included in the March 7, 2003 ACH batch and the other 536 checks totaling $1,652,310.77 paid through the Collection Trust account between March 7 and March 13, 2003 could not have been processed until a later date or could have been returned for insufficient funds.

<u>January 2004</u>

36. In January 2004 USACM made two transfers from the Investors Trust account to the Collection Trust account:

[74] Wire Transfer Confirmation. 783-1200.
[75] Wire Transfer Confirmation. 764-0415.
[76] Norwest Automated Clearinghouse, Operations File Detail, March 7, 2003. Wells03363-75.
[77] USACM Collection Trust Bank Statement, March 31, 2003. WF000836.

a. On January 9, 2004 a book transfer was executed transferring $500,000 from the Investors Trust to the Collection Trust[78]. After this transfer the balance on the Collection Trust account was $478,511.96[79]. Without this transfer the balance on the Collection Trust account would therefore have been $(21,488.04).

b. Also on January 9, 2004 a book transfer was executed transferring $200,000 from the Investors Trust to the Collection Trust[80]. Without these two transfers the balance on the Collection Trust account would therefore have been $(221,488.04).

c. The total of these two book transfers from the Investors Trust account to the Collection Trust account was $700,000. Without these transfers, the Collection Trust account would have run ongoing, substantial negative balances on the following business days, as shown on the attached Exhibit 13-2:

i. January 9 $(221,488.04);
ii. January 12 $(109,025.61);
iii. January 13 $(553,456.55);
iv. January 14 $(507,570.19).

37. Later in January 2004, once sufficient borrower payments had been received by the Collection Trust (along with $1.5 million looted from DTDF and deposited in the Collection Trust on January 15, as described above), USACM made two transfers back to the Investors Trust account from the Collection Trust account, rather than making the appropriate payments to the investors:

a. On January 19, 2004 a book transfer was executed transferring $350,000 back from the Collection Trust to the Investors Trust[81].

b. On January 21, 2004 a book transfer was executed transferring $350,000 back from the Collection Trust to the Investors Trust[82].

c. The total of these two book transfers from the Collection Trust account to the Investors Trust account was $700,000, thereby repaying the wrongful short-term borrowings from the Investors Trust account.

---

[78] Wire Transfer Confirmation. 814-1826.
[79] USACM Collection Trust Bank Statement, January 31, 2004. WF001010.
[80] Wire Transfer Confirmation. 814-1825.
[81] Wire Transfer Confirmation. 814-1824.
[82] Wire Transfer Confirmation. 814-1822.

38. Without WFB's wrongful provision of transfers between the trust accounts, the Collection Trust account would have run ongoing, substantial negative balances, as described above. If WFB had not processed these January 2004 transfers between the trust accounts nor permitted the Collection Trust account to be overdrawn, the 925 checks totaling $3,242,747.79[83] paid through the ACH system on January 9, 2004[84] could not have been processed on that date. As shown on the attached Exhibit 13-3, sufficient funds to cover this ACH transaction would not have been present in the account until January 15, 2004, thereby creating a delay of six days in the processing of these payments.

39. Alternatively, if some portion of these checks had been processed through creating a smaller ACH transaction, then some combination of the remaining checks included in the January 9, 2004 ACH batch and the other 635 checks totaling $2,347,729.40 paid through the Collection Trust account between January 9 and January 14, 2004 could not have been processed until a later date or could have been returned for insufficient funds.

<u>July 2005</u>

40. In July 2005 USACM made four transfers from the Investors Trust account to the Collection Trust account:

a. On July 7, 2005 a book transfer was executed transferring $2,000,000 from the Investors Trust to the Collection Trust[85]. After this transfer the balance on the Collection Trust account was $447,627.20[86]. Without this transfer the balance on the Collection Trust account would therefore have been $(1,552,372.80).

b. On July 8, 2005 a book transfer was executed transferring $1,000,000 from the Investors Trust to the Collection Trust[87]. After this transfer the balance on the Collection Trust account was $3,053,953.86[88]. Without these two transfers the balance on the Collection Trust account would therefore have been $53,953.86.

