# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC<br>Plaintiff<br>VS.<br>WELLS FARGO BANK, N.A.<br>Defendant | Adversary No. 08-01135<br>**EXPERT REPORT OF DR. ANDREW SAFIR** |

I, Dr. ANDREW SAFIR, declare that this Report is based upon my personal knowledge. If called as a witness, I could competently testify to the following:

**Professional Experience**

1. I am the President of Recon Research Corporation, an economic consulting firm that I founded in 1980. I hold a Ph.D. in Economics from Tufts University, a Master's degree in Economics from Tufts University, and a BA degree in Psychology and Economics from the University of Colorado.

2. Prior to the founding of Recon Research, I held a variety of positions with the Federal and California governments. In 1972, I was appointed as a staff member to the President's Council of Economic Advisers, and in mid-1973 joined the White House Council on International Economic Policy. In 1974, I moved to the Department of Justice, where I served as the senior economic advisor to the Office of Justice Policy, Planning, and Research. In 1975, I was appointed as the Assistant Director of the Office of International Energy Policy at the U.S. Treasury. I left this position in 1978 to join the Administration of

Governor Edmund G. Brown, Jr., as the Chief Business Economist for the State of California. However, I remained an advisor to the U.S. General Accounting Office specializing in energy, international finance, and national security issues throughout much of the 1980s.

3. As California's Chief Business Economist, and as President of Recon Research, I have had extensive experience in constructing, utilizing and analyzing complex damage analyses, and reviewing the work of other analysts. I have also testified extensively both in regulatory proceedings and in court regarding the appropriate financial and accounting techniques to utilize in constructing economically reasonable damage models, and the standards of statistical reliability such models should exhibit.

4. A list of my participation in court proceedings, arbitrations and regulatory hearings over the past four years is provided in Exhibit 1.

## Assignment

5. I was asked by Defendant's counsel to review and comment on the Expert Report of Mr. Colin A. Johns. In his Report, Mr. Johns provided a range of what he termed "damages" sustained by USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), resulting from the provision of services by Wells Fargo Bank, N.A. ("Wells Fargo") to USA Commercial Mortgage Company ("USACM"), 10-90, Inc. ("10-90"), and Mountain Vista, Inc. ("Mountain Vista"), which Mr. Johns argues aided in the fraudulent activity by Joe Milanowski and Thomas Hantges.[1] Mr. Johns includes in his calculations all monies that, in his opinion, are not legitimate loans and advances, and which were not paid back.

6. In conducting my analysis and forming my opinions, I have examined and relied upon the operative complaint, material provided by counsel, my independent research,

---

[1] *Expert Report of Colin A. Johns, CPA, CFF, CFE, CA,* at p. 2.

the Expert Report of Mr. Colin A. Johns and the deposition of Mr. Johns taken on November 6, 2009. I have also relied upon my economic training and experience, a summary of which has been provided in Paragraphs 1–3 above and Exhibit 1, as well as upon discussions with Defendant's counsel.

7. My analysis and opinions are based on the information I have received and the work I have performed to date. As discovery of the facts in this matter is on-going, I may have the opportunity to review additional relevant material and to supplement or modify this report as appropriate on that basis. Any new information that affects the report or testimony provided by Mr. Johns may be highly relevant to my analysis and may occasion a revision or supplement to my report.

**Opinions To Be Provided**

8. The damage calculations provided by Mr. Johns are constructed in an economically unreasonable manner and result in an overstatement of any losses DTDF may have sustained. In particular, Mr. Johns failed to perform a 'but-for' analysis. Such an approach is required where the proper measure of damage is the difference between what did happen and what would have happened absent the actions of the defendant. In this instance, a "but-for" analysis requires determining what DTDF would have earned had Wells Fargo not provided banking services to USACM, 10-90, and Mountain Vista, and then subtracting from that what was actually earned. Mr. Johns did not perform any such analysis.

9. Mr. Johns did not incorporate any factor in his damage calculations to account for the riskiness of the DTDF portfolio. He did not attempt to estimate the riskiness of DTDF's legitimate loans, much less take into account the effects of such risk. Considering the performance of the real estate markets in which DTDF invested, this omission by Mr. Johns results in loss estimates that are overstated.

10. In addition, Mr. Johns included in his damages amounts from transactions that did not involve a Wells Fargo account. These transactions would have occurred regardless of Wells Fargo's provision of banking services. As such, the losses from these transactions are not correctly included in a proper "but-for" analysis.

11. Finally, even if Mr. Johns' damage theory is correct (which it is not), it overstates losses by not mitigating for future recoveries. Not only does DTDF expect to receive additional monies directly through settlements previously negotiated, but it will also receive a share of those which may be negotiated by the USACM Liquidating Trust.[2] Despite having this information, Mr. Johns netted out only those recoveries actually received in calculating the damages due DTDF.

**Background**

12. Mr. Johns was retained by the Plaintiffs in this case to estimate the loss to DTDF that allegedly resulted from the provision of services by Wells Fargo. In order to arrive at this estimate, Mr. Johns assumed that any loans or advances made by DTDF that did not fit the standards of DTDF's prospectus for a "legitimate" loan or advance, would not have occurred had Wells Fargo not provided banking services to USACM, 10-90, and Mountain Vista. Mr. Johns' economic theory was that if Wells Fargo had not provided the banking services, "the fraud would have come to light, and actions, whatever they might be, would have taken place that would have prevented the damages suffered from DTDF from

[2] As part of the settlement agreement, USACM Liquidating Trust "shall pay to DTDF, when received, a percentage of gross recoveries on litigation commenced by the Trust after this date...as follows: 50% of the first $20,000,000, and 35% of all recoveries thereafter." Settlement Agreement Letter from Rob Charles of Lewis and Roca LLP to Jeffery D. Hermann, Esq. Re: USACM Liquidating Trust – USA Capital Diversified Trust Deed Fund, dated March 13, 2008. As posted on the DTDF Information Web Page at http://usacapdtdf.bmcgroup.com, last accessed December 11, 2009.

that point forward being incurred."[3] This is an improper standard on which to base a damage calculation.

13. In the first instance, Mr. Johns' approach requires the assumptions that (a) the provision of banking services was causal to the damages sustained, and (b) no party other than Wells Fargo would have been able or willing to provide banking services to USACM, 10-90, or Mountain Vista, had Wells Fargo chosen not to do so. The logic flaw here is that if another bank had decided to provide its services to DTDF, and the provision of those services was causal, the damages would have occurred with or without the involvement of Wells Fargo. While Mr. Johns bases his theory on the assumption that no other bank would have provided banking services to USACM, et al., had Wells Fargo refused to do so, he provides no evidence for that assumption. In fact, he has not even considered the issue.

14. Second, assuming that Wells Fargo was a causal factor in events and that no other bank would have provided comparable banking services, Mr. Johns has failed to determine and use as an offset to his calculated loss the amounts that DTDF might have lost in the normal course of its business, that is, had it invested in accordance with the actual terms and conditions of its prospectus. Again, Mr. Johns did not even consider such an analysis.

15. Both these failings are the result of not employing a "but for" damage analysis. In this instance, these failings are fatal to the economic reasonableness of the loss estimate Mr. Johns has constructed.

**Mr. Johns Has Not Done a Proper 'But-For' Damage Calculation**

---

[3] See *Deposition of Colin A. Johns*, November 6, 2009, at 39:19-23.

