# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

ADVERSARY NO. 08-01135

USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

v.

WELLS FARGO BANK, N.A.

# REBUTTAL REPORT

# OF

# COLIN A. JOHNS, CPA, CFF, CFE, CA

## I. Introduction

By report, dated September 30, 2009 (the "September Report"), I have previously submitted expert opinions with respect to certain issues in this case. I stated in that report that amendments or additions to the September Report might be required as a result of developments prior to trial, including, but not limited to, expert discovery.

Since the date of the September Report I have requested and received copies of the additional documents included in the attached Exhibit A.

This rebuttal report addresses the opinions expressed by Dr. Safir in both his written report and his deposition. I have not changed any of the opinions included in the September Report, and I have not attempted to restate all of the opinions, and the bases for those opinions, included in the September Report that are relevant to the opinions expressed by Dr. Safir. The focus of this rebuttal is on issues where additional information, not mentioned in the September Report, bear upon the opinions of Dr. Safir.

## II. Rebuttal Opinions

### A. Methodology

1. My assignment in this matter is to render an expert opinion with respect to the following:

    a. Whether and to what extent the services (including banking and wire transfer) provided by Wells Fargo Bank ("WFB") to USA Commercial Mortgage Company ("USACM"), 10-90, Inc. ("10-90") and Mountain Vista, Inc. ("Mountain Vista") substantially assisted the fraud and breaches of fiduciary duties that caused harm to USA Capital Diversified Trust Deed Fund, LLC ("DTDF").

    b. The amount of damages suffered by DTDF as a result of WFB's substantial assistance of the fraud and breaches of fiduciary duties referenced above.

2. Dr. Safir has opined that I have failed to perform a "but-for" analysis in as far as he states that this required determining "what DTDF would have earned had Wells Fargo not provided banking services to USACM, 10-90, and Mountain Vista, and then subtracting from that what was actually earned."[1]

[1] Expert Report of Dr. Andrew Safir, Page 3, Paragraph 8.

3. The specific criticisms offered by Dr. Safir in support of his opinion are addressed below.

The services provided by WFB might have been provided by another bank.

4. Dr. Safir opines that a proper damages analysis required an investigation of whether the services provided by WFB would have been provided by some other bank. However, he then notes that "[t]his is an issue that would be best determined by a liability expert."[2]

5. As I testified at my deposition, I have not been asked to speculate as to whether or not another bank somewhere in the country would have provided the same services as WFB.[3] In my analysis I am dealing with the specific services that WFB did provide to USACM, 10-90, and Mountain Vista.

6. Dr. Safir opines that "if banking services would have been provided by another bank had Wells Fargo refused to provide such services, then there would be no damages from Wells Fargo's actions."[4]

7. Had WFB not provided the services at issue in this case, including among other actions, assisting the Culpable Insiders in commingling Investors Trust and Collection Trust funds, then I acknowledge that there would be no damages attributable to WFB.

8. However, that is not the situation that I am dealing with in my analysis. WFB, and not some other hypothetical bank, did in fact provide those services and my analysis calculates the damages that were suffered by DTDF that resulted from the actions of WFB.

Normal losses that might have occurred in the DTDF portfolio

9. Dr. Safir cites certain of my deposition testimony in support of his proposition that I did not take into account "normal losses that might have occurred in the DTDF portfolio had it "followed the

---

[2] Ibid., Page 6, Paragraph 17.
[3] Deposition of Colin A. Johns, November 6, 2009, Page 39, Lines 9 through 13 (as corrected by an Errata Sheet dated November 25, 2009).
[4] Expert Report of Dr. Andrew Safir, Page 6, Paragraph 17.

rules" and only undertook investments in accordance with its corporate guidelines."[5]

10. A number of points are worth making with respect to this assertion by Dr. Safir:

a. My testimony, as cited and misinterpreted by Dr. Safir, was not that I had not taken into account "losses that might have occurred", but that I had not <u>increased</u> the amount of damages that I calculated to include additional potential elements of damage[6] such as DTDF's loss of use of the funds that were taken from it as a result of the fraud perpetrated by the Culpable Insiders.[7]

b. The potential for losses within DTDF's portfolio that would be attributable to the damages that I have calculated in this matter presupposes that once the fraud perpetrated by the Culpable Insiders was discovered, that DTDF would continue to fund new loans. To the extent that, having discovered the fraud, DTDF chose to wind down or discontinue its operations there would not be the potential for losses associated with the amounts included in my damages calculation. Instead, those amounts would be available for distribution to DTDF's members.