[83] Norwest Automated Clearinghouse, Operations File Detail, January 8, 2004. Wells03660-94.
[84] USACM Collection Trust Bank Statement, January 31, 2004. WF000998.
[85] Wire Transfer Confirmation. 808-1566.
[86] USACM Collection Trust Bank Statement, July 31, 2005. WF001312.
[87] Wire Transfer Confirmation. 853-1532.
[88] USACM Collection Trust Bank Statement, July 31, 2005. WF001312.

c. On July 18, 2005 a book transfer was executed transferring $2,000,000 from the Investors Trust to the Collection Trust[89]. After this transfer the balance on the Collection Trust account was $143,441.83[90]. Without this transfer the balance on the Collection Trust account would therefore have been $(1,856,558.17).

d. On July 20, 2005 a book transfer was executed transferring $2,000,000 from the Investors Trust to the Collection Trust[91]. At close of business on the day before this transfer the balance on the Collection Trust account was $(1,689,481.60)[92].

e. The total of these four book transfers from the Investors Trust account to the Collection Trust account was $7,000,000. Without these transfers, the Collection Trust account would have run substantial negative balances on the following business days, as shown on the attached Exhibit 14-2:

| | | |
|---|---|---|
| i. | July 7 | $(1,552,372.80); |
| ii. | July 11 | $(2,394,065.95); |
| iii. | July 12 | $(2,142,673.47); |
| iv. | July 13 | $(1,823,318.02); |
| v. | July 14 | $(2,377,886.99); |
| vi. | July 15 | $(3,560,456.24); |
| vii. | July 18 | $(4,856,558.17); |
| viii. | July 19 | $(6,689,481.60). |

41. Later in July 2005, once sufficient borrower payments had been received by the Collection Trust, USACM made a transfer back to the Investors Trust account from the Collection Trust account, rather than making the appropriate payments to the investors:

a. On July 21, 2005 a book transfer was executed transferring $7,000,000 back from the Collection Trust to the Investors Trust[93].

b. This repaid the funds wrongfully transferred from the Investors Trust account earlier in July.

42. Without WFB's wrongful provision of transfers between the trust accounts, the Collection Trust account would have run ongoing, substantial negative balances, as described above. If WFB had not

[89] Wire Transfer Confirmation. 853-0607.
[90] USACM Collection Trust Bank Statement, July 31, 2005. WF001313.
[91] Wire Transfer Confirmation. 853-0595.
[92] USACM Collection Trust Bank Statement, July 31, 2005. WF001313.
[93] Wire Transfer Confirmation. 853-0579.

processed these July 2005 transfers between the trust accounts nor permitted the Collection Trust account to be overdrawn, the 1,522 checks totaling $9,993,460.98[94] paid through the ACH system on July 7, 2005[95] could not have been processed on that date. As shown in the attached Exhibit 14-3, sufficient funds to cover this ACH transaction would not have been present in the account until July 20, 2005, thereby creating a delay of thirteen days in the processing of these payments.

43. Alternatively, even if some portion of these checks had been processed through creating a smaller ACH transaction, then some combination of the remaining checks included in the July 7, 2005 ACH batch and the other 991 checks totaling $6,889,205.91 paid through the Collection Trust account between July 7 and July 19, 2005 could not have been processed until a later date or could have been returned for insufficient funds.

44. As demonstrated above, there were, in the aggregate, thousands of checks and payments that could have been rejected for insufficient funds absent the wrongful transfers from the Investors Trust account to the Collection Trust account.

<u>Negative Balances in the Collection Trust Account</u>

45. The Collection Trust account was supposed to function as a conduit for payments received from borrowers on loans being serviced by USACM.

46. When borrowers made interest and/or principal payments on those loans, USACM was supposed to forward those payments, net of its servicing fees, to the investors who had an interest in those loans.