16. The proper and most commonly accepted method for estimating damages from actions which should not have been undertaken in the normal course of business is a 'but-for' calculation. The aim of this sort of analysis is to determine what would make the Plaintiff as well off as this party would have been, "but for" the actions of the defendant. *The Handbook of Business Valuation and Intellectual Property Analysis* gives an overview of this method:[4]

> "Economic damages are usually calculated as the difference between (1) what a plaintiff business would have earned from its business operations *but for* the legal violations of the defendant and (2) what the plaintiff business actually did earn or will earn. Therefore, unlike the case in typical business valuation assignments, the damages analyst typically prepares at least two different damage analysis/valuation scenarios. One damage analysis quantifies what the affected business would be worth (or would earn) in a hypothetical world but for the legal violations. The second damage analysis quantifies what the affected business is worth (or will earn)–given the actual impact of the legal violations on the plaintiff's business."[5]

The difference between the two constitutes the economic loss.

17. A proper damage analysis would be one which calculated what it would take to make DTDF as well off as it would have been, but for Wells Fargo's provision of banking services to USACM, 10-90, and Mountain Vista. This requires an investigation of whether the services provided by Wells Fargo would have been provided by some other bank. This is an issue that would best be determined by a liability expert. However, it should be noted that, if banking services would have been provided by another bank had Wells Fargo refused to provide such services, then there would be no damages from Wells Fargo's actions. Wells Fargo's actions would have made no difference in the ultimate outcome, as USACM, 10-90, and Mountain Vista would all have simply banked elsewhere.

---

[4] See also the Reference Manual on Scientific Evidence put out by the Federal Judicial Institute for use by Federal Judges, at page 284: "The damages study restates the plaintiff's position "but for" the harmful event; this part is often called the but-for analysis. Damages are the difference between the but-for value and the actual value."

[5] Robert F. Reilly and Robert P. Schweihs, *The Handbook of Business Valuation and Intellectual Property Analysis* (McGraw-Hill: 2004) at p. 330

18. Even if Mr. Johns was asked to assume there was something unique about the provision of services of Wells Fargo, his damage analysis would still be deficient. As indicated above, Mr. Johns would still have to account for the normal losses that might have occurred in the DTDF portfolio had it "followed the rules" and only undertook investments in accordance with its corporate guidelines. Yet Mr. Johns himself recognized that he had not looked at this aspect in arriving at his damage calculation:[6]

> A. ...I include nothing here for the loss of use of funds or the earnings that DTDF could have made had they put this money into legitimate interest-earning investments.
>
> Q. Or in all likelihood reasonable probability would have made?
>
> A. That's right.
>
> Q. Not what they could have made, but within reasonable probability would have made?
>
> A. Exactly, and you could look at the portfolio as to what the return was on the legitimate side of the portfolio.
>
> Q. You have not done that?
>
> A. No. I have chosen to limit what I have included in damages just to the actual cash that went out, and I have not added to that any element for loss of use of those funds during the time after they were disbursed.

19. This is not simply a trivial and theoretical oversight: The whole purpose behind the DTDF and USACM portfolios was to offer their investors higher returns than they could receive in less risky investments. Consequently, the nature of the portfolio constructed in the normal course of business was one with a high probability of financial loss. For example, as Geoffrey L. Berman testified in his deposition, USACM was able to provide high returns because it was providing loans to risky projects:[7]

> Q. Why – I think the answer probably is self-evident, but would you agree that the reason that USA Commercial Mortgage was able to pay, as it advertised, historically higher rates of return than other lenders was because it made loans in riskier ventures?

---

[6] See *Deposition of Colin A. Johns*, November 6, 2009, at 107:1-18.

[7] See *Deposition of Geoffrey L. Berman*, November 10, 2009, at 64:23-66:3.

A. I think, as you said, that would generally be the way it works.

20. DTDF clearly had a high risk appetite as well. Even legitimate real estate investments made by DTDF often failed to pay off. Referring to DTDF investments in Homes for America, for example, Thomas J. Rondeau stated in deposition:[8]

> A. ...And in the case for Homes for America, I think they were going to build – Homes For America built housing for, I think, relatively low-income people or bought housing and refurbished it for relatively – and then when they had a couple of projects that were supposed to pay off there – I don't think they did. They were in Florida and Texas.
>
> I think the hurricanes that year had something to do with that. You know? Katrina did some damage. And there was another one Rita, and there was – even some other ones. I know they were hit. And they were hit by those, and then by '06, you know, or late '06, the market started getting soft. By '07 it was a disaster. So things didn't work out.

21. Despite the fact that loan losses were a normal occurrence in the Plaintiff's portfolio, Mr. Johns did not take into account any factor for risk-related losses in his damage calculation. Rather he assumed no offsets of any kind. A non conforming loan of $100 that went unpaid was included in his damage calculation at $100, even if $50 of this amount would have been lost had it been lent in the normal course of business. Moreover, Mr. Johns took this approach despite a clear understanding that a full recovery of legitimate loans was highly unlikely:[9]

> Q. You would agree, though, that even if legitimate loans had been made it would be unreasonable to assume that there would be 100 percent recovery on all legitimate loans, correct?
>
> A. That depends on whether you believe Mr. Milanowski's and Mr. Hantges' publicity in terms of USA Capital.[10]
>
> Q. Do you believe it?

---

[8] See *Deposition of Thomas J. Rondeau*, November 4, 2009, at 19:18-20:12.

[9] See *Deposition of Colin A. Johns*, November 6, 2009, 107:19-108:9.

[10] This remark refers to the marketing material used by USACM and DTDF that states that "since 1989 USA Capital has placed over 41 billion in trust deeds on behalf of clients, without ever losing a dime of investors' principal." (DTDF Marketing Material - 002-MISC-0366, as quoted in *Expert Report of Colin A. Johns, CPA, CFF, CFE, CA.* at p. 6)

A. I think what you would look at would be the portfolio as a whole, and there is going to be some kind of performance for the portfolio as a whole where you are likely in total to make money, but there are very few lenders that I am aware of that don't have any bad loans.

22. Again, this is not a trivial oversight. During the loss period cited by Mr. Johns, DTDF was legitimately making loans on real estate located in several U.S. metropolitan areas including Southern California, Scottsdale, AZ, Boca Raton and Orlando, FL, Houston, TX, Aurora, IL, Concord, MA, and New York. Most of these projects were either condominium or office complex developments. These legitimate loans were long term in nature (that is, they had time horizons of more than one or two years) and would have still been outstanding over the 2006-2009 time period. In the latter portion of this period, commercial real estate in the areas cited above declined in value, and many real estate development projects suffered substantial losses. Thus, even if the money used by DTDF for illegitimate loans had been used instead for legitimate purposes, a portion of these assets would have been lost.

23. DTDF warns investors of the potential for this type of market risk on the front page of its Prospectus dated June 2, 2003. It states that "[I]nvesting in our membership units involves a high degree of risk."[11] One of these risks is that DTDF will be "adversely affected...if the economic conditions deteriorate in regions where the properties securing the loans are located."[12] It later further states that "we run the risk that a weak real estate market will prevent the borrowers from refinancing or selling their properties and, as a result, repaying our loans."[13]

24. The Prospectus notes that, "[b]ecause our manager may not be as familiar with borrowers, properties and the local market conditions with respect to loans secured by

---

[11] USA Capital Diversified Trust Deed Fund, LLC, Prospectus, dated June 2, 2003 at 1. Exhibit 1, *Deposition of Victoria Loob,* July 31, 2009.

[12] DTDF Prospectus dated June 2, 2003, at p. 36.