11. Dr. Safir also cites my deposition testimony where I stated:

"I think what you would look at would be the portfolio as a whole, and there is going to be some kind of performance for the portfolio as a whole where you are likely in total to make money, but there are very few lenders that I am aware of that don't have any bad loans."[8]

Dr. Safir attempts to characterize this testimony as evidencing my "clear understanding that a full recovery of legitimate loans was highly unlikely."[9]

---

[5] Expert Report of Dr. Andrew Safir, Page 7, Paragraph 18.
[6] During his deposition Dr. Safir testified that under his approach, in the but-for world had DTDF earned substantial monies during the period at issue in this case, one could consider that profit in the damages. Deposition of Andrew Safir, Ph.D., Page 45, Lines 4 through 15.
[7] The term "Culpable Insiders" is used in this report, consistent with its usage in the September Report, to refer to Thomas Hantges and Joseph Milanowski.
[8] Deposition of Colin A. Johns, November 6, 2009, Page 108, Lines 4 through 9.
[9] Expert Report of Dr. Andrew Safir, Page 8, Paragraph 21.

12. However, nowhere in his report does Dr. Safir acknowledge either:

a. Had the fraud been discovered, DTDF would not necessarily have continued to fund new loans and would not therefore be exposed to potential future losses; or

b. Even if DTDF had continued to fund new loans and incurred some related losses, DTDF would also be earning and realizing interest on those new loans.

13. Much of Dr. Safir's basis for asserting that losses would in fact have been incurred appears to be the alleged impact of the economic downturn that negatively impacted the real estate industry. For instance:

a. "In the latter portion of [the 2006-2009 time] period, commercial real estate in the areas cited above declined in value, and many real estate development projects suffered substantial losses."[10]

b. "The fact that even legitimate loans would have posted losses is clear from a general review of the real estate market over the 2006-2009 period."[11]

c. "... commercial real estate in the "Apartment" industry (including apartment buildings and condominium developments) purchased after the third quarter of 2004 would have sold for a lower price in June 2009 than at which it was purchased."[12]

14. While I acknowledge that real estate values decreased by 2009, Dr. Safir appears to give no consideration to the fact that the vast majority of the damages suffered by DTDF occurred in 2003 and 2004. As reflected in DTDF's June 2, 2003 Prospectus, the typical term of DTDF's legitimate loan portfolio was generally between one and three years.[13] As a result, if all or a portion of the damage amounts were invested in new legitimate loans, DTDF would have realized earnings on the majority of those amounts prior to the economic downturn.

15. In fact, during 2003, DTDF invested in twenty-four new loans to non-affiliates of the Culpable Insiders. Between 2003 and 2005 DTDF made cash advances of approximately $90.3 million on

[10] Ibid., Page 9, Paragraph 22.
[11] Ibid., Page 10, Paragraph 25.
[12] Ibid., Page 10, Paragraph 26.
[13] USA Capital Diversified Trust Deed Fund, LLC, Prospectus dated June 2, 2003, Page 12.

these twenty-four loans. As of the date of DTDF's bankruptcy only one of these loans, the Cloudbreak Loan, reflected an outstanding balance. Furthermore, subsequent to DTDF's bankruptcy, this loan was also repaid.

16. Dr. Safir also cites a section from the June 2, 2003 DTDF Prospectus that refers to certain loans in DTDF's portfolio as of December 31, 2002, being "either impaired or non-performing"[14] apparently believing that this bolsters his position with respect to "normal losses." However, that same citation includes the statement that "the underlying collateral is sufficient to recover the amounts due."[15] Dr. Safir offers no analysis as to the subsequent outcome, or any other details, with respect to these loans.

17. I have also performed an analysis of the performance of DTDF's portfolio during the period 2003 through 2005. That analysis, as shown on the attached Exhibit 1, reflects the following:

a. The interest income actually collected on DTDF's loan portfolio approximated $8.7 million in 2003, $11.9 million in 2004 and $7.6 million in 2005.

b. After adjustment for amounts potentially prepaid as a part of the Culpable Insiders' fraudulent scheme the interest income received approximated $7.1 million in 2003, $10.2 million in 2004 and $6.3 million in 2005.

c. Deducting from these amounts an estimate of loan losses each year, results in an average return on the loan portfolio of approximately 9.4% per annum.