47. USACM had no obligation to make any payments to the investors unless a payment had been received from a borrower. As a result, there should never have been a negative balance on the Collection Trust account[96].

48. Despite this, and the transfers discussed above from the Investors Trust account to cover cash shortfalls in the Collection Trust account, there were several occasions when the Collection Trust's

[94] Norwest Automated Clearinghouse, Operations File Detail, July 7, 2005. Wells04487-565.
[95] USACM Collection Trust Bank Statement, July 31, 2005. WF001299.
[96] Similarly, there should never have been a negative balance on the Investors Trust account as the Investors Trust account was supposed to function as a conduit for monies received from investors to fund loans originated by USACM.

bank statement reflected a negative balance on the account, as shown on the attached Exhibit 15.

49. A review of the bank statements reflects the following:

a. On April 3, 2000 the closing balance on the account was $(578,176.36)[97]. This resulted from the processing of an ACH transaction totaling $1,068,670.35 on that day and was covered by deposits on April 4, 2000 totaling $6,550,713.29[98].

b. On July 5, 2000 the closing balance on the account was $(25,409.72)[99]. This resulted from the processing of an ACH transaction totaling $385,678.05 on that day and was covered by deposits on July 6, 2000 totaling $165,435.44[100].

c. Between March 10, 2003 and March 13, 2003 the closing balance on the account was negative with the overdrawn status of the account reaching a high of $(634,730.70) on March 11, 2003[101]. Between March 11 and March 13, 2003 a total of $500,000 was transferred from the Investors Trust to cover this shortfall in the Collection Trust.

d. On April 14, 2003 the closing balance on the account was $(690,480.58)[102]. This negative balance resulted from a transfer from the Collection Trust account to the overnight investment account in excess of the available balance and was covered by the return of those funds to the account the next day[103].

e. On February 14, 2005 the closing balance on the account was $(516,166.55)[104]. This negative balance resulted from the payment of 340 checks totaling $849,712.07 on February 14, 2005[105]. The negative balance was covered by the receipt of a $525,000 wire transfer on February 15, 2005 from USAIP[106].

---

[97] USACM Collection Trust Bank Statement, April 30, 2000. WF000539.
[98] USACM Collection Trust Bank Statement, April 30, 2000. WF000533-34.
[99] USACM Collection Trust Bank Statement, July 31, 2000. WF000558.
[100] USACM Collection Trust Bank Statement, July 31, 2000. WF000552-53.
[101] USACM Collection Trust Bank Statement, March 31, 2003. WF000848.
[102] USACM Collection Trust Bank Statement, April 30, 2003. WF000861.
[103] USACM Collection Trust Bank Statement, April 30, 2003. WF000850-52.
[104] USACM Collection Trust Bank Statement, February 28, 2005. WF001224.
[105] USACM Collection Trust Bank Statement, February 28, 2005. WF001211-24.
[106] USACM Collection Trust Bank Statement, February 28, 2005. WF001209.

f. On February 16, 2005 the closing balance on the account was \$(163,426.18)[107]. This negative balance was covered by deposits of 1,923,947.35 on February 17, 2005 followed by a \$498,000 wire transfer from the Investors Trust account on February 18, 2005[108].

g. On July 15, 2005 the closing balance on the account was \$(560,456.24)[109]. On July 18, 2005 \$2 million was transferred from the Investors Trust to cover this negative balance[110].

h. On July 19, 2005 the closing balance on the account was \$(1,689,481.60)[111]. On July 20, 2005 \$2 million was transferred from the Investors Trust to cover this negative balance[112].

i. On October 18, 2005 the closing balance on the account was \$(182,607.28)[113]. This negative balance was covered by the receipt of eight wire transfers from title companies totaling \$19,845,819.84 on October 19, 2005[114].

50. If WFB had not permitted the Collection Trust account to be overdrawn, a significant number of checks drawn on that account could not have been honored on the date that they were presented for payment.