[13] DTDF Prospectus dated June 2, 2003, at p. 39.

properties located outside Nevada, we may incur greater risk when loans are made to borrowers and when properties are located outside of Nevada."[14] Most of the developments that DTDF invested in were outside of Nevada.

25. The fact that even legitimate loans would have posted losses is clear from a general review of the real estate market over the 2006-2009 period. The most commonly used indicator of commercial real estate prices is Moody's/REAL Commercial Property Price Index ("CPPI").[15] The national CPPIs show that commercial real estate prices in the "Apartment," "Industrial," and "Office" industries saw gains until around 2007 and have been declining since then (see Chart 1 below).

**Chart 1**
**Moody's REAL CPPI - National**
**(1Q2001=1.00)**




*Source: Moody's REAL CPPI - National (downloaded from http://webmmit.edu/cre/researc/credl/rca.thml.*

---

[14] DTDF Prospectus dated June 2, 2003, at p. 40.

[15] Index data downloaded from http://web.mit.edu/cre/research/credl/rca.html. According to the index website, "The Moody's/REAL commercial property (CPPI) is a periodic same-property round-trip investment price index of the U.S. commercial investment property market based on data from MIT Center for Real Estate industry partner Real Capital Analytics, Inc (RCA)....The index is designed to track same-property realized round-trip price changes based purely on the documented prices in completed, contemporary property transactions. The index uses no appraisal valuations."

26. Using the above indices, one can calculate the current average rate of return for an investment that was made in the past. Chart 2 shows the rate of return as of June 2009 for investments made between the first quarter of 2001 and second quarter of 2009. Most of the loans made by DTDF appear to be made to companies developing either condominium complexes or office complexes. As seen in the chart, commercial real estate in the "Apartment" industry (including apartment buildings and condominium developments) purchased after the third quarter of 2004 would have sold for a lower price in June 2009 than at which it was purchased. In the "Office" industry, properties purchased after the second quarter 2005 would have sold for a lower price in June 2009 than the original purchase price.

**Chart 2**
**Moody's/REAL CPPI - National**
**Rate of Return as of June 2009 of Investment Made in Year Shown**




*Source: Recon Corporation calculations and Moody's REAL CPPI - National (downloaded from http://webmmit.edu/cre/researc/credl/rca.thml.*

27. David Fogg confirms that the market, at least in Southern California, where a number of DTDF properties were located, took a big hit. In describing various housing development projects in Southern California that he was involved in and that USACM

invested in, Mr. Fogg tells how several projects failed because the market "declined beyond belief."[16] He stated that the downturn of the real estate market in Southern California started, in his estimation, in the latter part of 2006.[17]

28. In describing how the real estate market has performed since 2006, Mr. Fogg states:[18]

> A. The market has gone down 80 to 90 percent. We have never seen anything like this in the real estate business. I've been through two or three downturns, and this one is off the charts. And we have banks that have failed that have been in business for – for years and years and years. And we see values of houses dropping in half, which we've never seen. And I could go on and on.

29. Southern California was not unique in this experience. As illustrated by the chart of the Moody's index above, commercial real estate values fell on a national level. Many of the loans funded by DTDF and USACM would have been negatively affected by the market downturn.

30. In fact, Robert Worthen, Chairman of the Board for DTDF, stated in a letter to investors that DTDF's loan portfolio had been hurt by the economy:

> "To make matters worse for DTDF investors, since the April 2006 bankruptcy filing, DTDF collateral and prospects for recovery have been rocked by the failing subprime mortgage industry, taking down many legitimate borrowers and eroding the value of virtually all underlying DTDF collateral."[19]

31. If anything, Mr. Worthen was soft peddling DTDF's legitimate loan loss problem. According to a summary of DTDF loan holdings posted on the DTDF Information

---

[16] See *Deposition of David Fogg*, March 11, 2009, at 153:25-154:1.

[17] See *Deposition of David Fogg*, March 11, 2009, at 280:15-23.

[18] See *Deposition of David Fogg*, March 11, 2009 at 281:24-282:6.

[19] Letter to DTDF Investors from Robert G. Worthen, Chairman of the Board,USA Capital DTDF, dated May 19, 2008. Posted on the DTDF Information Web Page at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.

Web Page, fewer than half of DTDF's legitimate loans were recorded as "Performing" as of December 31, 2006 .[20] As summarized in Table 1 below, only six were listed as being "Repaid" or "Performing" in the *Performance Evaluation* column. The other 7 were "Non-Performing" (except for one, the performance of which was somehow "unknown").[21]

**Table 1 - Summary of DTDF Legitimate Loans**

| Performance Evaluation | # loans | Note Amount | % DTDF Legitmate portfolio |
|---|---|---|---|
| Impaired or Non-performing | 6 | $ 3,297,449 | 27.9% |
| Performing or Repaid | 6 | $ 4,706,141 | 39.6% |
| Unknown | 1 | $ 3,857,968 | 32.5% |
| Total | 13 | $ 11,861,558 | 100% |

*Source: DTDF Loan Summary as of June 15, 2006, USA Capital Loan Summary as of July 31, 2006*

32. DTDF also states in its Prospectus dated June 2, 2002, that a large portion of its holdings were not performing as of the end of 2002:[22]

> "As of December 31, 2002, our loan portfolio contained seven loans of approximately $32.4 million that were either impaired or non-performing. These impaired or non-performing loans represented 33.5% of our total loan portfolio as of December 31, 2002. Although our management has not provided for an allowance for losses with respect to these loans and has determined that the underlying collateral is sufficient to recover the amounts due, there is no guarantee that the costs associated with enforcing our security interest with respect to a particular loan or foreclosing on the real property securing the loan will not have a material adverse effect on our results of operations or on our ability to make distributions to our members. During the year ended December 31, 2002, we incurred professional fees of $637,652 as a result of our impaired or non-performing loans."

---

[20] "USA Capital Loan Summary as of December 31, 2006," posted under "Past Loan Summary Reports:DTDF Loan Summary as of 12_31_06 on the DTDF Information Web Page at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009. Summary lists the data as being "provided by Mesirow."

[21] See Table A in Exhibit 2 for details on DTDF's loan holdings as of June 15, 2006.

[22] DTDF Prospectus dated June 2, 2003, at p. 38.

33. The loans held by the USA Capital companies as a whole did not perform well, either. A summary of all USA Capital loans showed that, excluding the loans in which DTDF was a participant, nearly 60% of the 92 loans listed were evaluated as being either "Maturity Default," "Interest Default," or "Non-Performing." Over half of those are in the "Non-Performing" category.[23]

34. If DTDF had used the money that went towards the allegedly fraudulent loans to invest in "legitimate" commercial real estate projects – one aspect of the "but for" scenario that Mr. Johns failed to investigate – it is likely that a good portion of those who would have suffered losses. Yet, Mr. Johns implicitly assumed that legitimate loans would have suffered no losses in the "but-for" world. This results in a clear overstatement of any damage amount.

**Mr. Johns Improperly Included Amounts That Never Touched a Wells Fargo Account.**

35. If Wells Fargo had nothing to do with a particular transaction, then that transaction would have occurred even but for Wells Fargo's provision of banking services. Therefore, losses from such a transaction should not be included in a proper and correct "but-for" damage analysis. In his calculation of losses, Mr. Johns includes amounts resulting from transactions that had nothing to do with Wells Fargo. He admitted to such in his deposition:[24]

> Q. In terms of the losses that you have included here, you have included losses even though Wells Fargo may not have been involved in the transactions, correct?