The assumed loan loss provision is based upon the actual rate established by USA Capital First Trust Deed Fund ("FTDF").[16] While FTDF was also managed by the Culpable Insiders, it is my

---

[14] Expert Report of Dr. Andrew Safir, Page 13, Paragraph 32.
[15] Ibid.
[16] USA Capital First Trust Deed Fund, LLC ("FTDF") was organized as of February 16, 2001 for the stated purpose of making or purchasing entire or fractional interests in certain types of loans secured by first deeds of trust on, among other things, undeveloped land and residential and commercial real estate developments. Its organizational structure provided USACM and the Culpable Insiders the ability to offer investors located within the United States, the opportunity to invest in loans originated by USACM through the purchase of membership units. Under this operating structure, FTDF was required to file reports and disclosures with the Securities and Exchange Commission. Accordingly, it was subject to heightened regulatory scrutiny. At its bankruptcy petition date, FTDF had approximately 950 members. As of July 31, 2006, its reported outstanding loan portfolio totaled $62,653,825, consisting solely of loans originated by USACM. [See Third Amended Joint Plan of Reorganization, filed November 15, 2006]

understanding that it was not subjected to the same fraudulent activities and therefore did not incur the same level of losses suffered by DTDF. As a result, FTDF represents a proxy for what performance results might have been expected had DTDF been operated in accordance with its governing documents and not been looted by the Culpable Insiders.

d. Accordingly, if the amounts included in my damages calculation had been invested in new loans in the year in which the damage was incurred by DTDF, and had earned 9.4% per annum between the date of investment and December 31, 2006, DTDF's portfolio would have grown by approximately $22.8 million through December 31, 2006, net of any additional portfolio management fees and before assumed member distributions.

e. Based upon DTDF's actual historical earnings distribution rate to its members, I have estimated assumed member distributions to be approximately $18.1 million from 2002 through 2006.

f. As noted above, FTDF's results represent a proxy for what DTDF's operating results might have been. As evidenced in FTDF's bankruptcy, its members successfully recovered approximately 75% of its outstanding capital.[17] In addition to uncollectable loan losses, it is my understanding that the amounts recovered are net of bankruptcy and other related costs.

When applying FTDF's 75% recovery rate as a conservative estimate[18] of anticipated loan losses, the growth in DTDF's portfolio between 2002 and 2006, including estimated member distributions, would have more than offset the losses suffered in the bankruptcy proceedings.

g. As a result, no adjustment is necessary to the damages previously computed and presented by me in the September Report.

18. To further corroborate this analysis, I have also looked at the performance of the loan portfolio held by FTDF.

19. As shown in the attached Exhibit 2, the average interest income earned by FTDF during the period 2003 through September 30,

[17] Final Distribution Letter to Members of USA Capital First Trust Deed Fund, LLC.
[18] This estimate is conservative for a number of reasons, including the fact that none of the loans in which DTDF invested during 2003 were shown as still being outstanding as of December 31, 2006.

2005[19] equated to an average annual interest return on its loan portfolio of 9.3%. This was calculated net of recorded loan losses incurred by FTDF on its loan portfolio. This earnings rate supports the reasonableness of the amount calculated with respect to DTDF.

## B. Causation

1. Dr. Safir opines as follows:

   "If Wells Fargo had nothing to do with a particular transaction, then that transaction would have occurred even but for Wells Fargo's provision of banking services. Therefore, losses from such a transaction should not be included in a proper and correct "but-for" damage analysis."[20]

2. However, it is noteworthy that Dr. Safir ignores in his "analysis" the rationale, expressed in both my expert report and in my deposition, for the inclusion of these amounts in my damages calculations.

3. During my deposition and in my report, I observed that the damages calculated resulted from Wells Fargo's assistance of the concealment and perpetuation of the Culpable Insiders' fraud through the provision of its banking services. While I have not tried to identify whether a WFB account was directly involved in all of the transactions referenced in the September Report resulting in damage, given the nature of the damages claimed this would not be a relevant factor in all cases.