51. The extent of the cash shortfalls in the Collection Trust were actually far greater than was reflected on the bank statements. This was because USACM, at the direction of the Culpable Insiders, was holding checks payable to DTDF and not remitting those payments to DTDF. Even after the \$11.425 million January 2003 circular transaction, which effectively extinguished the balance of unremitted funds due to DTDF as of December 31, 2002, there continued to be shortfalls in the Collection Trust account. As a result, the Culpable Insiders caused further collected amounts not to be remitted to DTDF. The impact of these unremitted amounts on the reported balance on the Collection Trust account is summarized in the attached Exhibit 16. For example, as of November 30, 2003, the balance of payments not remitted to DTDF totaled \$9,376,315.97. If these funds were remitted to

---

107 USACM Collection Trust Bank Statement, February 28, 2005. WF001224.
108 USACM Collection Trust Bank Statement, February 28, 2005. WF001208-10.
109 USACM Collection Trust Bank Statement, July 31, 2005. WF001313.
110 USACM Collection Trust Bank Statement, July 31, 2005. WF001298.
111 USACM Collection Trust Bank Statement, July 31, 2005. WF001313.
112 USACM Collection Trust Bank Statement, July 31, 2005. WF001298.
113 USACM Collection Trust Bank Statement, October 31, 2005. WF001369.
114 USACM Collection Trust Bank Statement, October 31, 2005. WF001353-54.

DTDF, the Collection Trust account would have been overdrawn in the amount of $(6,098,704.93).

## E. The Damages Suffered by DTDF

1. The damages suffered by DTDF have been calculated based on the services provided by WFB to USACM, 10-90 and Mountain Vista being discontinued as of various dates. But for the substantial assistance of WFB, the Culpable Insiders could not have continued and concealed the fraud being perpetrated against DTDF.

2. The damages suffered by DTDF due to the misappropriation of DTDF's monies by the Culpable Insiders have been quantified in six main categories: (1) the 10-90 loan; (2) funds received by the Collection Trust but not remitted to DTDF; (3) the Epic/Tree Moss loan; (4) the amounts advanced to Colt Gateway; (5) other purported loans to Colt; and (6) amounts due to DTDF from USAIP. Each of these is discussed in more detail below and shown on the attached Exhibit 1.

<u>The 10-90 Loan</u>

3. As discussed above, the purported 10-90 loan is the most egregious example of the looting of DTDF's assets by the Culpable Insiders. This was not a loan at all, but rather a device designed by the Culpable Insiders to loot DTDF and fraudulently fund their personal investment vehicle USAIP and the entities in which it had an equity interest, as well as to make payments of obligations of other third parties connected to USAIP.

4. This is clearly demonstrated by the following facts concerning the loan and 10-90:

   a. The initial funding of this purported loan in April 2002 occurred some eight months prior to there being a 10-90 entity;

   b. After 10-90 was formed in December 2002 it conducted no business and served only as a conduit through which DTDF's funds were passed to USAIP and its related entities;

   c. 10-90 did not have a bank account until one was opened at the Temecula, California branch of WFB in March 2003, some eleven months after the first funding of this purported loan;

d. After the opening of this bank account, over the course of a twenty-one month period a series of forty-four wire transfers were made from DTDF's bank account at Nevada State Bank to 10-90's account at WFB. These funds were almost immediately wired on via Mountain Vista, another sham entity, to USAIP or, in one instance, to the Collection Trust;

e. There was no consideration provided or legal documents relative to the advances made by DTDF until a promissory note was executed in August 2004. This promissory note was backdated to April 12, 2002; and

f. These funds were never repaid to DTDF.

5. The amount of damages suffered by DTDF with respect to the 10-90 loan have been categorized as falling into two subsets: (1) the indirect transfers to the Collection Trust, USAIP, entities in which USAIP had an equity interest and entities connected to USAIP through the 10-90 and Mountain Vista accounts at WFB; and, (2) the direct transfers to those entities.