---

[23] "USA Capital Loan Summary as of September 30, 2006," as posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com (under *Past Loan Summary Reports*), accessed December 7, 2009. Out of 92 loans, 20 are classified as "Repaid," 15 as "Peforming," 14 as "Maturity Default," 8 as "Interest Default," 32 as "Non-Performing," 2 as "Special Situation," and 1 as "Not Funded."

[24] See *Deposition of Colin A. Johns*, November 6, 2009, at 26:20-27:2.

A. There may not be any specific involvement, and some of these I haven't tried to identify whether a Wells Fargo account was touched in some way by the transaction...

36. One example of such a "Wells-free loan" is the one from DTDF to Epic Resorts--Palm Springs Marquis Villa, LLC ("Epic") for development of a timeshare resort property. DTDF executed a quitclaim deed for Epic's collateral under this loan to Tree Moss Partners, LLC ("Tree Moss") for no consideration. Because of this, Mr. Johns included the diminution of the value of the Epic property in his loss calculations. He included that loss despite that fact that Wells Fargo had nothing directly to do with the Epic loan:[25]

Q. What role, if any, did Wells Fargo have with regard to that transaction?

A. Other than having continued to provide services up through the point in time where that fraudulent act took place and therefore helping or assisting the perpetuation of the fraud to that point in time, I am not saying they had any direct involvement.

37. He states that the fraudulent act associated with the Epic/Tree Moss loan was not the loan itself, but the transfer of the quitclaim from DTDF to Tree Moss without any consideration.[26] He goes on to say that Wells Fargo had nothing to do with this act:[27]

Q. Needless to say, to your knowledge, Wells Fargo had absolutely nothing to do with the transfer or quitclaim deed from DTDF to Tree Moss, correct?

A. Correct.

38. Another example is the advance of $170,000 from DTDF to USAIP. Mr. Johns describes this as "cash that was taken from DTDF and transferred to USAIP."[28] DTDF's operating account was with Nevada State Bank. USAIP's account was with Bank of

---

[25] See *Deposition of Colin A. Johns*, November 6, 2009, at 55:18-25.

[26] See *Deposition of Colin A. Johns*, November 6, 2009, at 128:6.

[27] See *Deposition of Colin A. Johns*, November 6, 2009, at 129:12-16.

[28] See *Deposition of Colin A. Johns*, November 6, 2009, at 32:14-15.

Commerce. As no Wells Fargo account was involved, this transaction would have happened regardless of Wells Fargo's provision of service, and so should not be included as a damages component.

39. Mr. Johns also includes in his loss calculations three advances on a loan to Colt Gateway, LLC, which he refers to as the "Colt DIV Loan." "Two of these advances were made directly by DTDF, " according to Mr. Johns' expert report.[29] Another Colt Gateway loan funded by DTDF, referred to as the "CREC Loan," is included in the loss calculations, even though no indication is given as to whether this was funded through a Wells Fargo account.[30]

40. Regarding these transactions, Mr. Johns testified that he had no knowledge of whether a Wells Fargo account was involved. Nonetheless, he included this in his damage calculations:[31]

> A. ...I have not looked to see whether all of these particular amounts went through a Wells Fargo account or not.
>
> Q. The fact whether it did or did not go through a Wells Fargo account is not a basis for the causal connection between Wells Fargo and --
>
> A. No, it is not.

41. In fact, whether or not a Wells Fargo account was involved is an important consideration in a "but-for" analysis. If a transaction never touched a Wells Fargo account, then but for Wells Fargo's provisions of services to USACM, et. al, the transaction still could have happened. DTDF would still have had its bank account with Nevada State Bank and so still could have made advances on the Colt DIV and CREC Loans. Hence, the amounts

---

[29] See *Expert Report of Colin A. Johns, CPA, CFF, CFE, CA.* at pp. 28-29

[30] See *Expert Report of Colin A. Johns, CPA, CFF, CFE, CA.* at p. 29

[31] See *Deposition of Colin A. Johns*, November 6, 2009, at 121:12-18.

from the CREC Loan and the two advances to the Colt DIV Loan that were transferred directly from the DTDF account should not be included in the damage calculations.

**Even If We Accept Mr. Johns' Damage Theory, His Calculations Were Not Properly Mitigated For Expected Recoveries.**

42. In a proper calculation of economic damages, the losses would be mitigated by the present value of any expected recovery to be paid to the damaged entity. Otherwise damages will be overstated. Mr. Johns neglected to consider the impact of potential mitigation.

43. Specifically, Mr. Johns should have subtracted from his loss estimates DTDF's share of potential recoveries from bankruptcy proceedings and settlements with accountants, other banks, or law firms. Instead, Mr. Johns only subtracted amounts actually recovered to date. He did not even attempt to find out what other recoveries were expected or their chances of being paid:[32]

> Q. Have you factored in the probability of any future recoveries on any of these items?
>
> A. No. That would be, at this point, speculation on my part....
>
> ⋮
>
> Q. I mean, have you checked to see if there is going to be any recovery?
>
> A. In terms of prospect, no, I haven't inquired as to prospect. What I have – until something happens, you don't know. What I have inquired as to is whether any of this money has been recovered, and that is – that was the focus of my inquiry, not somewhere down the road is there any chance you are going to get any of this back.

44. Once again, these amounts are not trivial and need to be accounted for in any economically reasonable damage analysis. For example, according to Robert Worthen, monies due to DTDF from USACM's recoveries included a split of certain reserves held by

---

[32] See *Deposition of Colin A. Johns*, November 6, 2009 at 30:18-21 and 100:17-25..

USACM on a 40/60 basis, a $128 million unsecured claim in the USACM estate, a share of proceeds of litigation claims (50% to DTDF of the first $20 million of gross recoveries and 35% thereafter) and a 50% claim on any proceeds from a $58 million note made by USA Investment Partners, as well as assorted other sums.[33]

45. In fact, a low estimate of the expected recoveries of DTDF from its share of litigation claim proceeds totals over $25 million, of which Johns credited only $8.9 million from HMA Sales.[34] Even though many of these settlement agreements have not been paid yet, they have been approved by the courts and so DTDF can expect to receive them.[35] Thus, they should be netted out of any calculations of loss. The other monies due to DTDF as a result of the agreement with USACM who should be netted out.

46. The above estimate of expected recoveries does not include settlements for which the amount has been kept confidential nor settlements that may occur in cases that are still pending. Such amounts ultimately would need to be included in mitigation of any loss calculation.

## Conclusions

47. Mr. Johns failed to perform a "but-for" assessment of the sort that would be required for a reasonable damage analysis. As a result, Mr. Johns did not calculate losses to DTDF in an economically correct manner. His calculations do not account for the possibility

---

[33] Letter to DTDF Investors from Robert G. Worthen, Chairman of the Board,USA Capital DTDF, dated February 13, 2009. As posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.

[34] See Table B in Exhibit 2 for a detailed list of claims from USACM and DTDF litigation.

[35] "DTDF has received fundsof approximately $6.6 million from USACM based on DTDF's allowed claim." Letter to DTDF Investors form Robert G. Worthen, Chairman of the Board, USA Capital DTDF, dated December 1, 2009. As posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.

of alternative causality and do not acknowledge that even legitimate investments made by DTDF would have generated some losses as a result of DTDF's normal investment portfolio risk. He also wrongly included amounts that had nothing to do with Wells Fargo's provision of services. Moreover, Mr. Johns did not properly mitigate damages by netting out expected recoveries.