4. It is my opinion that but for the provision of services by WFB the Culpable Insiders would not have been able to continue to conceal, and therefore continue to perpetrate, the fraud. The damages suffered by DTDF resulted from the assistance provided by WFB through its provision of services and the resulting continuation of the Culpable Insiders' fraud.

## C. Mitigation

1. Dr. Safir also opines that my damages calculation "neglected to consider the impact of potential mitigation."[21]

---

[19] The final Form 10-Q filed by FTDF prior to its bankruptcy related to the nine month period ended September 30, 2005.
[20] Expert Report of Dr. Andrew Safir, Page 14, Paragraph 35.
[21] Ibid., Page 17, Paragraph 42.

2. In my calculation of the damages in this matter I have given credit for the amount recovered by DTDF with respect to HMA Sales. To my knowledge that is the only amount that has been recovered to date by DTDF with respect to the specific items of damage included within my calculations.

3. To the extent that there are additional recoveries with respect to the specific transactions that comprised my damages calculations I will consider whether an offset would need to be applied.

Executed in San Francisco, California on February 26, 2010

Colin A. Johns, CPA, CFF, CFE, CA

EXHIBIT A

DOCUMENTS CONSIDERED

1. The expert report of Dr. Andrew Safir, dated December 14, 2009.
2. The expert report of William B. Watkins, dated December 21, 2009.
3. The expert report of H. Stephen Grace, Jr., Ph.D., issued December 21, 2009.
4. The expert report of John W. Burdiss, CFE, CPA, CBLL, dated October 14, 2009.
5. The transcript of Dr. Safir's deposition taken on January 20, 2010.
6. The transcript of William B. Watkins deposition taken on February 1, 2010.
7. DTDF Prospectus, dated June 2, 2003.
8. FTDF's Prospectus, dated December 22, 2004.
9. FTDF's Quarterly Report filed on Form 10-Q dated August 18, 2003.
10. FTDF's Quarterly Report filed on Form 10-Q dated November 13, 2003.
11. FTDF's Quarterly Report filed on Form 10-Q dated May 17, 2004.
12. FTDF's Quarterly Report filed on Form 10-Q dated August 20, 2004.
13. FTDF's Quarterly Report filed on Form 10-Q dated November 22, 2004.
14. FTDF's 2004 Annual Report filed on Form 10-K dated April 15, 2005.
15. FTDF's Quarterly Report filed on Form 10-Q dated May 23, 2005.
16. FTDF's Quarterly Report filed on Form 10-Q dated August 22, 2005.
17. FTDF's Quarterly Report filed on Form 10-Q dated November 15, 2005.
18. Third Amended Joint Plan of Reorganization, filed November 15, 2006.

19. USA Capital First Trust Deed Fund, LLC's Final Report of Action Taken and Progress Towards Consummation of Confirmed Plan of Reorganization, filed July 16, 2007.

20. USA Capital First Trust Deed Fund, LLC's Motion to Close Case and Request for Final Decree entered July 27, 2007.

21. USA Capital First Trust Deed Fund, LLC's Supplement to Final Report dated September 28, 2007.

22. Declaration of Susan M. Smith in Support of USA Capital First Trust Deed Fund, LLC's (1) Final Report, as Supplemented, and (2) Motion to Close Case and Request for Final Decree dated September 28, 2007.