<u>Indirect Transfers</u>

6. The indirect transfers totaling $23,328,000 have been discussed in an earlier section of this report and are summarized in the attached Exhibit 4.

<u>Direct Transfers</u>

7. Commencing in April 2002 there were a series of wire transfers from DTDF to the Investors Trust, to USAIP, or to various entities connected with USAIP.

8. As shown on the attached Exhibit 3, between April 2002 and February 2005 these wire transfers totaled $31,725,253.

9. Included within this total is the $11,425,000 circular transfer in January 2003 to the Investors Trust and on to the Collection Trust. This has been included in this category of damages because it was funded by $11.425 million of DTDF's funds which were recorded as a part of the 10-90 loan. These damages are not included in any other category of damages.

10. Although the advances of DTDF's funds were purportedly a loan, the 10-90 transactions were nothing more than a mechanism by

which the Culpable Insiders looted DTDF. However, even if it is considered to be a loan, it violated a number of the restrictions placed on the loans that could be made by DTDF in its governing documents. Among these was the prohibition against DTDF making loans to affiliates of USACRA. These transfers were therefore all prohibited transactions and constituted a fraud on DTDF and its members.

Offset for HMA Recovery

11. As shown on Exhibits 3 and 4, one of the entities to which monies were diverted through the direct and indirect transfers was HMA Sales, LLC. ("HMA"). HMA was an entity in which USAIP had an equity interest.

12. Credit has been given in the calculation of the amount of damages suffered by DTDF for an allocation of the recovery obtained from HMA. The calculation of this credit is detailed in the attached Exhibits 3 and 4.

13. The total 10-90 related damages suffered by DTDF as a result of the direct and indirect transfers, net of the credit relating to HMA, are shown on the attached Exhibit 2 and ranged between $1,275,000 and $46,153,253 .

Unremitted Collections from Borrowers

14. As discussed above, one of the devices used by the Culpable Insiders to cover shortfalls in the Collection Trust resulting from the fraud was to use payments received from borrowers that were due to DTDF to pay amounts to other investors.

15. As of the date of the DTDF and USACM bankruptcies, the aggregate outstanding amount of unremitted interest and principal payments totaled $18,912,734 for which the Collections Trust account lacked sufficient funds remaining to pay DTDF.

16. As shown on the attached Exhibit 6, these checks relate to funds received from borrowers at various times during 2004. I have verified that funds were in fact received by the Collection Trust from these borrowers and that the payment due to DTDF was not made.

Amounts advanced to Colt Gateway

17. The Culpable Insiders caused DTDF to enter into three transactions with Colt Gateway, LLC ("Colt") in which USAIP had a 50% interest.

18. As with some of the other transactions discussed above, DTDF's advances to Colt contravened the prohibitions on loans to affiliates of USACRA under DTDF's governing documents. As such, these loans constituted a fraud against DTDF and its members.

Colt Gateway Loan

19. On January16, 2003 DTDF funded $1.35 million out of a total amount funded of $5.7 million pursuant to a loan agreement dated December 22, 2002[115]. The remaining $4.35 million was funded by Fertitta Enterprises, Inc. ("Fertitta") and USACM.

20. In February 2003 DTDF purchased $350,000 of USACM's interest in this loan, thereby bringing its interest in the loan up to $1.7 million.

21. In July 2003 the total amount of the loan was increased by $3 million from $5.7 million to $8.7 million[116]. DTDF funded $1 million of this increase bringing its total interest in the loan to $2.7 million[117].

22. In August 2003 USACM assigned its remaining $1 million interest in the loan to DTDF[118], bringing DTDF's interest up to $3.7 million.

Other Purported Loans

23. On July 10, 2003 DTDF funded a second purported loan to Colt (the "Colt DIV Loan") in the amount of $1.5 million[119].