48. My compensation in this proceeding is $475 per hour

49. I declare that the foregoing is true and correct.

Submitted this 14th day of December 2009 in Los Angeles, California.

ANDREW SAFIR

**Exhibit 1**
**Testimony in deposition, trial or before regulatory bodies of Dr. Andrew Safir since July, 2005**

**a. Depositions Given as an Expert Witness:**

*In re: Motor Fuel Temperature Sales Practices Litigation*, U.S. District Court for the District of Kansas, MDL No. 1840, Case No. 07-MD-1840-KHV/JPO, June 22, 2009.

*Saint John's Medical Plaza, L.P., v. Morlin Management Corporation, et. al.*, Superior Court of the State of California for the County of Los Angeles, April 27, 2009.

*Ineos USA LLC v. BP Products North America Inc.*, before the American Arbitration Association, Arbitration No. 13 158 Y 01929 06, February 4, 2009.

*Cadiz, Inc. v. Metropolitan Water District of Southern California*, Superior Court of the State of California, County of Los Angeles, Case No. BC 343232, March 20, 2008.

*Leisa Elliott, v. Starbucks Corporation LLC.*, United States District Court, Central District of California, Western Division, Case No. CV07-924-ODW (Ex) September 21, 2007.

*Leisa Elliott, v. Spherion Pacific Work LLC.*, United States District Court, Central District of California, Division, Case No. CV06-5032-ABC (PLAx) September 14, 2007.

*Ilshin Investment Co. Ltd., v. Buena Vista Home Entertainment, Inc.*, Superior Court of the State of California, County of Los Angeles, Case No. BC 327911, April 13, 2007.

*Toby Harris et al. v Investor's Business Daily, Inc., et al.*, Superior Court of the State of California, County of Los Angeles, Central District, Case No. BC 269313, April 12, 2007.

*Bickford and Niagra Films v. Pohlad and River Road Entertainment*, Case No. 120035084, before the Judicial Arbitration and Mediation Services, Inc., December 13, 2006.

*AEP Energy Services Gas Holding Company v Bank of America, N.A.*, Civil Action No. H-03-4973, United States District Court for the Southern District of Texas, Houston Division, March 10, 2006, November 29, 2006.

*Shopco Advisory Corp. v. Jeffrey Soffer, et al.*, United States District Court, Southern District of Florida, Case No. 05-22359-CIV-Seitz-McAliley, October 17, 2006.

*CononcoPhillips Co. v. Riata Energy, et al.*; 112th Judicial District, District Court, Pecos County, Texas, Cause No. 9,846, March 15, 2006; July 20, 2006.

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, United States District Court, Southern District of Texas, Laredo Division, Civil Action NO. L-04-CV-48, May 23, 2006.

Coordination Proceeding Special Title (Rule 1550(b)), *Natural Gas Antitrust Cases* I, II, III, & IV (Southern California only), J.C.C.P. Nos. 4221, 4224, 4226, and 4228, Superior Court of the State of California, County of San Diego, May 11, 2006.

*Air Alliant, LLC and James L. Kochman v. The New Piper Aircraft, Inc. et al.*, Case No. 1-03-CV-817012, Superior Court of the State of California for the County of Santa Clara, January 12, 2006.

**b. Expert Witness Testimony at Trial or Arbitration:**

*Ilshin Investment Co. Ltd., v. Buena Vista Home Entertainment, Inc.*, Superior Court of the State of California, County of Los Angeles, Case No. BC 327911, August 23 & 24, 2007.

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, United States District Court, Southern District of Texas, Laredo Division, Civil Action NO. L-04-CV-48, July 25, 2007.

*Andes Trading de Mexico v. Church & Dwight Co., Inc.*, Docket No. MER-L-3125-02, Superior Court of New Jersey, Law Division, Mercer County, September 29, 2005.

**c. Testimony before Regulatory Bodies:**

*Oral Testimony* on behalf of the Canadian Association of Petroleum Producers regarding business risks faced by Alberta utilities in the Generic Cost of Capital hearing before the Alberta Utilities Commission, June, 2009.

*Written Evidence* on behalf of the Canadian Association of Petroleum Producers regarding business risks faced by Alberta utilities in the Generic Cost of Capital hearing before the Alberta Utilities Commission, March, 2009.

*Written Testimony* on behalf of the Canadian Association of Petroleum Producers regarding business risks faced by Trans-Québec Maritimes Pipeline before the National Energy Board of Canada, April, 2008.

*Written Rebuttal Submission* on behalf of Imperial Oil Resources and Exxon/Mobil Canada Energy, before the Alberta Energy and Utilities Board in the Matter of an Inquiry into Natural Gas Liquids Extraction, November, 2007.

*Written evidence regarding the impact of comprehensive component metering and competitive extraction on the Alberta natural gas liquids market*, on behalf of Imperial Oil Resources and Exxon/Mobil Canada Energy, before the Alberta Energy and Utilities Board in the Matter of an Inquiry into Natural Gas Liquids Extraction, August, 2007.

*Written Evidence of Dr. Andrew Safir on Behalf of Imperial Oil* before the National Energy Board in the Matter of an Application by Enbridge Pipelines Inc., July 2007 (RH-2-2007).

*Testimony of Dr. Andrew Safir on Behalf of the Mackenzie Valley Pipeline* before the National Energy Board regarding the Application for a Certificate of Public Convenience and Necessity for the Mackenzie Gas Pipeline, July and November 2006, (GH-1-2004).

*Testimony of Dr. Andrew Safir on Behalf of the Industry Group* before the National Energy Board regarding TransCanada Pipelines Limited and TransCanada Keystone Pipeline GP Ltd. Application for Leave to Transfer Pipeline Facilities, October 2006, (MH-1-2006).

*Written Evidence of Dr. Andrew Safir on Behalf of the Industry Group* before the National Energy Board regarding TransCanada Pipelines Limited and TransCanada Keystone Pipeline GP Ltd. Application for Leave to Transfer Pipeline Facilities, September 2006, (MH-1-2006).