23. Order Granting Motion to Close Case and Request For Final Decree entered October 12, 2007.

24. Final Distribution Letter to Members of USA Capital First Trust Deed Fund, LLC.

25. USA Company Listings

Exhibit 1

**USA Capital Diversified Trust Deed Fund, LLC v. Wells Fargo Bank, N.A.**
**DTDF Portfolio Return Analysis**

| | Ref | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Beginning Interest Receivable (Excluding EPIC and Sheraton) | 1 | $1,638,211.68 | $8,008,493.08 | $16,862,409.94 |
| Ending Interest Receivable (Excluding EPIC and Sheraton) | | 8,008,493.08 | 16,862,409.94 | 25,048,212.43 |
| Interest Income (Excluding EPIC and Sheraton) | | 15,035,179.80 | 20,777,300.47 | 15,802,941.69 |
| Assumed Cash Collected | | 8,664,898.40 | 11,923,383.61 | 7,617,139.20 |
| Less: | | | | |
| - Assumed Prepaid Interest (Bankruptcy Plan - $4,641,402) | 2 | (1,582,184.94) | (1,725,427.34) | (1,333,789.71) |
| - Assumed Loan Loss Provision (Applied FTDF Provision Rate) | 3 | (491,119.93) | (467,271.35) | (273,584.20) |
| Assumed Cash Earned from Performing Loans | | 6,591,593.53 | 9,730,684.91 | 6,009,765.29 |
| | | | | |
| Beginning Balance (All Loans, excluding, 10-90, EPIC and Sheraton) | 1 | 71,206,086.56 | 90,198,824.27 | 85,818,807.32 |
| Ending Balance (All Loans, excluding, 10-90, EPIC and Sheraton) | | 90,198,824.27 | 85,818,807.32 | 50,246,328.57 |
| Average Estimated Loan Balance Outstanding | | 80,702,455.42 | 88,008,815.80 | 68,032,567.95 |
| | | | | |
| Assumed Gain from 2003 Loan Activity to Non-Affiliates of DTDF | | 8% | 11% | 9% |
| | | | | |
| **Average Earnings Rate** | | 9.4% | | |

| **DTDF Analysis of Assumed Return (Loss)** | 12/31/2002 | 12/31/2003 | 12/31/2004 | 12/31/2005 | 12/31/2006 |
|---|---|---|---|---|---|
| Beginning Principle Balance | $0 | $3,787,241 | $42,348,536 | $78,200,250 | $81,117,750 |
| Additional Principal - Damages | 3,750,972 | 38,119,825 | 34,701,987 | 1,407,879 | 4,868,939 |
| Ending Principal Balance | 3,750,972 | 41,907,067 | 77,050,523 | 79,608,129 | 85,986,689 |
| Average Balance | 1,875,486 | 22,847,154 | 59,699,529 | 78,904,190 | 83,552,219 |
| Earnings at DTDF Average Rate of Return | 175,407 | 2,136,812 | 5,583,482 | 7,379,625 | 7,814,339 |
| Less Assumed Distributions (DTDF Average Rate of Distribution During 2002 and 2001) | (137,573) | (1,675,917) | (4,379,165) | (5,787,892) | (6,128,841) |
| Less Incremental Management Fee on Reinvested Earnings (1% per Prospectus) | (1,565) | (19,426) | (54,591) | (82,112) | (101,087) |
| **Assumed Ending Balance Including Reinvested** | $3,787,241 | $42,348,536 | $78,200,250 | $81,117,750 | $87,571,100 |

| **Summary of DTDF Estimate of Return** | **Assumed DTDF Rate** |
|---|---|
| Total Assumed Member Distributions | $18,109,389 |
| Assumed Return on Ending Balance - 75% | 65,678,325 |
| **Total Estimated Return - DTDF** | 83,787,713 |
| Total Investment - Damages | 82,849,603 |
| **Total Estimated Gain (Loss) on Investment** | $938,110 |

| | **Legend** |
|---|---|
| 1 | Agreed to DTDF General Ledger Detail. |
| 2 | Agreed the total Prepaid Interest of $4,641,402 to the Third Amended Joint Plan of Reorganization filed on November 15, 2006 (the "Plan") denoting amounts paid by USACM to DTDF. More specifically, the Plan describes Prepaid Interest as funds taken from the Collection Trust to advance payments on non-performing loans to certain direct lenders, including DTDF. Accordingly Prepaid Interest may pertain to the prepayment of either interest or principal. For purposes of my analysis, I have conservatively assumed the entire amount pertained to the prepayment of interest due under DTDF's loan portfolio. If any portion of the $4,641,401 related to the prepayment of principal, the average earnings rate and estimated gain on investment would increase.<br><br>In addition, the entire Prepaid Interest was conservatively allocated over the three years ended December 31, 2005 based upon the average estimated loan balance outstanding. Had a portion of the prepaid balance pertained to prepayments occurring prior to 2003 or subsequent to 2005 the average earnings rate and estimated gain on investment would further increase. |
| 3 | Amounts were derived utilizing FTDF's average provision rate as calculated at Exhibit 2. |
| | Note: For purposes of conducting the analysis above, I have estimated an interest rate of return using activity throughout the three years ended December 31, 2005. Certain operating results prior to this period were not included herein given limitations in the information available and necessary to compute equivalent calculations. Specifically, DTDF's general ledgers did not separately identify interest receivable and principal balances outstanding prior to December 31, 2002. However, it should be noted that based upon my review of DTDF's 2002 financial statements reflected in its June 2, 2003 Prospectus, I observed that interest received in cash as a percentage of the average reported loan balance outstanding results in a realized rate of return of 11%, exceeding the 9.4% computed above. Accordingly, the inclusion of 2002 results would likely increase the estimated gain on investment cited above. |