24. In April 2004 DTDF made three additional advances on the Colt DIV loan bringing the total amount funded to $4.6 million[120]. Two

[115] Loan Agreement dated December 22, 2002, Exhibit A. USACM006122.
[116] First Amendment to Loan Documents. USACM 006078.
[117] First Amendment to Loan Documents, Exhibit A. USACM 006081.
[118] Assignment of Beneficial Interest in Deed of Trust, dated August 18, 2003. USACM006194.
[119] Promissory Note dated July 10, 2003. USAB025418.

of these advances were made directly by DTDF and the third was made by the Investors Trust on behalf of DTDF.

25. On September 26, 2003 DTDF funded a third purported loan to Colt (the "CREC Loan") in the amount of $3,718,777.18[121].

26. As of the date of USACM's bankruptcy the total amount outstanding on these loans due to DTDF was approximately $10.8 million.

27. The Colt DIV and CREC loans were not documented and there was no collateral for the advances made by DTDF. This constituted a violation of the restrictions on the loans that could be made by DTDF, as well as these advances being prohibited as they were to an affiliate of USACRA. As such these advances constituted a fraud upon DTDF and its members.

28. The damages suffered by DTDF in connection with these purported loans to Colt are summarized in the attached Exhibit 7.

<u>Epic / Tree Moss Loan</u>

29. On or about June 26, 2000 the Culpable Insiders caused DTDF to enter into an $11.5 million Loan Agreement with Epic Resorts – Palm Springs Marquis Villa, LLC ("Epic") for the purpose of providing Epic with general working capital[122]. Epic was wholly owned by Epic Resorts, LLC[123].

30. Epic owned and operated a 101 unit timeshare resort located in Palm Springs, California ("Marquis Villas") situated on land leased from the Bureau of Indian Affairs ("BIA")[124].

31. The loan was secured by substantially all of Epic's assets, including ground leasing rights from the BIA and its interest in sixty-six unsold fully built condominium units. The loan was also personally guaranteed by Epic's President, Thomas F. Flatley ("Flatley")[125].

---

[120] First Amendment to Loan Documents; Money Transfer Detail Reports. USA0005350, USA0005357; Wire Detail Report. USA0005353.
[121] Promissory Note dated September 26, 2003; Wire Transfer Entry Review, September 26, 2003. USA0005312-14; DTDF September 30, 2003 Bank Statement. USA0005315.
[122] Loan Agreement, dated as of June 26, 2000, between Epic Resorts – Palm Springs Marquis Villas, LLC and USA Capital Diversified Trust Deed Fund. USAB025687-713.
[123] Bankruptcy Court Opinion – Case No. 01-2458 dated February 27, 2003. Pages 3-4.
[124] Bankruptcy Court Opinion – Case No. 01-2458 dated February 27, 2003. Page 3.
[125] Limited Guaranty, dated June 26, 2000. USACM000998-1005.

32. In April 2001, as a result of Epic's failure to comply with certain established debt provisions, it was advised by DTDF of its default under the loan[126].

33. During August 2001, after exhausting approximately $1.5 million in cash reserves established under the loan, Epic failed to make certain ongoing payments due to DTDF[127].

34. On November 9, 2001, involuntary bankruptcy proceedings against Epic and its parent company commenced resulting from petitions against the consolidated entity by other outside creditors[128].

35. As of April 30, 2002 outstanding obligations due to DTDF totaled approximately $13,804.834. In connection with the Epic bankruptcy proceedings, on or around that date, DTDF and one of Epic's other creditors stipulated to the value of the loan collateral being $14,019,525[129].

36. The stipulated value was supported by a February 12, 2002 valuation prepared in connection with Epic's bankruptcy proceedings[130].

37. Beginning July 15, 2002, at the direction of the Culpable Insiders, DTDF began making additional advances to Epic to cover certain working capital requirements including but not limited to legal expenses, BIA land leasing fees, and taxes.