# Exhibit 2

# Tables

**Table A - USA Capital DTDF Loan Summary**

| Project | City | ST | Industry | Origination Date | *As of June 15, 2006* | | | Loan Type per Johns Report | *As of Dec 31, 2006* |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Total Note | DTDF Int | DTDF Share | | Performance Eval. |
| Amesbury/Hatters Point | Concord | MA | | 12/16/02 | $ 18,676,004 | 15.18% | $ 2,835,017 | Legitimate | Mat & Int Default |
| Ashby Financial | Corona | CA | | 5/3/04 | $ 7,200,000 | 2.08% | $ 149,760 | Fraudulent | Repaid |
| Bay Pompano Beach | Boca Raton | FL | Apartments | 6/20/05 | $ 15,353,604 | 0.47% | $ 72,162 | Legitimate | Maturity Default |
| Brookmere/Matteson | Aurora | IL | | 10/29/03 | $ 27,050,000 | ? | ? | Legitimate | |
| BySynergy, LLC | Sedona | AZ | Apartments | 2/3/06 | $ 4,434,446 | 87%? | $ 3,857,968 | Legitimate | Special Situation |
| Cloudbreak LV | Inglewood | CA | | 12/17/03 | $ 3,815,277 | 0.69% | $ 26,325 | Legitimate | Repaid |
| Colt DIV added #1 | Yonkers | NY | | 7/10/03 | $ 1,500,000 | 100.00% | $ 1,500,000 | Fraudulent | Non-Performing |
| Colt DIV added #2 | Yonkers | NY | | 7/10/03 | $ 3,100,000 | 100.00% | $ 3,100,000 | Fraudulent | Non-Performing |
| Colt Gateway | Hartford | CT | Retail | 1/17/03 | $ 5,628,161 | 42.53% | $ 2,393,657 | Fraudulent | Non-Performing |
| CREC Building Colt | Yonkers | NY | | 9/26/03 | $ 3,718,777 | 100.00% | $ 3,718,777 | Fraudulent | Non-Performing |
| EPIC Resorts | Palm Springs | CA | Apartments | Undeterm'd | | 100.00% | | Fraudulent | Special Situation |
| Fiesta Development McNaughton | Corona | CA | | 1/10/05 | $ 6,000,000 | 100.00% | $ 6,000,000 | Fraudulent | Non-Performing |
| Franklin-Stratford Invest. | Scottsdale | AZ | | 3/30/05 | $ 5,225,039 | 19.33% | $ 1,010,000 | Legitimate | Performing |
| HFA - Clear Lake | Yonkers | NY | | 1/6/05 | $ 16,022,727 | 0.88% | $ 141,000 | Legitimate | Maturity Default |
| Huntsville (West Hills Park JV) | Houston | TX | | 3/31/04 | $ 10,469,799 | 5.96% | $ 624,000 | Legitimate | Performing |
| Interstate Commerce Center, LLC | Scottsdale | AZ | Offices | 2/20/04 | $ 2,529,876 | 98.34% | $ 2,487,880 | Legitimate | Performing |
| Interstate Commerce Center Phase II | Scottsdale | AZ | Offices | 8/11/04 | $ 1,856,847 | 13.66% | $ 253,645 | Legitimate | Performing |
| Lake Helen Partners | Boca Raton | FL | | 12/7/04 | $ 3,162,268 | 6.05% | $ 191,317 | Legitimate | Maturity Default |
| Mountain House Bus. Park | Pleasanton | CA | Offices | 6/10/04 | $ 16,666,667 | 0.30% | $ 50,000 | Legitimate | Interest Default |
| Oak Shores II | San Luis Obispo | CA | | 6/6/05 | $ 11,360,314 | 0.07% | $ 7,952 | Legitimate | Maturity Default |
| Sheraton Hotel | Salt Lake City | UT | Hotels | 9/28/99 | | 100.00% | | | Special Situation |
| Ten-Ninety | Corona | CA | mixed | 4/15/02 | $ 55,113,781 | 100.00% | $ 55,113,781 | Fraudulent | Interest Default |
| Ten-Ninety, Ltd | Corona | CA | mixed | 12/30/02 | $ 4,150,000 | 20.48% | $ 849,920 | Fraudulent | Interest Default |
| The Gardens Timeshare | Orlando | FL | | 3/24/04 | $ 5,603,880 | 5.43% | $ 304,291 | Legitimate | Performing |
| Totals | | | | | $ 228,637,467 | | $ 84,687,454 | | |

*Sources: DTDF Loan Summary As Of June 15, 2006, USA Capital Loan Summary as of July 31, 2006.*

Note: Loan listed as "Fraudulent" according to classfication given by Colin Johns in his expert report.

**Table B - USACM Liquidating Trust (USACMLT), DTDF Litigation and Amounts Recovered or Potentially Recoverable**

| Case No. | Plaintiff | Defendants | Status | Recoverable amts | Other claims | Notes |
|---|---|---|---|---|---|---|
| 08-01066-lbr | USACMLT | Compass Escrows | Pending | $ 1,049,534 | | $1,049,533.90 wired to USACM Liq Trust in Jan 2009 in a compromise of an escrow dispute. |
| 08-01114-lbr | USACMLT | Shober Consulting, Inc. | Settled | ? | | |
| 08-01115-lbr | USACMLT | Bob Stupak | Dismissed | $ 0 | | Dismissed with prejudice 10/28/08 |
| 08-01116-lbr | USACMLT | Greenwald, Pauly, Foster & Miller | Settled | $ 13,000 | | Paid, dismissed on 12/23/08 |
| 08-01117-lbr | USACMLT | David Rentz | Dismissed | $ 0 | | Dismissed 09/30/08 |
| 08-01118-lbr | USACMLT | Jerry Cadeski | Dismissed | $ 0 | | Dismissed 02/03/09 |
| 08-01119-lbr | USACMLT | Robert A. Russell; Deborah Russell; Russel A. Development Group, LLC; Freeway 101 Investors, LLC; Freeway 101 Loop RAR Investment, LLC; Boise/Gowen, LLC; Der NV Invesco, LLC, SVRB Investments, LLC | Settled | ? | | Defendants "agree to make certain payments to the Trust over time." (USACM Liq. Trust Quarterly Report, June 2009, fn 13) |
| 08-01120-lbr | USACMLT | Gentile De Palma, Ltd. | Settled | ? | | settlement agreement provided for "an agreed obligation, deferred payments" (USACM Liq. Trust Quarterly Report, June 2009, fn 14) |
| 08-01121-lbr | USACMLT | Fertitta Enterprises, Inc. | Pending | | | |
| 08-01122-lbr | USACMLT | Mountain West Mortgage LLC, John M. Keilly, J.M.K. Investments, Ltd. | Settled | $ 140,000 | | $120,000 from J.M.K. Invest. and Keilly, $20,000 from Mountain West |
| 08-01123-lbr | USACMLT | Fiesta Development, Inc., Ashby USA, LLC, Richard K. Ashby, Random Developments, LLC, and Ashby Development Company, Inc. | Judgment | $ 5,062,766 | | plus post-judgment interest. Immediate payment of $82,500. Then stipulated judgment filed by Ashby Dev., Fiesta Dev., and Random Dev. |
| 08-01124-lbr | USACMLT | Homes for America Holdings, Inc., HFA Clear Lake, LLC, One Point Street, Inc., and Mediterranee, LLC f/k/a HFAH-Monaco, LLC | Settled | $ 2,800,000 | | $7,500/month for 12 months, $60,000 in month 13. $2.8 million to be held in escrow for 18 months as long as payments are made. |
| 08-01125-lbr | USACMLT | Anthony Monaco, Susan Monaco, and Monaco Diversified Corporation | Pending | | | |
| 08-01126-lbr | USACMLT | James Cioffi Architect Corporation | Settled | | | Settlement agreement not available |
| 08-01127-lbr | USACMLT | Amesburyport Corporation | Settled | $ 2,832,832 | | |
| 08-01128-lbr | USACMLT | K&S Properties | Dismissed | | | |
| 08-01129-lbr | USACMLT | Tanamera Resort Partners, LLC | Settled | $ 140,000 | | Payment was due 07/19/09 |
| 08-01130-lbr | USACMLT | Phillips USA, LLC | Judgment | $ 425,000 | | Plus pre- and post-judgment interest |