Exhibit 2

**USA Capital Diversified Trust Deed Fund, LLC v. Wells Fargo Bank, N.A.**
**USA Capital First Trust Deed Fund, LLC Portfolio Return Analysis**

| | | 12/31/2003 (annualized earnings) | | 12/31/2004 | | 9/30/2005 (annualized earnings) | | Assumed Balance at Bankruptcy Date | Averages | |
|---|---|---|---|---|---|---|---|---|---|---|
| FTDF Actual Results and Averages | | | | | | | | | | |
| Beginning Loan Balance | 1 | $0.00 | 1 | $5,642,444 | 2 | $45,875,697 | 2 | $59,175,229 | | |
| Ending Loan Balance | ↓ | 5,642,444 | ↓ | 45,875,697 | ↓ | 59,175,229 | 6 | 62,653,825 | | |
| **Average Loan Balance** | | 2,821,222 | 3 | 19,116,106 | | 52,525,463 | | 60,914,527 | | |
| Reported Interest Income (except where annualized) | 4 | 345,648 | 1 | 2,575,460 | 4 | 6,908,963 | | N/A | | |
| Loan Loss Provision | 1 | - | 1 | (500,000) | 4 | (80,000) | 1 | N/A | | |
| **Ending Provision as a Percent of Ending Balance** | | 0.00% | | 1.09% | | 0.14% | | N/A | 0.54% | Weighted Average |
| Less - Allocated Prepaid Interest (Bankruptcy Plan - $2,557,307) | 5 | (78,514) | 5 | (531,997) | 5 | (1,461,771) | 5 | (485,026) | | |
| Adjusted Estimated Interest Earned, Net of Loss Provision | | 267,134 | | 1,543,463 | | 5,367,192 | | N/A | | |
| **Interest Rate of Return** | | 9% | | 8% | | 10% | | | 9.3% | Annualized Average |

| | **Legend** |
|---|---|
| 1 | Agreed to FTDF Annual Report on Form 10-K Filed April 15, 2005 |
| 2 | Agreed to FTDF Quarterly Report on Form 10-Q Filed November 15, 2005 |
| 3 | Note that for 2004, the significant increase in the ending loan balance appears to be the result of additional funding obtained and invested during the latter part of 2004. Accordingly to compute the average balance outstanding we also considered the loan balance outstanding at June 30, 2004 which totaled $17,473,141. Accordingly, averaging the balance in the first and second half of the year resulted in this more precise average loan balance outstanding at FTDF during 2004. |
| 4 | Amount has been annualized using reported results. For 2003 results, loan activity and primary operations began during the three months ended 12/31/03. During this period, reported interest income totaled $86,412. Accordingly this amount has been annualized above. Similarly, the interest income reported by FTDF during the nine months ended 9/30/05 of $5,181,722 has also been annualized. |
| 5 | Agreed total Prepaid Interest of $2,557,307 to the Third Amended Joint Plan of Reorganization filed on November 15, 2006 (the "Plan") denoting amounts paid by USACM to FTDF. More specifically, the Plan describes Prepaid Interest as funds taken from the Collection Trust to advance payments on non-performing loans to certain direct lenders, including FTDF. Accordingly Prepaid Interest may pertain to the prepayment of either interest or principal. For purposes of my analysis, I have conservatively assumed the entire amount pertained to the prepayment of interest due under FTDF's loan portfolio. Prepaid Interest was then allocated based upon the average estimated loan balance outstanding during each period including an assumed amount for the period ended April 13, 2006 (the date of FTDF's bankruptcy). |
| 6 | Agreed to the Third Amended Joint Plan of Reorganization. |