38. On or about June 26, 2003, the Epic bankruptcy court entered an order approving the assignment of Epic's collateral in favor of DTDF[131].

39. At the direction of the Culpable Insiders, DTDF executed a Quit-Claim Deed dated September 15, 2003 to transfer its rights to Epic's collateral under the loan to Tree Moss Partners, LLC ("Tree Moss"), an entity wholly-owned by USAIP[132]. DTDF received no consideration in exchange for the execution of the Quit Claim

[126] Bankruptcy Court Opinion – Case No. 01-2458 dated February 27, 2003. Pages 4-5.
[127] Ibid. Page 5.
[128] Ibid. Page 5.
[129] Ibid. Pages 5-6.
[130] Valuation Report of Resort Capital Advisors, Inc dated February 12, 2002.
[131] Agreement between Tree Moss and DTDF (undated and unsigned).
[132] Operating Agreement of Tree Moss Partners, LLC. USAB025550-89.

Deed. The Quit-Claim Deed was not recorded until February 23, 2006[133].

40. At the direction of the Culpable Insiders, DTDF continued to make cash advances to, or on behalf of, Tree Moss through May 13, 2005.

41. DTDF received certain payments from Tree Moss during the period October 2005 through March 2006.

42. On December 7, 2006, DTDF filed an involuntary Chapter 7 petition against Tree Moss demanding restitution.

43. In connection with the Tree Moss bankruptcy proceedings, in March 2008 the Tree Moss Trustee attempted to sell its interest in the Marquis Villa property[134]. A purchase agreement was reached for $9 million[135], but the sale did not take place.

44. It is my understanding that, as of the date of this report, the property has not been sold. Included within DTDF's damages is the diminution in the value of the property, calculated as the difference between the April 2002 stipulated value of $14 million and the March 2008 agreed-upon sales price of $9 million.

45. The execution of the Quit Claim and the continuing use of DTDF's monies to support the working capital needs of the Epic properties, constituted a misappropriation of DTDF's assets by the Culpable Insiders. The damages suffered by DTDF as a result of the fraud perpetrated on it by the Culpable Insiders are shown on the attached Exhibit 8. These damages are net of the payments received from Tree Moss and the payments made to DTDF by Flatley.

<u>Other</u>

46. In addition to the amounts described above, the Culpable Insiders caused DTDF to advance certain funds that were reflected on DTDF's balance sheet as being an account receivable from USAIP.

[133] Quit-Claim Deed to Tree Moss Partners, LLC. September 15, 2003. 55-0447 through 55-0448.
[134] Chapter 11 Trustee's Second Statement Pursuant to 11 U.S.C. Section 1106(a)(3) and (4) – Case No. 07-11821-LBR dated May 8, 2008. Page 12..
[135] Purchase and Sale Agreement between Tree Moss Partners, LLC and Diamond Resorts Corporation.

47. The amount of damages suffered by DTDF USAIP on this account was $170,000[136].

48. Absent the fraud perpetrated by the Culpable Insiders, these amounts would not have been advanced by DTDF. Similar to the other transactions discussed above, no consideration was given, there were no legal documents relative to this advance, and even if the transfer was made pursuant to a loan document, such a transfer would have contravened the prohibitions on loans to affiliates of USACRA under DTDF's governing documents.

Summary

1. As shown on the attached Exhibit 1, the damages suffered by DTDF range from $3,823,159 to $82,329,443 depending on what point in time it is assumed that WFB would have ceased to provide services to USACM, 10-90 and Mountain Vista.

2. The amounts shown on Exhibit 1 are premised on the assumption that had WFB ceased to provide services to USACM, 10-90 and Mountain Vista as of the dates shown, the subsequent damages discussed above would have been avoided by DTDF.

Executed in San Francisco, California on September 30, 2009

Colin A. Johns, CPA, CFF, CFE, CA

[136] DTDF Balance Sheet, February 28, 2006. 774-0558 through 774-0560.