**Table B - USACM Liquidating Trust (USACMLT), DTDF Litigation and Amounts Recovered or Potentially Recoverable**

| Case No. | Plaintiff | Defendants | Status | Recoverable amts | Other claims | Notes |
|---|---|---|---|---|---|---|
| 08-01131-lbr | USACMLT | Bingham McCutchen, LLP | Judgment | $ 202,909 | | Partial summary judgment granted. $200,000 plus pre-judgment interest. |
| 08-01132-lbr | USACMLT, DTDF | Stanley E. Fulton | Pending | | | |
| 08-01133-lbr | DTDF | Kathryn L. Petersen, indiv. & as Trustee of Kathryn L. Petersen Living Trust & Trustee of the KLP Trust DTD 7/15/99 and Specialized Dev. Tahoe, LLC | Settled | confidential | | |
| 08-01134-lbr | USACMLT, DTDF | Mary Petersen; Mary Petersen Family Trust dated 8/12/98; Michael D. Petersen Family Trust dated 8/12/98; Kathryn L. Petersen; Kathryn L. Petersen Living Trust; KLP Trust dated 7/15/99 | Settled | confidential | | |
| 08-01135-lbr | USACMLT, DTDF, FTDF | Wells Fargo Bank, N.A. | Pending | | | |
| 07-01154 | USACMLT | JMK Investments, et al. | Pending | $ 2,750,000 | | Defendants to pay $2,750,000 to USACMLT, or $2,250,000 if paid by June 30, 2009. |
| 08-01164-lbr | USACMLT, DTDF | Beadle, McBride, Evans & Reeves, LLP, Reeves, Evans, McBride & Zhang, LLP, TG McBride CPA LTD, and T. Garth McBride | Settled | $ 1,500,000 | | |
| 08-01268-mkn | USACMLT | Lucius Blanchard, the Blanchard Children's Irrevocable Trust DTD 12/1/90 (Thomas A. Hantges, Trustee) and Palomino Partners, Ltd. | Settled | $ 3,050,000 | | $2,550,000 goes to Carmel (other adversary case) and USACM Liq Trust. Palomino Partners agrees to purchase from Plaintiffs, upon demand, the claims, interest, and proceeds assigned to Plaintiffs from Eagle Ranch for $500,000 in cash. |
| 08-10969 | USACMLT | James J. Lee | Pending | | | |
| | USACMLT | Lowe Enterprises | Settlement | $ 386,078 | | $187,996.50 from Tricor Title escrow account, $198,081.49 from USAIP Trustee, plus 70% of Double Diamond Ranch Parks funds (amount unknown). Paid. |
| 07-11821-lbr | USACMLT, DTDF | USAIP | Pending | | $ 393,655,917 | Promissory note to USACM for $58,374,919 for the benefit of creditors. Trust filed proof of claim seeking $158,900,000 from USAIP estate. DTDF also filed a proof of claim from USAIP for $176,380,998. |

**Table B - USACM Liquidating Trust (USACMLT), DTDF Litigation and Amounts Recovered or Potentially Recoverable**

| Case No. | Plaintiff | Defendants | Status | Recoverable amts | Other claims | Notes |
|---|---|---|---|---|---|---|
| 06-13758-lbr | DTDF | Tree Moss Partners | Pending | | $ 24,191,845 | DTDF filed a proof of unsecured claim for $23,116,045 in this case. USACM Trust filed an unsecured claim for $1,075,799.91. |
| 07-12694 | DTDF | HMA Sales | | $ 8,900,000 | | Paid. DTDF "will receive additional monies from HMA." |
| 08-7680-rtb | DTDF | BySynergy, LLC | Pending | | | |
| | USACMLT, DTDF | Piercy, Bowler, Taylor & Kern PC | Settled | confidential | | |
| | USACMLT, DTDF | Kummer, Kaempfer, Bonner & Renshaw and Ferrario, LLP | Settled | $ 12,000,000 | | |
| | USACMLT | Donald Granatstein, International Resort Management, Inc. | Settled | $ 10,000 | | Payable $2,500 down and $2,500 monthly, secured by stipulated judgment of $17,750. |
| 07-12377-lbr | DTDF | USA Investors VI, LLC | Closed | $ 93,370 | $ 13,310,422 | DTDF filed proof of unsecured claim for $13,310,422. USACMLT received distribution on its unsecured claim of $93,370. |
| | USACMLT | American Enchantment II, LLC | Pending | | $ 4,055,707 | USACMLT as agent for USAIP filed a proof of claim in the Ch. 7 bankruptcy case |
| 06-01251 | USACMLT | Salvatore Reale; Trustee for Salvatore Reale Revocable Trust | Judgment | $ 4,000,000 | | plus Trust's taxable costs plus pre- and post-judgment interest |
| | DTDF | Colt Loans | Pending | | | |
| 2:08-CV-461 | USACMLT, DTDF | Deloitte & Touche, LLP; Victoria Loob | Pending | | | Action has been dismissed against Ms. Loob. DTDF's claims against Deloitte were dismissed on 08/15/08 |
| | USACMLT | Debt Acquisition Company of America V, LLC | Settled | $ 1,000,000 | | DACA paid $1 million to buy $5,174,487.91 in uncollected prepaid interest claims re: Marquis Hotel |
| 08-0112-0 | USACMLT, DTDF | David A. Fogg | Pending | | | |
| 07-13169-lbr | | Thomas A. Hantges | Pending | | $ 487,538,254 | DTDF filed proof of claim of $182,538,254. USACMLT filed proof of claim of $305,000,000 |

**Table B - USACM Liquidating Trust (USACMLT), DTDF Litigation and Amounts Recovered or Potentially Recoverable**

| Case No. | Plaintiff | Defendants | Status | Recoverable amts | Other claims | Notes |
|---|---|---|---|---|---|---|
| 07-13162-lbr | | Joseph Milanowski | Settled | $ 1,000,000 | $ 487,538,254 | DTDF filed proof of claim of $182,538,254. USACMLT field proof of claim of $305,000,000. Roughly $1 million settlement, has paid down balance to about $740,000. |
| | | Totals | | $ 46,305,956 | $4,410,290,399 | **These totals do not represent the full recoverable amount expected. They do not include confidential settlement agreements or any amounts that may be due from pending cases. |
| | | Total USACM recoverable amounts | | $ 38,455,490 | $832,406,426 | |
| | | DTDF Share of recoverable amounts | | $ 16,459,421 | $ 291,342,249 | |
| | | DTDF Recoverable amounts | | $ 8,900,000 | $ 577,883,973 | |
| | | Total DTDF Recoverable amounts | | $ 25,359,421 | $ 869,226,222 | |
| | | Accounted for in Johns' calculations | | $ 8,900,000 | $ 0 | |
| | | Difference | | **$ 14,388,348** | $ 869,226,222 | |

Table B Sources:

08-01066-lbr, 08-01114-lbr, 08-01115-lbr, 08-01116-lbr, 08-01117-lbr, 08-01118-lbr, 08-01119-lbr, 08-01120-lbr, 08-01121-lbr, 08-01125-lbr, 08-01154, 08-10969, Lowe Enterprises, Piercy Bowler, Granatstein, American Enchantment, 06-01251, Debt Acquisition Company, 08-0112-0

Quarterly Post-Confirming Report of Geoffrey L. Berman, Trustee, USACM Liquidating Trust, United States Bankruptcy Court, District of Nevada, Case 06-10725-lbr, Doc 7125-1, dated March 2009.

08-01122-lbr — Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 7/21/2009. Order Granting Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, dated 09/16/2009.

08-01123-lbr — Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 2/10/2009. Also, Stipulation and Order for Entry of Agreed Judgment, filed June 30, 2009

08-01124-lbr — Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 6/24/2009, Exhibit B. (Note: summary in motion text says $2,900,000, but settlement agreement says $2,800,000.). Approval granted 09/16/2009.

08-01126-lbr — Stipulated Dismissal of USACM Liquidating Trust's Claims Against James Cioffi Architect Corporation, filed 12/02/2008.

| | |
|---|---|
| 08-01127-lbr | Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 8/20/2009. Approval granted 10/28/2009. |
| 08-01128-lbr | Stipulated Dismissal of USACM Liquidating Trust's Claims Against K&S Properties, A California General Partnership, filed 08/20/2008 |
| 08-01129-lbr | Motion Seeking the Approval of the Settlement Agreement Between the USACM Liquidating Trust and Tanamera Resort Partners, LLC, filed 05/20/2009. Approval granted 07/09/2009. |
| 08-01130-lbr | Default Judgment Against Defendant Phillips USA, LLC, filed 12/24/2008. |
| 08-01131-lbr | Order Granting USACM Liquidating Trust's Motion for Partial Summary Judgment and Final Judgment, filed 08/12/209. |
| 08-01133-lbr | Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 11/13/2009. Also, Letter to DTDF Investors form Robert G. Worthen, Chairman of the Board, USA Capital DTDF, dated December 1, 2009 at p. 3. As posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009. |
| 08-01135-lbr | (Current case) |
| 08-01164-lbr | Application to Compromise and Settle Controversies with Beadle, McBride, Evans & Reeves, LLP, et al., filed 10/20/2008. Approval granted 12/09/2008. |
| 08-01268-mkn | Application to Compromise and Settle Controversies in Adv. No. 08-01268, filed 09/04/2009. Approval granted 10/14/2009. |
| 06-10725-lbr | Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, dated 02/10/2009. |

07-11821-lbr, 06-13758-lbr, 07-12377-lbr, Colt Loans, 2:08-CV-461

Letter to DTDF Investors form Robert G. Worthen, Chairman of the Board, USA Capital DTDF, dated December 1, 2009. As posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009. Also, Quarterly Post-Confirming Report of Geoffrey L. Berman, Trustee, USACM Liquidating Trust, March 2009. As posted on the USACM Liquidating Trust website at http://usacmcucc.bmcgroup.com/Trustees Quarterly Reports/Forms/AllItems.aspx

Kummer, et al *Deposition of Geoffrey L. Berman*, November 10, 2009 at 127:23-128:5.

08-01132-lbr, 08-01134-lbr, 07-12694-lbr, 08-7680-rtb, 06-01251, 08-0112-0, 07-13169-lbr, 07-13162-lbr

Letter to DTDF Investors form Robert G. Worthen, Chairman of the Board, USA Capital DTDF, dated December 1, 2009. As posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.

**Exhibit 3**

**Documents Reviewed and Relied Upon**

**United States Bankruptcy Court, District of Nevada documents:**

Case 06-10725-lbr, Doc 7125-1 - Quarterly Post-Confirming Report of Geoffrey L. Berman, Trustee, USACM Liquidating Trust, dated March 2009.

Case 08-01122-lbr:

– Doc 59 - Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 7/21/2009.

– Doc 65 - Order Granting Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, dated 09/16/2009.

Case 08-01123-lbr:

– Doc 43 - Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 2/10/2009.

– Doc 47 - Stipulation and Order for Entry of Agreed Judgment, filed June 30, 2009

Case 08-01124-lbr:

– Doc 47 - Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 6/24/2009.

– Doc 49 - Order Granting Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, dated 09/16/2009.

Case 08-01126-lbr, Doc 15 - Stipulated Dismissal of USACM Liquidating Trust's Claims Against James Cioffi Architect Corporation, filed 12/02/2008.

Case 08-01127-lbr:

– Doc 34 - Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 8/20/2009.

– Doc 38 - Order Granting Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, dated 10/28/2009.

Case 08-01128-lbr, Doc 8 - Stipulated Dismissal of USACM Liquidating Trust's Claims Against K&S Properties, A California General Partnership, filed 08/20/2008

Case 08-01129-lbr:

– Doc 29 - Motion Seeking the Approval of the Settlement Agreement Between the USACM Liquidating Trust and Tanamera Resort Partners, LLC, filed 05/20/2009.

– Doc 32 - Order Granting Motion Seeking the Approval of the Settlement Agreement Between the USACM Liquidating Trust and Tanamera Resort Partners, LLC, filed 07/09/2009.

Case 08-01130-lbr, Doc 22 - Default Judgment Against Defendant Phillips USA, LLC, filed 12/24/2008.

Case 08-01131-lbr, Doc 65 - Order Granting USACM Liquidating Trust's Motion for Partial Summary Judgment and Final Judgment, filed 08/12/209.

Case 08-01133-lbr, Doc 92 - Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 11/13/2009.

Case 08-01135-lbr:

– Expert Report of Colin A. Johns, CPA, CFF, CFE, CA.

– Expert Report of John Burdiss, CFE, CPA, CBLL.

– Doc 134 - Plaintiff's First Amended Complaint, filed 05/15/2009.

– *Deposition of Geoffrey L. Berman*, November 10, 2009.

– *Deposition of David Fogg*, March 11, 2009.

– *Deposition of Colin A. Johns*, November 6, 2009.

– *Deposition of Victoria Loob,* July 31, 2009.

  – Exhibit 1 - USA Capital Diversified Trust Deed Fund, LLC, Prospectus, dated June 2, 2003.

– *Deposition of Thomas J. Rondeau*, November 4, 2009.

Case 08-01164-lbr:

– Doc 28 - Application to Compromise and Settle Controversies with Beadle, McBride, Evans & Reeves, LLP, et al., filed 10/20/2008.

– Doc 29 - Order Approving Settlement with Beadle, McBride, Evans & Reeves, LLP, et al., filed 12/09/2008.

Case 08-01268-mkn:

– Doc 51 - Application to Compromise and Settle Controversies in Adv. No. 08-01268, filed 09/04/2009.

– Doc 56 - Order Approving Application to Compromise and Settle Controversies in Adv. No. 08-01268, filed 10/14/2009.

Case 06-10725-lbr:

– Doc 6794 - Motion for Approval of Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed 02/10/2009.

**Other Documents:**


Letter to DTDF Investors from Robert G. Worthen, Chairman of the Board,USA Capital DTDF, dated May 19, 2008. Posted on the DTDF Information Web Page at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.

Letter to DTDF Investors from Robert G. Worthen, Chairman of the Board,USA Capital DTDF, dated February 13, 2009. As posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.

Letter to DTDF Investors form Robert G. Worthen, Chairman of the Board, USA Capital DTDF, dated December 1, 2009. As posted on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.

Loan Summaries, posted under "Past Loan Summary Reports" on the DTDF Information Webpage at http://usacapdtdf.bmcgroup.com, accessed December 7, 2009.:

– DTDF Loan Summary as of June 15, 2006

– USA Capital Loan Summary as of July 31, 2006

– USA Capital Loan Summary as of September 30, 2006

– USA Capital Loan Summary as of December 31, 2006

Moody's/REAL Commercial Property Price Index (CPPI) data and website (http://web.mit.edu/cre/research/credl/rca.html. Last accessed on November 20, 2009.

*Reference Manual on Scientific Evidence, Second Edition*, Federal Judicial Center, 2000.

Robert F. Reilly and Robert P. Schweihs, *The Handbook of Business Valuation and Intellectual Property Analysis* (McGraw-Hill: 2004)

Settlement Agreement Letter from Rob Charles of Lewis and Roca LLP to Jeffery D. Hermann, Esq. Re: USACM Liquidating Trust – USA Capital Diversified Trust Deed Fund, dated March 13, 2008. As posted on the DTDF Information Web Page at http://usacapdtdf.bmcgroup.com, last accessed December 11, 2009.