# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
--oOo--

| | |
|---|---|
| In re: USA COMMERCIAL MORTGAGE COMPANY, et al., Debtor, | BK-S-06-10725LBR |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, Plaintiff, v. WELLS FARGO BANK.NA. Defendant. | No. 08-01135-LBR |

DEPOSITION OF COLIN A. JOHNS, CPA

Friday, November 6, 2009

REPORTED BY: DENISE A. FORD, CSR 7525

# I N D E X

## INDEX OF EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MR. FLEMING | 5 |


## EXHIBITS MARKED FOR IDENTIFICATION


| No. | Description | Page |
|---|---|---|
| Exhibit 1 | Letter from C. Johns | 15 |
| Exhibit 2 | Expert Report of Colin A. Johns, CPA | 16 |
| Exhibit 3 | Miscellaneous documents | 21 |

A P P E A R A N C E S

FOR THE PLAINTIFF: DIAMOND McCARTHY, 6504 Bridgepoint Parkway, Suite 400, Austin, Texas 78730, LISA S. TSAI, ESQ. and JOSH BRUCKEROFF, ESQ.

FOR THE DEFENDANT: FULBRIGHT & JAWORSKI, 300 Convent Street, Suite 2200, San Antonio, Texas 78205, DEAN V. FLEMING, ESQ.

ALSO PRESENT: Jennifer McKay, video operator. Rebecca Acosta, Recon Research Corporation.

--oOo--

--oOo--

BE IT REMEMBERED that pursuant to Notice and on Friday, November 6, 2009 commencing at 8:37 a.m. thereof, at the Offices of HEMMING & MORSE, 160 Spear Street, Suite 1900, San Francisco, CA 94105, before me, Denise A. Ford, a Certified Shorthand Reporter, personally appeared

COLIN A. JOHNS, CPA

called as a witness herein, who, having been first duly sworn, was examined and testified as follows:

--oOo--

Page 5

EXAMINATION BY MR. FLEMING
VIDEO OPERATOR: Today's date is November 6, 2009. The time is 8:37. This marks the beginning of videotape no. 1 in the deposition of Colin Johns in the case of USA Capital Diversified Trust Deed Fund v. Wells Fargo Bank, Case No. 08-01135 in the United States District Court -- Bankruptcy Court, District of Nevada.
This deposition is taking place at Hemming Morse, Inc. in San Francisco, California.
Your videographer today is Jennifer McKay of Merrill Legal Solutions located in San Francisco, California.
The court reporter today is Denise Ford of Merrill Legal Solutions.
Would all present, Counsel, please voice identify yourselves and state whom you represent?
MR. BRUCKEROFF: Josh Bruckeroff for plaintiff USA Capital Diversified Trust Deed Fund.
MS. TSAI: Lisa Tsai also for the plaintiff.
MR. FLEMING: Dean Fleming for Wells Fargo Bank as the defendant, and with me is Becky Acosta.
VIDEO OPERATOR: Would the court reporter please swear in the witness?

Page 6

(Witness sworn.)
MR. FLEMING: Q. Would you state your name for the record, please?
A. Colin Anthony Johns.
Q. Counsel, for the record, as I understand it, you are designating Mr. Johns as a corporate representative under 30(b)(6) for the 30(b)(6) deposition?
MR. BRUCKEROFF: That's correct.
MR. FLEMING: What subject areas?
MR. BRUCKEROFF: He is going to testify on topic 7 and topic 15 to the extent that they concern his expert report.
MR. FLEMING: Q. Mr. Johns, you have been designated as a damage expert in this case; is that correct?
A. That's correct.
Q. How many other cases have you worked on with the Diamond McCarthy firm?
A. It depends on how you define "cases." There are matters relating to USACM Liquidating Trust and Diversified Capital as a plaintiff. In this matter today, if you group that as one or whether you break that down into parts makes a difference.

Page 7

Q. Let's just -- setting aside the USA Capital group of companies, how many other cases?
A. I have testified relative to one other group of cases which is the matter that you and I met originally involving the InverWorld group of companies.
I have consulted, but not been a testifying expert, in maybe three or four other cases.
Q. In those three or four other cases, are they ongoing or have they been concluded?
A. My understanding is that one is ongoing, but the others have been concluded.
Q. And the one that is ongoing, you have not yet been identified as a testifying expert?
A. I will not be the testifying expert in that case.
Q. What case is that?
A. It is -- well, I am not sure that we as a firm or the partner here is going to be the testifying expert or is anticipated will be the testifying expert who has been designated, so I am not sure I am free to disclose that.
MS. TSAI: Could the question be read back?

Page 8

(Record read.)
MS. TSAI: Dean, Mr. Johns has worked on a consulting basis on certain matters, and so we instruct him not to answer with respect to any matters on which he is a consultant. But to the extent that Mr. Johns has been designated or it is clear the intent is to designate him as a testifying expert, he can speak as to that engagement.
THE WITNESS: This particular case, although my firm -- I think I have touched on it very briefly only in a consulting capacity, and that is all of the involvement I have had in that. It is not a case that I am actively involved in. My firm is, but not me personally.
MR. FLEMING: Q. And is it the intention of Diamond McCarthy to designate someone in your firm as a testifying expert?
A. That is my understanding.
Q. So what's the name of the case?
A. The exact name of the case I can't tell you. I am not sure, but it relates to some of the Parmalat entities, P-a-r-m-a-l-a-t.
Q. And where is that case pending?
A. I believe it is in New York, but again, this isn't a matter that I am actively



123122e3-7412-4f0b-8142-c981c6b7887f

involved in, so I am not certain about that.

Q. In terms of the USA Capital group of companies, what are matters or cases in which you have been retained?

A. Well, my retention is actually a fairly general one. I have consulted on a number of matters, and I have also been designated, besides this particular case, in certain fraudulent transfer actions.

Q. I am sorry, on what?

A. Fraudulent transfer actions.

Q. What cases have you consulted on?

A. I have consulted on matters involving some of the outside accountants and the outside lawyers for the USA Capital group.

Beyond that, I believe those would be the main ones where I have been in a consulting role.

Q. When you say the accountants, are you referring to the case against Deloitte?

A. There were actually three different accounting firms, and I have consulted to some extent with respect to all three.

Q. To the Deloitte case?

A. I have consulted on that, yes.

Q. The Beadle McBride case?



A. Yes.

Q. And I forget the name of the third?

A. Piercy Bowler.

Q. Piercy Bowler.

You were not designated as an expert in any of those cases?

A. The Piercy Bowler and Beadle McBride I believe have settled. Deloitte is an ongoing matter, and I may be designated in that as we go forward.

Q. So to answer my question is you were not designated in the Beadle McBride or the Piercy Bowler cases?

A. No.

Q. Have you prepared reports or preliminary reports on any of those cases?

A. No.

Q. And which cases against law firms were you involved in?

A. I was only involved in, like I say, a consulting capacity. That related to the Kummer Kaempfer law firm. I may not be pronouncing that correctly.

Q. And in which matters have you been designated as an expert?



A. I can't give you an entire list. Most -- other than this case, I would only be in fraudulent transfer actions, and there have been approximately six cases. I am not sure. I would say approximately six cases that I have been designated in.

Q. They are only fraudulent transfer actions?

A. Yes.

Q. Can you provide the names of the cases, please?

A. One involved certain members of the Peterson family. One concerned the law firm Bingham McCutchen. One involved Mr. and Mrs. Monaco. I believe one -- although some of these have gone different stages, and some have gone away before I have done very much, but I believe one was also JMK was the name of the entity. There was a case involving the Hantges Children's Trust and Dr. Blanchard.

Those are the ones that I recall sitting here today.

Q. Is the case at present the only case in which you have been designated as an expert on behalf of Diversified Trust Deed Fund?



A. Yes.

Q. Have you been retained or have you been designated in any case as a damages expert behalf of USA -- or the trustee of USA Commercial Mortgage?

A. I view my client as USACM Liquidating Trust. If that's the same entity that you are referring to, then in matters that I just gave you a list of, I was designated as a damages expert in those.

Q. And only those?

A. To date, yes.

Q. Other than the ones you have listed as being consulting -- as cases in which you have been consulting, are you expected to be designated in any other cases involving USA Capital?

A. The only one that -- actually, I have heard mention of the fact that there could be other fraudulent transfer actions going forward, but nothing concrete has been discussed in terms of that. The only other one that there is I believe some expectation at this point that I will be designated is in the Deloitte matter.

Q. And have you issued written opinions in the fraudulent transfer actions in which you have





123122e3-7412-4f0b-8142-c981c6b7887f

been designated?
A. In most of the ones, if not all of the ones that I have listed for you, yes.
Q. Have you issued any other opinions other than in this case and the fraudulent transfer actions in connection with USA Capital?
A. No. And I assume -- I am including Diversified in that umbrella of USA Capital. I am not sure how you intended that.
Q. Yes.
Now in this particular case, you have prepared, by my count, 26 binders of data and material in connection with your work in this case, correct?
A. Most -- when you say "prepared," I believe most of that is just a compilation of source documents. The vast majority of that is really just copies of bank statements and things like that.
Q. Let me revise my question.
You have compiled 26 binders of materials for this case, correct?
A. Whatever -- that sounds approximately right, Counsel. They are all sitting on a cart over on the right there. I can count them if you want me to.



Q. That's fine.
Do the binders contain all of the material on which you have relied in rendering your opinions in this case?
A. I believe so, yes.
Q. Now are there any electronic files, such as spreadsheets and that sort of thing, that you have?
A. I have electronics files that would -- I believe all of the exhibits that are attached to my report, I have an electronic version of that on my computer or on the network here in the office, and obviously the report itself there is an electronic version of that.
Q. I also noted when we went through the files there appeared to be electronic work papers.
Do you have electronic work papers in this case?
A. To the extent there is anything in those binders that was prepared by us.
Q. I understand.
A. These days everything is produced electronically rather than by hand.
Q. We have not received yet the electronic copies that we asked for.



Can we get those?
MS. TSAI: Yes, we can work with Mr. Johns on what exactly he has electronically.
MR. FLEMING: I remember when I was here I had asked for that, and I still haven't received that.
Can we be sure we get that?
MR. BRUCKEROFF: Yes.
(Whereupon Exhibit 1 was marked for identification.)
MR. FLEMING: Q. Mr. Johns, we have handed you what has been marked Exhibit No. 1, and I am going to ask you if this a true and correct copy of your engagement letter for this case?
A. Yes, it is.
Q. What is the date of the engagement letter?
A. This was effective April of 2008.
Q. It is effective April of 2008?
A. Yes.
Q. When was it actually prepared?
A. Sometime in the last week.
Q. So until last week you had been working without a formal engagement letter?
A. Yes. With respect to Diversified Trust Deed Fund itself, there was a letter prepared



very early on that specified USACM Liquidating Trust as being the entity we were going to be doing work for, but there wasn't a separate letter generated when Diversified also became part of the client -- an additional client.
Q. So until the engagement was issued last week, were your billings being done under the USA Commercial Mortgage Liquidating Trust engagement?
A. It was captured under that number, yes.
Q. And were you paid by the same people who were -- were your services paid for by the USACM Liquidating Trust?
A. To be honest, I am not sure who is paying the bills. I submit my bills to Diamond McCarthy, and I don't physically see the check that comes in in payment of those bills.
(Whereupon Exhibit 2 was marked for identification.)
Q. Mr. Johns, I have handed you what has been marked as Exhibit 2, and I just want to ask you if that is a true and correct copy of the report you have issued in this case?
A. It appears to be, yes.
Q. Mr. Johns, do you have any updates,





123122e3-7412-4f0b-8142-c981c6b7887f

changes, modifications or revisions planned for this report?
A. There is one additional area that work has been done but it is not complete, at least in part because I understand that there is additional documents that the plaintiff has requested from Wells Fargo that they haven't received yet. But it is basically an analysis of the wire transfer activity in the Collection and Investor Trust account and the level of approvals that were called for within the bank.
Q. And what --
A. Relative to those wires.
Q. And what -- is this part of your damages analysis?
A. No. It is just an analysis of -- that I have been asked to do in terms of the transactions going through that account.
Q. You have all of the records of all of the wire transfers, correct?
A. Yes, but I don't have any of the records -- as I understand it, the information that has not yet been received from the defendant relates to the internal approval process within the bank relative to those wires.



Q. To the extent there is an internal approval process, can't you conclude if a wire transfer was -- took place that there was an approval?
A. I am not going to assume anything. In terms of what I have been asked to do is aggregate the wires in terms of what the dollar magnitude was and prepare some analysis based on that. And as I understand it, that will be either by me or by somebody else looked at in comparison to the internal approval documentation.
Q. Have you already done the analysis of the buyers themselves?
A. It is not final, but some portion of that work has been done, yes.
Q. When were you first asked to begin doing that work?
A. Sometime -- well, since the date of my report, so sometime in the last month.
Q. So just during the last month you have been asked to begin work on this?
A. The part that we are doing at the moment is not a huge part. It can't -- as I understand it, the overall task cannot be completed until the documentation is received from the bank.



Q. From the accounting standpoint though, you have all of the records you need for the actual wire transfer activity itself, correct?
A. Yes.
Q. Any other updates, changes or revisions that you anticipate?
A. Other than potentially preparation of exhibits, if there are any additional depositions as we go through this process that counsel believes are relevant to my opinions, I should look at to see whether there is any impact on new opinions I have expressed. Beyond that, not at this time.
Q. And so would it be fair to say that sitting here today you believe that your report contains all of the opinions you have been asked to give in this case?
A. To this point, yes.
Q. And you don't have any expectation at this point of any other opinions?
A. No.
Q. And other than the approvals that you referred to, are you waiting for any other information in order to complete any aspect of your work in this case?
A. Well, no, although the only other area



that counsel and I have talked about is, again, I think relative to some of the early time frame, it is my understanding that there are certain items that have been requested from the bank that haven't been received.
So to the extent that additional information became available relative to the early portion, say 2000 through 2002, or maybe earlier, then I may attempt to supplement some of the analyses that I have done and prepared here.
Q. Do you have -- let me just back up.
Have you ever worked on a case involving fraudulent activity by a mortgage broker such as USA Commercial Mortgage before this situation?
A. Not specific to a mortgage broker, no.
Q. Anything like that?
A. Over -- I think you are aware of the fact that I have been working in forensic accounting now for over 20 years. Many of the assignments that I have worked on over that period of time have some element of fraud involved, but I wouldn't say there are any that are equivalent or close in nature to this particular one.
Q. What is the level of your experience or expertise with regard to banking policies and

procedures?
A. I have a very general knowledge from having been working in public accounting for over 30 years and operating both on a personal level and here within my firm in a -- I am currently CFO of Hemming Morse. That's one of the hats I wear. So I have a general sense from that, but I don't claim to have an expertise in terms of the detailed inner workings of the banks.
Q. Or of their practices or policies?
A. That's correct.
Q. In fact, have you ever studied or reviewed any bank practices or policies?
A. I may have seen some over the years but not in the sense of anything that I would ever express an opinion on myself.
(Whereupon Exhibit 3 was marked for identification.)
Q. Mr. Johns, we are handing you what has been marked as Exhibit 3, and I just want to ask you is this a true and correct copy of the binder covers for the binders that you have compiled in this case?
A. It doesn't actually appear to be complete.
Q. In what respect?
A. You are short some. This goes from



binder -- you have two copies of binder 1, the cover sheet for that, and the highest number that you have here is 13c. My recollection is that the numbers go higher than that.
Q. Why don't we just take a break and let you look at the binders?
A. I may be wrong.
Q. I want to make sure we got everything.
VIDEO OPERATOR: Going off the record.
The time is 9:04.
(Break taken.)
VIDEO OPERATOR: The time is 9:09.
MR. FLEMING: Q. Mr. Johns, if you will look in your report and turn please to Exhibit 1?
A. Okay.
Q. Will you please explain what Exhibit 1 purports to show?
A. Exhibit 1 is a summary of the calculations that I have made with respect to the damages suffered by Diversified Trust Deed Fund, and the way this is set out is that I have done those calculations as of various dates, the earliest of which was March 31 of the year 2001, and they are on



a quarterly basis from that point on until June 30 of 2006. There are various columns here relative to the category of damages, and as of each of those dates, I have calculated the amount of damage that would have been avoided had the fraud been discontinued as of that date.
Q. So if, for example, we look at March 31, 2003, what you are saying is if we look at the far right on the total column, $64,138,471 of damage would have been avoided if the business had been discontinued as of that date?
A. I am sorry, what date were you looking at?
Q. March 31, '03.
A. Yes, the total but for the provision of the services by Wells Fargo and the continuation of the fraud, DTDF, Diversified Trust Deed Fund, would have not suffered damages totaling 64,138,471.
Q. Let me back up.
Are the figures that you have listed here, is that the total amount of money that left DTDF that was not returned to DTDF?
A. No. These are specific elements of damages that have been identified. There may be other items that could have been included, but these



are the primary ones where in -- let's see, in all but one instance here, this represents money that left -- was taken from -- can I call it DTDF or would you prefer me call it Diversified?
Q. We call it DTDF.
A. In all but one category these amounts represent monies that left DTDF and were not returned.
Q. And what is the one category where there is an exception?
A. That would be the unremitted collections where there were amounts that were owed to DTDF based on collections on loans in which they had an interest where they were not paid the amount they were due.
Q. And those would be collections by USA Commercial Mortgage?
A. Yes.
Q. How did you make the decision as to which categories of transactions to include within these damage calculations?
A. Through discussions with counsel, review of the complaint, and then discussions with the underlying client in terms of the nature of the losses that had been suffered by DTDF. That was the

Page 25

process, and as a result of that process, these are the categories that were identified.
Q. Were there specific categories of losses that were intentionally excluded from this analysis?
A. There are some things where additional amounts could, I believe, have been added, such as in no instance here do we claim anything related to the loss of use of funds. We are only looking at the amount in the case of some of these purported loans, the principal amount that was funded, no amount is included for any interest on those.
So there are some elements where the numbers could be higher. But with relation to the Epic/Tree Moss -- two different words category -- with respect to the Epic/Tree Moss, I built in an offset there for what I believe may be recovered by DTDF down the road. However, at this point it is looking like the number that I used is likely to be higher than what any eventual recovery might be. So again, that category could be higher than it is.
Q. What I am specifically referring to, are there transactions that you have specifically -- involving DTDF that you have specifically excluded from this analysis?

Page 26

A. No, I don't believe so.
Q. So basically the damages that you are calculating, except for you mentioned other kinds of damages, such as loss of use or interest, but basically if we look at Exhibit 1, this would show the total losses by DTDF?
A. These are only losses suffered -- that I believe were suffered as a result of the fraud. There may be other losses that were suffered by DTDF that don't have anything to do with the fraud, and I would not have looked to include those or investigated them.
The clearest example would be if they invested in a legitimate loan to an unrelated third party that was secured by a deed of trust and for whatever reason that loan went bad and there wasn't sufficient collateral, then there would be a loss incurred. Those types of things I am not including here.
Q. In terms of the losses that you have included here, you have included losses even though Wells Fargo may not have been involved in the transactions, correct?
A. There may not be any specific involvement, and some of these I haven't tried to

Page 27

identify whether a Wells Fargo account was touched in some way by the transaction, but these are losses that resulted from a combination of things, but they were all part of this fraudulent scheme that was perpetrated by the culpable insiders and could not have been -- or if that fraud had been discontinued as a result of the banking services not being provided, then obviously those specific transactions would not have occurred.
Q. I am going to need a read back on that answer, please.
(Record read.)
Q. Why have you chosen March 31 of 2001 as the starting point for your damages?
A. That was a date that was given to me by counsel as being -- I was asked to do my calculations on a quarterly basis starting with that date.
Q. Did you gain an understanding as to why that particular date was chosen by counsel?
A. No. Beyond that -- I think certainly at this point in time I believe there are at least a couple of transactions that are identified within my report that date back as far as 2000. So obviously this would be one of the first dates after those

Page 28

transactions.
But again, as I indicated earlier, it is my understanding that there may be additional information received relative to some of the early time frame. And so I think my understanding was that this was viewed as being the earliest date that it was likely to be -- the court was likely to consider.
Q. Do have you an opinion as to which of these dates would be the most appropriate date for identifying damages in this case?
A. No.
Q. Have you been asked to render or come up with such an opinion?
A. No. What I have been asked to do is calculate what I believe the damages are as of these various dates, and it is my understanding that the decision as to what date, if any, to use would be made by the trier of fact, the court.
Q. Now how would the fact finder use or deal with Exhibit 1 if there is a timing issue in terms of when monies were received by DTDF? Let me explain.
A. Yes.
Q. Let's just take a hypothetical,



123122e3-7412-4f0b-8142-c981c6b7887f

March 31, 2003.
A. Yes.
Q. You have got damages of $64,138,471.
A. Okay.
Q. Is that correct?
A. Yes. That's the same number we referred to earlier on.
Q. What if two days later a $20 million loan was paid off and received by DTDF, how do you deal with that kind of a timing difference?
A. That wouldn't unless -- well, that would not impact the damages calculation at all because these damages are specific to the items that I have laid out here and are contained in the additional exhibits. These damages have been incurred by DTDF the same as any other item. I am not saying that DTDF would discontinue operations or anything else as of these dates. The only thing I am saying is that if all losses for a certain point have been avoided, this is the amount that would have been avoided.
Q. You are not opining --
A. When I say "losses," these specific elements of damage suffered as a result of the fraud.



Q. You are not -- I forgot my question. Okay.
When you say "damage," are you referring to net cash outlays in each of these situations?
A. The specific items where I have included within the damages that I have calculated, other than the example I gave you before, the unremitted collections, all of these amounts represent cash that was taken from DTDF and was not returned. To the extent that there were some payments received, I believe I have incorporated those and netted them against the amount that went out.
Q. So amounts actually received then?
A. There are some instances where some amounts were received, yes, and those have been taken into account.
Q. Have you factored in the probability of any future recoveries on any of these items?
A. No. That would be, at this point, speculation on my part, and I am not aware of -- there is one instance where there has been a recovery that I have incorporated here. I am not aware of any other potential -- well, I am not aware of any other recoveries that have occurred.



The one thing I am thinking, I have factored in a potential recovery, as I said, in the Epic calculation that I have done, and at the moment that appears to be a very conservative calculation. If anything, I am overstating the likely recovery in my calculation there, but that is the only other instance.
Q. Have you given credit for all bankruptcy recoveries in your calculations?
A. The only amount I have given credit for in my calculations relates to HMA sales. That's the only one that I am aware of that relates to the specific transactions that we are dealing with here.
Q. Are there -- have there been bankruptcy recoveries by DTDF that you have knowingly excluded from this calculation?
A. Not knowingly, but I haven't -- I have not looked at what recoveries have been made during the bankruptcy proceeding. I have inquired and been supplied information by Mr. Tucker with respect to the specific items that I am looking at here. And like I said, my understanding, based on those discussions, is for the items that I have included in my damages calculations, the only recovery that has been achieved up until now relates to HMA sales.



Q. If DTDF has achieved recoveries other than these items, what would those be for?
A. There could be -- again, I am not involved in the general bankruptcy. I don't have knowledge of all of the issues involved there. I am just looking at a very specific set of transactions. There could be any number of things that they might recover monies on that I am not aware of.
Q. On Exhibit 1 there is a category called USAIP Advances?
A. Yes.
Q. Would you explain what that is, please?
A. That is an amount that was -- is cash that was taken from DTDF and transferred to USAIP. That is actually one specific transaction. It is a wire transfer for 170,000. And to my knowledge, there was no business -- legitimate business purpose for that money being transferred to USAIP, found no documentation of any debt acknowledged by USAIP to DTDF or any other documentation relative to that other than the fact that it is recorded through the bank records and in the general ledger.
My position -- my opinion is that had it not been for the fraud, there was no reason for those





123122e3-7412-4f0b-8142-c981c6b7887f

monies to be taken from DTDF and transferred to USAIP.
Q. The reason I ask the question is when I was -- when we were looking through your documents, we understood your only support for that was a line item in the balance sheet that said account receivable from USAIP.
A. No, we have actually identified and I believe included within the binders that you were given access to a copy of the bank statements, general ledgers, that evidence the 170,000 being transferred.
Q. If you look at paragraphs -- paragraphs 46 through 48 of your report --
A. Can you give me a page number?
Q. Pages 31 through 32.
In looking through the support that you cited in your report, the only support I saw was the balance sheet.
You are saying though that that's not correct, you actually have the -- underlying wire transfer documentation?
A. That is my recollection is that we have the general ledger and we also -- we may not have specific wire information, but we have bank



statements showing that the wire occurred. I can show you where I believe that is in the binders, but that is my recollection.
Q. We will see how our time goes today. If we have the time, we will have you go pull that for us.
Is that included in the $1.7 million of direct transfers that you have identified under the 10-90 loan, that 170,000?
A. No. The 170,000 was actually another item that at one time was considered for inclusion within this category, and we identified -- or I identified the fact that it was included in another category. That is -- that was excluded from here and left where it was already included.
I am not aware of any instance -- clearly if there was an instance where it was included in two different places, then it should only be there once.
Q. In terms of Exhibit 1, each of these calculations are done as of the actual day that is listed on this report, correct?
A. That's correct.
Q. So these are specific points in time from 2001 through 2006?
A. Right. And the way it operates, just



so -- I believe you understand it, but what we are saying, all transactions that occurred after that date would have been avoided -- all transactions relative to these damage elements.
Q. Now turn, if you would, please, to page 32 of your report.
A. Yes.
Q. In your summary, Item 2 reads as follows, "The amounts shown in Exhibit 1 are premised on the assumption that had Wells Fargo Bank ceased to provide services to USACM, 10-90 and Mountain Vista as of the dates shown, the subsequent damages discussed above would have been avoided by DTDF."
Who asked you to make that assumption?
A. I think that's an assumption that is fundamental to the approach that I have taken to calculating the damage. That if there is a cut-off in services as of a particular point in time, then the subsequent damages would not be incurred.
Q. So this is an assumption that you created?
A. I believe this is an assumption that either I created or has just come out of the normal evolution of determining what the damages are.



Q. Could you equally say that the amount shown in Exhibit 1 are premised on the assumption that had Nevada State Bank ceased to provide services to DTDF as of the dates shown, the subsequent damages discussed above would have been avoided by DTDF?
A. No, I don't believe so because the focus of the calculations that I have made are damages that were suffered as a result of the fraud that was being perpetrated and the continuation of that fraud and its concealment through the services that were provided by Wells Fargo.
What you are asking, whether I could assume Nevada State Bank wasn't involved in the concealment or assistance in the continuation of that fraud, so these particular damages you could substitute Nevada State Bank to somebody else. I am just dealing with what actually happened. I am not dealing with other hypotheticals or speculating on what might or might not have happened had Nevada State Bank not provided services to DTDF.
Q. You would agree that all of the transfers initiated at Nevada State Bank?
A. To the extent that monies were taken out of DTDF's account, they -- obviously that





123122e3-7412-4f0b-8142-c981c6b7887f

account was at Nevada State Bank.
Q. You would agree, for example, on the indirect transfers, as you call them, all of the transfers from DTDF to 10-90 occurred out of the Nevada State Bank account, correct?
A. Yes, they did.
Q. So would you agree then that the provision of wire transfer services by Nevada State Bank was also a significant role in any damages suffered by DTDF?
A. I don't believe so. I think it is the people perpetrating the fraud and the acts that were improper were being done primarily at the direction of those insiders and within the USACM entity. Clearly they also directed monies to be transferred out.
If money had not been taken out of DTDF's account, then there would be no loss other than the unremitted collections. But I think the fraud itself was being perpetrated within the USACM entity rather than within the DTDF entity. There was a fraud perpetrated on DTDF as part of that.
Q. DTDF was an active participant in the fraud, wasn't it?
A. I don't believe so.



Q. Who was the manager of DTDF?
A. Well, you are talking about -- I believe it is USACRA was the manager.
Q. Who was the manager of USACRA?
A. There you follow the link up to the top, and you come to the same culpable insiders, but that doesn't mean DTDF as an entity, which is what you were indicating, was an active participant in the fraud. It was a victim of the fraud in my mind.
Q. How could DTDF be a victim of a fraud when it only has one manager and that is Mr. Milanowski?
A. When somebody is not acting in accordance with the fiduciary responsibilities and is basically robbing the entity, misappropriating the assets, I think it is certainly a victim.
Q. So you think the entity itself is a victim?
A. Yes.
Q. Now, implicit in your assumption in paragraph 2 under your summary is if Wells Fargo had ceased to provide banking services, that no other bank would provide those same services, correct?
A. Yes.
Q. Your assumption is essentially that



Wells Fargo Bank had the ability to simply shut down the business of USA Commercial Mortgage and DTDF?
A. It certainly had the ability to choose to discontinue to provide the services to USACM that it provided.
Q. And your assumption is that USACM would not be able to find any other bank in the country to carry out those services, correct?
A. I am not -- I haven't been asked to speculate on whether there may or may not be another bank similar in the country that would provide those services. I am just dealing with the fact that Wells Fargo was in fact providing those services.
Q. Implicit in your assumption in Item 2 though is that if Wells Fargo had ceased to provide those services, no other bank would provide them, correct?
A. I am not sure that it follows. What is implicit from my assumption is that the fraud would have come to light, and actions, whatever they might be, would have taken place that would have prevented the damages suffered from DTDF from that point forward being incurred.
Q. You say --
A. That is my assumption.



Q. You say the fraud would have come to light.
How would come it have come to light?
A. Well, obviously, as explained within my report, the services provided by Wells Fargo to USACM enabled or assisted USACM in concealing the fact that there were shortfalls. They assisted in the actual transfer of monies from DTDF through 10-90, Mountain Vista, out to USAIP.
So it assisted in the scheme itself, the looting element of the scheme, and it also assisted in concealing that fraud. Had that not been done, then the payments that were made to the investors could not have been made.
Q. My question to you, sir, is if Wells Fargo Bank had discontinued those services at any point on this continuum that you have created in Exhibit 1, is it your assumption that that would have ended the fraud?
A. I believe it would have brought the fraud to light and actions would have taken place that would have prevented the losses suffered from that point forward.
Q. And is that an assumption on your part or is that an actual opinion that you have that is





123122e3-7412-4f0b-8142-c981c6b7887f

beyond the scope of speculation?
A. I believe there are other people that are going to address what action would have been taken had certain things come to their attention. What I am saying is that the services provided by Wells allowed this to be concealed. If those services had not been provided, then that concealment would not have occurred and it would have come to light.
Q. Those services --
A. I think when a fraud comes to light, it typically -- something happens to cause it to end.
Q. How would it have come to light?
A. Payments that would have been or were made to various investors could not have been made.
Q. How many bank accounts did USA -- let me back up.
With how many banks did USA Commercial Mortgage do business?
A. I was going to ask you in what sense, but I know Wells Fargo was a primary bank. I am not aware of all of its banking relationships. I am focused in the analysis I have been asked to do in the Investors Trust -- primarily with the Investors



Trust and the Collection Trust accounts, both of which were at Wells Fargo.
Q. If there were Investor Trust accounts and Collection Trust accounts at other banks, and if Wells Fargo had terminated its relationship, and assume with me that USA Commercial Mortgage could use these other bank accounts to route its funds, the fraud would have continued, would it not?
MR. BRUCKEROFF: Objection, form, speculation.
THE WITNESS: I think that is speculation. I am not aware of there being any other trust accounts, so I am not aware whether that's a situation we are dealing with, but the existence of other trust accounts would not affect the fact that there were shortfalls in the Collection Trust account at Wells Fargo Bank, and that is what would have caused the fraud to come to light because the payments being drawn on that account could not have been drawn without some of the other activities or assistance that was provided by Wells.
MR. FLEMING: Q. So you are just refusing to consider the possibility that this fraud could continue on with another bank if Wells Fargo



had ceased to do business?
A. What I am saying is I am not -- I have not been asked to do that analysis, and I am not prepared to speculate on whether another bank would have undertaken to provide those services to the people who were committing this fraud.
Q. What services did Wells Fargo provide other than deposit services?
A. I believe this is more in the area that is going to be addressed by DTDF's other experts, but my knowledge would include there were ACH services provided. There were certain investment services provided. There were obviously wire transfer services provided. I have seen reference in documents that I have looked at in terms of there being a credit facility provided and payroll accounts. I think it is a very broad range of services.
Q. What about Bank of Commerce's provision of services to USAIP, was that part of the fraud?
A. I think USAIP was the recipient of some of the funds that were taken from other entities as a result of the fraud.
Q. So is Bank of Commerce's provision of



banking services to USAIP a cause of the loss?
A. I don't believe so.
Q. Why?
A. Because, again, the items that I am citing as being the cause or the assistance provided by Wells Fargo Bank which enabled the concealment and the direct looting refers specifically to items associated with allowing transfers between various trust accounts, allowing there would be negative balances. There are specific items that relate to the operation of the Wells Fargo accounts, not to the account that was at Commerce Bank with USAIP.
Q. You have used the term "substantial assistance" a number of times in your report.
Would you please give me your definition of "substantial assistance"?
A. I am aware of the fact from talking with counsel that there is a legal meaning associated with that in some courts. That is not what -- the sense I am using it. You could say significant assistance, extensive assistance. In my mind, they are the same thing as "substantial assistance."
Q. And what --
A. It is a large degree of assistance.





123122e3-7412-4f0b-8142-c981c6b7887f

Page 45

Q. So the assistance occurred in the provision of banking services?
A. Through the provision of certain services and by allowing certain transactions to take place.
Q. Such as -- give me an example?
A. The transfers between trust accounts, allowing various items to be cleared from the account when it created a negative balance in a trust account. Some of the transfers of funds that occurred involving the 10-90 and Mountain Vista accounts.
Q. Let me ask you this: Is it your belief then that a bank has the obligation to be policing the wire transfer activity of its customers?
A. That is, again, an area that I think Mr. Burdiss is going to address rather than me, but in a very general sense I believe there are some responsibilities, but that is not my area of expertise.
Q. Other than providing the banking services you have just described, in what -- what other ways did Wells Fargo substantially assist?
A. I believe there are -- I think those

Page 46

are the main items in terms of I talk within my report in terms of assistance of the direct looting, which is the taking of the money and transferring it through 10-90 and Mountain Vista. To some extent you could argue that the January 2003 transaction represented looting as well. There is also the concealment, and that is the services that were provided by Wells that helped to conceal the fact there was a shortfall of funds in the Collection Trust account.
Q. When you say "concealment," can you give me an example?
A. Well, to the extent that payments to investors were due to be made for a certain amount of money, and because of the fraud, that amount of money wasn't in the Collection Trust account, and the bank allowed or encouraged or whatever sufficient funds to be transferred from a separate trust account that wasn't supposed to be in any way commingled, allowing funds to be taken from that account to cover the shortfall and allow payments to be made to investors. I think that helps to conceal the shortfall of funds.
Q. Were you aware that the financial institutions division of the State of Nevada did

Page 47

annual audits on USA Commercial Mortgage?
A. They weren't necessarily annual in nature, but I know they did periodic audits, yes.
Q. Were you aware that when they did these periodic audits, the bank statements of the Investors Trust account and the Collection Trust account were reviewed?
MR. BRUCKEROFF: Objection, mischaracterizes the evidence.
THE WITNESS: That depends on which examination you are talking about because at least in some of the examinations I have seen the two accounts did not exist, and that was a reason for the FID reprimanding USACM at that time.
MR. FLEMING: Q. That was before 2001 though, correct?
A. I believe so.
Q. Since 2001 are you aware that the FID reviewed the banking statements from the Investor Trust account and the Collection Trust account?
MR. BRUCKEROFF: The same objection.
THE WITNESS: To be honest, without going back and refreshing my recollection, I do not know exactly what the FID -- I have read the reports over time, I believe I cite two of the earlier

Page 48

reports in my report. I know they look at a lot of internal documentation. How much they look at in the way of the bank statements, I would have to refresh my recollection.
MR. FLEMING: Q. But in any event, those statements would have been available to the financial institutions division, correct?
A. Certainly there are -- to the extent that that was part of the financial records of the entity, then I would expect it to be available to them.
Q. Would you agree that when repeated transfers of funds were made from Nevada State Bank directly to the 10-90 account, that Nevada State Bank substantially assisted in the fraud?
A. Obviously the ability that -- well, at least as far as DTDF, the entity was concerned that was supposedly a funding of a loan to 10-90 and would be no different than -- on its surface than any other loan funded by DTDF.
To the extent that that would be at least on the surface a normal transaction, not necessarily -- I have not been asked to analyze the role of Nevada State Bank in this, but it would appear to me in terms of their involvement to just be a routine





123122e3-7412-4f0b-8142-c981c6b7887f

Page 49

transaction.
Q. Would Bank of Commerce when it received repeated transfers from Mountain Vista have substantially assisted in this fraudulent activity?
A. Again, that is not an analysis that I have been asked to perform, but the receipt of funds for investment in some of the projects that USAIP was involved in, I don't view that receipt per se as being substantial assistance by Commerce Bank.
Q. Why?
A. Again, there are lots of monies going to USAIP that would be seen, at least in my mind, by Commerce Bank as a normal, typical transaction involving the business of that entity.
Q. Did Victoria Loob provide substantial assistance in this fraud?
A. She certainly participated in some of the transactions that were fraudulent or part of the fraud, although I believe she was just acting at the direction of her superiors within USACM.
Q. Did Joseph Milanowski substantially assist in this fraud?
A. Joseph Milanowski I believe is clearly one of the culpable insiders, as I referred to, and was one of the perpetrators of the fraud. He did

Page 50

not substantially assist. He was the guy that was being substantially assisted.
Q. And so who was substantially assisting him within the company? Somebody had to give the wire transfer instructions.
A. I am not sure that that in my mind -- that is, you are getting down to lower-level employees that are just working at the direction of their superiors, and I am not sure that in my mind that rises, the way I use the term, to substantial assistance.
Q. Why not? Just because they are taking directions from their employer?
A. They don't necessarily know those transactions are improper.
Q. How about the chief financial officer, did he substantially assist?
A. That -- I am unclear at this point in time as to the exact level of knowledge that that individual had with respect to some of these transactions, okay? And, again, it is not part of the assignment that I have been asked to undertake.
Q. Are you saying that only Wells Fargo substantially assisted in this fraud?
A. Not necessarily, no. I haven't been

Page 51

asked to evaluate all of the other potential people, if there are other potential people, that could have played a role in that. What I have been asked to do is certain calculations relative to Wells Fargo substantially assisting in the fraud.
Q. Let's look at Exhibit 1 real quickly, the 10-90 loan, going across the top.
A. Yes.
Q. Did David Fogg substantially assist in that loan in those transactions?
A. David Fogg -- again, David Fogg certainly was involved in those transactions.
Q. Did he substantially assist?
A. He was a party. I am not sure, again, what his knowledge was, but he was the individual that set up the accounts with Wells Fargo. He was the one that processed the wire. So certainly he played an integral part. It is a question of whether he assisted or was one of the perpetrators.
Q. Colt Gateway loan, were there people outside of the USA Commercial entities involved in the Colt Gateway loan?
A. Not that were, in my mind, involved in the fraud.
Q. Was the Colt Gateway loan part of the

Page 52

fraud?
A. No. The use of DTDF's funds to make or participate in that loan is what I view as being fraudulent in nature.
Q. What about the loan is fraudulent?
A. It was a prohibited transaction as far as DTDF was concerned. It involved a related party that wasn't necessarily -- well, just there I think it was prohibited because DTDF was not supposed to be making loans to its manager or the entities affiliated with its manager.
Q. In that case USAIP was a 50 percent owner of Colt Gateway, correct?
A. That's my understanding, yes.
Q. And other third parties own the other 50 percent?
A. It is my understanding that it was one other entity owned the other 50 percent, but again, we have the documentation. We can verify that.
Q. That other entity, did that other entity substantially assist in the fraud by procuring the loan from DTDF?
A. No. It is my understanding from the documentation that I have looked at that they were merely the recipient of the loan.

Q. Apart from the fact USAIP owned 50 percent of Colt Gateway, was there anything else, as you call it, fraudulent about the loan?

A. I think there were other requirements in terms of what DTDF was supposed to -- what DTDF's funds were supposed to be used for in terms of making loans. There were -- the affiliates of the manager would be one prohibition. There were also supposed to be loan-to-value ratios. You were also supposed to have security in the form in the first deed of trust. If you look at the various Colt loans then or purported loans, then there are violations of a number of those requirements.

Q. Are you saying or suggesting that Wells Fargo should know what those loan requirements are?

A. No. This is an area where my position is these are damages that resulted to DTDF from the fraud, and had the banking services not continued and allowed the fraud to continue, these losses would have been avoided. I am not even saying that -- this is one of the items where I said I haven't looked to see whether a Wells Fargo account was touched by these transactions.

I am assuming given that USACM was involved



that they could have done. If the loan was funded in the standard process, then it would have involved the Investor Trust account, for instance, but I am not saying that Wells Fargo was directly involved in some of these specific transactions. What I am saying is the damages resulted from the provision of services that allowed the fraud to continue.

Q. Do you know if the funds from DTDF to Colt Gateway even went through a Wells Fargo account?

A. I believe I just said I haven't even looked at that.

Q. And would the same be true of what you call the other purported Colt loans?

A. Yes, it would.

Q. Epic/Tree Moss, who else besides USACM was involved in the Epic/Tree Moss loans?

A. Well, you actually have two different sets of entities here, and the first set of transactions, the original Epic loan, I find no fault with the way that was structured or funded. I don't believe that per se was anything to do with the fraud.

At a certain point in time the Epic or the Epic entities ran into financial difficulties and



actions were taken by DTDF to foreclose on the loan and take the property. Where the fraud occurred in this particular aspect is the culpable insiders, I am talking about Mr. Milanowski and Mr. Hantges, caused a quitclaim deed to be executed by DTDF that transferred title to that property to an entity called Tree Moss that was wholly owned by USAIP.

And it was the execution of that quitclaim deed and the loss of the property as a result, as far as I can tell, no consideration being received for that transfer, that has caused the loss or the damage to DTDF.

Q. Who executed the quitclaim deed on behalf of DTDF?

A. I believe it was done by Mr. Milanowski, but again, I also think there is a copy of that in the documentation that I provided.

Q. What role, if any, did Wells Fargo have with regard to that transaction?

A. Other than having continued to provide services up through the point in time where that fraudulent act took place and therefore helping or assisting the perpetuation of the fraud to that point in time, I am not saying they had any direct involvement.



Q. Would it be fair to say that -- let me back up.

How much experience have you had in investigating Ponzi schemes?

A. I think I have been involved in some aspects. There have been probably at least five or ten cases that I have worked on over the years that have involved Ponzi schemes, and I have -- obviously, it is a very well publicized type of scheme at the moment, but I have had awareness of and knowledge of Ponzi schemes for a lot longer than that.

Q. Would you characterize USA Commercial Mortgage and its related entities as a Ponzi scheme?

A. I believe that one aspect of the fraud that was being perpetrated by the culpable insiders was a Ponzi scheme.

Q. What aspect was that?

A. Where they were using funds either coming in from borrowers or from new investors to pay obligations that otherwise could not have been paid.

Q. In your experience, the Ponzi schemes that you worked on, were bank accounts used to carry out the Ponzi schemes?





123122e3-7412-4f0b-8142-c981c6b7887f

Page 57

A. Well, frequently there is -- I mean, it involved the movement of cash typically, and most of the time some kind of involvement on the part of a bank is the case. Things go in and out of bank accounts.
Q. Would it be your opinion any time there is a Ponzi scheme the bank that provides accounts to the fraudster substantially assists in the Ponzi scheme?
A. No.
Q. Why not?
A. Because what I am looking at is what I believe were improper or unusual transactions, and these are addressed more fully as to the nature of the usualness by Mr. Burdiss, but these are transactions that I don't believe were legitimate transactions even in terms of the bank.
There are other instances, and I think this is where there is just the deposit and withdrawal of funds and nothing else happening in terms of the provision of services by a bank, it wouldn't necessarily operate in the same way.
Q. So you are saying that there is something that Wells Fargo did in this case that makes it a substantial assister that would not be

Page 58

the case in other Ponzi schemes?
A. I believe so.
Q. And that would be --
A. The allowing of transfers between accounts where I think Mr. Burdiss will get into more detail, but where there were improper transfers allowing the shortfalls in one trust account to be covered using the funds from another one, allowing a trust account to operate with negative balances, and I believe the transactions involving 10-90 and Mountain Vista, in my mind that clearly looks like money laundering, and I would expect the bank to be aware of that.
Q. In terms of these transfers between the Investor Trust account and Collections Trust account, do you know whether the Nevada state laws on that subject apply to national banks?
A. I have not looked at the regulations with respect to national banks. What I have looked at is regulations relative to the mortgage broker which would be the customer of at least Wells Fargo in this instance.
Q. So you don't know whether the revised -- the Nevada statutes on the subject even apply to Wells Fargo?

Page 59

A. The section I have looked at governs the manner in which USA Capital's business is to be conducted.
Q. Are you aware of any law that prohibits a bank from honoring a request for -- a national bank honoring a request for a transfer from an Investor Trust account to a Collection Trust account?
A. I am not, but again, that I believe is more within Mr. Burdiss's area of expertise than mine.
Q. The reason I was asking, in places in your report you refer to that as a wrongful provision of transfer, meaning that there is wrongdoing on the part of Wells Fargo. I am asking the basis for that opinion.
A. Well, I think the basis for that would be the fact that Wells Fargo knew the nature of USACM's business. I think that even I know from my general knowledge that there are some responsibilities imposed on banks in terms of knowing their customers, and that the nature of trust accounts in general would suggest that that is money being held for other people.
Q. And --

Page 60

A. And, therefore, transfers between accounts would certainly be atypical, not usual transactions. In this case, there are actually specific regulations that apply to USA Capital that say those monies are to be kept separate. In my mind, that's improper.
Q. Have you investigated or determined whether any other mortgage loan brokers in Nevada would make those kinds of transfers in their accounts?
A. No.
Q. You can't say whether it is usual or unusual?
A. All I can address is the fact that Nevada's regulations say you should not do it.
Q. And you are not positing yourself as a legal expert, are you?
A. No, I am not, but I have read the Nevada statutes, and I am certainly not a lawyer. I am just the accountant here, but I think the language is very plain within that statute where it says that the monies collected from investors for funding a loan are to be kept separate from not only payments being made on loans but other funds of the mortgage broker and has similar provisions with

respect to the Collections trust account.
I am not drawing a legal conclusion, but I think it is pretty plain language that that is how I interpret it as an accountant.
Q. Do you know if USA Commercial Mortgages was ever cited for improper commingling of funds after they established the Investor Trust account and Collection Trust account by the Nevada financial institutions division?
A. That I don't recall whether they were or not. I know that they were cited in the early days for not having the necessary two accounts to keep those funds separate. I don't recall whether the FID ever picked up on the transfers that were occurring or the fact that those funds weren't always being kept separate.
Q. Look at page 2 of your report.
On the paragraph C at the top of the page, the second sentence says, "As detailed below, Wells Fargo Bank's provision of felonious transfers between the Investors Trust account and Collection Trust account concealed large negative balances in the Collection Trust account and thereby the underlying Ponzi scheme."
What is your basis for concluding that these



were felonious transfers?
A. It is my understanding from reading the Nevada statutes and from discussions with counsel that the transfers between accounts of that type over a certain dollar amount are considered -- are felonies.
Q. Who are you accusing of being a felon?
A. I think it is the people that -- well, I am not going to be drawing any legal conclusions there either, but I think it is the person that makes the transfer, so I would imagine that would be USACM rather than the bank. But all I am saying here is the actual making of those transfers, my understanding is that transfers of that nature over a certain amount are a felony.
Q. Would you explain, if you would, the causal connection between the so-called felonious transfers and the damages sustained by Diversified?
A. The causal connection is quite clear in as far as the transfers we used to cover shortfalls in the Collection Trust account and resulted in payments continuing to be made by investors or two investors on a timely basis that otherwise would not have been possible and therefore concealed the fraud and allowed it to continue.



Q. Instead of -- in essence it amounted to advancing of funds, correct, to the Collection Trust account?
A. It was taking other funds and allowing those to be used by the Collection Trust.
Q. Were those funds from DTDF or from other investors?
A. They were from the Investor Trust account which could be -- it is from investors. Whether they be the same or different doesn't matter. Those funds were supposed to be kept separate.
Q. My question is the funds that were transferred from the Investor Trust account to the Collection Trust account, did that include any funds of DTDF?
A. At certain points in time clearly there would have been funds of DTDF in the Investor Trust account. I am not aware with respect to the specific transfers as to whether there was or was not DTDF monies in the Investor Trust account at that time. Certainly money -- to the extent there was monies fungible, you can't tell whose money it is being taken and transferred. It would just be -- it may have been, may not have been, some of DTDF's



money in that account at the time of the transfer.
Q. You haven't analyzed specifically whether at the time of the transfer any funds of DTDF were in that account?
A. I have not.
Q. As I recall, I think you identified roughly four time frames in which funds were transferred from the Investor Trust account to the Collection Trust account and then transferred back later or paid back later to the Investor Trust account.
Is that correct?
A. It was three or four time frames with ones that I highlighted in my report, yes.
Q. Did you ever undertake to learn why those took place, those transfers?
A. The transfers that I highlighted within my report?
Q. Yes, sir.
A. Where there are certain of those transfers, clearly were made to cover shortfalls. Those are the ones that I discuss at most length within my report.
Q. In terms of those transfers, did you undertake to determine if those were done because of





123122e3-7412-4f0b-8142-c981c6b7887f

Page 65

a timing issue, in other words, the company wanted to issue the payments on a certain date using ACH but perhaps a borrower asked for a ten-day extension or something like that?
Did you ever attempt to determine if that was the reason for these shortfalls?
A. There was no -- there is no documentation that would evidence or that I have seen that would evidence any such request. What I can say -- and there is no obligation on the part of USACM to make any payments to the investors if money has not been received.
So the way it should operate on the Collection Trust account is money comes in from a borrower and USACM takes those fees relative to servicing those loans, and then what is left goes out to the investors that funded those loans that are being repaid or that are receiving interest.
Q. I understand that's how it is supposed to go. I guess what I am asking you is did you ever investigate why on those -- only those four occasions or -- three or four occasions monies were taken from the Investor Trust account and later paid back.
Did you seek to determine whether although

Page 66

it may have been a technical violation, it was just a practical situation of wanting to pay the investors knowing that the money was coming in?
A. I don't believe -- I certainly have not seen -- I have looked at what explanations there were for the transfers, and I see no indication that that was the case. I am aware of the fact that there are non-performing loans and that payments are being made to investors, and that had been the case for a period of time.
As you make those payments, you are going to have a shortfall. There are some amounts that the funds that you receive aren't sufficient obviously to fund all of the payments that are being made.
Q. So the only causal relationship then between what you are calling the felonious transfers and the damages sustained by DTDF is merely the fact that Wells Fargo continued to provide banking services to USA Commercial Mortgage?
A. No, I don't believe that's what I said.
Q. What are you saying?
What is the causal connection?
A. The fact that they allowed transfers of monies between trust accounts where the funds in

Page 67

those trust accounts were supposed to be kept separate, there were times when they allowed the Collection Trust account to have a negative balance.
Q. I am sorry, I am focusing only on the felonious transfers, what you are calling the felonious transfers.
What is the causal relationship between the felonious transfers and the damages caused that you claim were incurred by DTDF?
That's all I am focusing on right now.
A. The causal connection is the felonious transfers one mean used to cover -- conceal the fact that there was a shortfall of funds and therefore allow the fraud to continue.
Q. By USACM?
A. Yes.
Q. We have been going at it a little while. Why don't we take a little break.
VIDEO OPERATOR: This marks the end of tape no. 1 in the deposition of Colin Johns.
Going off the record. The time is 10:21.
(Break taken.)
VIDEO OPERATOR: This marks the beginning of tape no. 2 in the deposition of Colin Johns.

Page 68

Back on the record. The time is 10:53.
MR. FLEMING: Q. Mr. Johns, during the break we added the missing binder pages to Exhibit 3; is that correct?
A. That is correct.
Q. And having added those pages, now is Exhibit 3 a complete copy of the binder covers for the work that you have done in this case?
A. I believe so, yes.
Q. Mr. Johns, can you tell us what percentage of funds under management by USACM the DTDF funds were?
A. No, that is not an analysis that I have undertaken to perform.
Q. Is there -- can you give us an estimate? In other words, was it half, more than half, less than half? Understanding it is a guess. I am just --
A. To be honest, I wouldn't even want to guess at that. Obviously depending on what time frame you look at, DTDF could be a significant portion, but in the earlier days, obviously, DTDF wasn't around for the entire length of time that USACM was in operation, and towards the later part of the time you also have first trust deed funds

that is involved. So without having done the analysis, I wouldn't want to guess.
Q. In the report you refer to Mr. Hantges and Milanowski as culpable insiders.
Where did you get that term, "culpable insiders"?
A. That's a term that I believe has been used throughout the time frame that I have been involved in work relative to the USA Capital group and over time has become, I believe, an accepted reference to Mr. Hantges and Mr. Milanowski.
Q. How would you define the term "culpable insiders"?
A. The principal people within the USA Capital management that were perpetrating the fraud.
Q. How did you determine -- let me just back up.
What did Mr. Hantges do to become a culpable insider?
A. I think he was involved in many of the transactions. His level of involvement varies from one time to another, but it is my understanding based on the work that I have done over the last couple of years that he was an integral part of the fraud and the perpetration of the fraud.



Q. Of the fraudulent activity that you have described earlier, was he involved in directing any of that activity?
A. I believe he was involved in some of that activity. There are different transactions that have different handprints on, if you would like, where Mr. Milanowski may be more visible in terms of having executed documents, but Mr. Hantges, my understanding, was very involved in the underlying fraud.
Q. For what period of time?
A. I am not sure that I would limit it. I think there are -- I at least have heard references to periods of time where -- I am not sure whether you call them health reasons or otherwise, Mr. Hantges may not have been as actively involved in the day-to-day operations of USA Capital, but certainly he was one of the beneficiaries of the fraudulent scheme, and it is my understanding that he was very much involved.
Q. You talk about the beneficiaries of the scheme.
Has anyone traced any of the money from DTDF into either Mr. Milanowski's or Mr. Hantges' pockets?



A. Not that I am aware of, but much of the money that was looted from DTDF ends up in entities where USAIP had equity interest or some interest in another entity, and USAIP, the ownership of that, involves both Mr. Milanowski and Mr. Hantges.
So if you are talking in terms of their personal bank account, have we traced money into a particular personal bank account, I haven't attempted to do that. We have traced where much of DTDF's money went, and it typically went to an entity where they had a financial interest.
Q. But were you able to determine whether they financially benefited from that entity after the transaction occurred?
A. I have not attempted to take it to that level.
Q. Did you undertake to determine whether there were other culpable insiders besides Mr. Milanowski and Mr. Hantges?
A. No, that hasn't been part of the assignment that I have been asked to undertake.
Q. Throughout the duration of your damage calculations in March of '01 through some point I think in 2006, July, June, what was Mr. Milanowski's



position vis-a-vis USA Commercial Mortgage?
A. I am not sure whether there is a change in -- during that time frame, I don't know if I refer to that specifically in my report or not by title, but on page 6 of my report in paragraph 13 I refer to the fact that Mr. Hantges was the chairman and CEO of USACM and Mr. Milanowski was the president.
I haven't undertaken to see whether that varied at all, but it is my understanding that those were the roles that they played within the management if not for the entirety of the period, certainly the vast majority of it.
It is my understanding that I believe during the time frame you referred to that that would have been throughout that time period.
Q. So Mr. Milanowski was president of USA Commercial Mortgage for the -- to the best of your knowledge throughout that time period?
A. That's correct.
Q. And would you agree that he was also the sole manager through USACRA of DTDF?
A. That is my understanding, yes.
Q. Did DTDF have any kind of investor oversight board or any other kind of board to which





123122e3-7412-4f0b-8142-c981c6b7887f

Page 73

Mr. Milanowski would be held accountable?
A. That I have not looked at, and so I am not sure.
Q. In terms of all of the transfers that you consider fraudulent, have you investigated whether Mr. Milanowski was directly or indirect- -- well, let me back up.
In terms of all fraudulent transfers you have looked at, have you found any evidence that -- of any transfers that did not involve Mr. Milanowski -- or let me start over. Let me start over.
Looking at all of the transactions that you consider to be fraudulent involving USA Commercial Mortgage, have you found evidence that either Mr. Milanowski or Mr. Hantges directed those transactions?
A. I believe it is fair to say that all of the transactions that I have looked at that were part of the fraud, one or both of those individuals were involved in those transactions.
Q. In other words, were you able to find, for example, an e-mail from either Mr. Milanowski or Mr. Hantges directing someone to carry out those transactions?

Page 74

A. I have seen e-mails where people have been instructed to make a particular transfer. There are other -- where there is documentation that purports to memorialize some of the transactions, typically execute -- those documents are executed by either Mr. Hantges or Mr. Milanowski.
Q. Have you -- like, for example, the transfers from the Investor Trust account to the Collections Trust account, have you been able to find evidence that on each occasion Mr. Milanowski directed the transfer of those funds?
A. Not any written documentation, certainly not in every case, although it is my understanding from reading the deposition of Ms. Low --
Q. Loob?
A. -- Loob that Mr. Milanowski was involved in if not all, certainly the majority of those transactions.
Q. Is there a difference in your mind between a person who is controlling a company and someone who is an insider, a culpable insider, with regard to the fraud?
A. I don't draw the distinction in my mind. The culpable insider in this instance

Page 75

happened to be the two people that controlled the day-to-day operations of the USA Capital group. So in this particular instance they are one and the same.
Q. Was Mr. Milanowski accountable to anyone on the USA Commercial Mortgage aspect of the fraud?
MR. BRUCKEROFF: Objection, vague.
THE WITNESS: Depends on what you mean by "accountable" because, obviously, there are significant shareholders within USACM. The majority of the equity interests in that entity were held by Mr. Hantges and Mr. Milanowski. There were at other times at least one other shareholder that I am aware of. There were other members at different times of the board of directors. Management typically would be accountable to the board of directors.
MR. FLEMING: Q. In terms of how the company functioned, did the company -- did Mr. Milanowski and Mr. Hantges hold themselves accountable to the shareholders and the board?
A. I believe, at least my personal view, and this is just a sense, I have not read all of the board of directors' minutes or anything like that, so this is just a sense rather than anything more

Page 76

than that, and that would be that they pretty much did what they wanted to do.
Q. And neither the shareholders of USACM nor any independent directors sought to hold them accountable, correct?
A. That I can't speak to. I have not looked at that issue.
Q. Have you been aware of any situation where a shareholder of USACM or a board member -- an independent board member attempted to hold Mr. Milanowski or Mr. Hantges accountable for their actions as president?
A. I am not aware of any instance of that, but that doesn't mean that that may have occurred and I may not be aware of it.
Q. On pages 8 and 9 of your report you have a section starting with paragraph 11 on page 8 called Unremitted Collections from Borrowers.
A. Yes.
Q. Page 9, at the top of the page, am I understanding you to say that the December 31, 2001 audit report disclosed that there were $7 million in interest and principal payments that were being held by USACM that was due to DTDF?
A. Yes. There was a -- I quote in my

Page 77

report a footnote that appeared in DTDF's audited financial statements relative, and it is headed Subsequent Events. These were checks if the auditors of DTDF became aware that had not been remitted at that time that were dated -- and I go through what dates of the various checks are.
Actually, the reason it is in a note called Subsequent Events is these were all checks that were generated subsequent to the balance sheet date covered by those financial statements, but there were checks dated between January 5, 2002 and May 6, 2002 that had not been remitted as of the date that the financial statements were issued. I think here it quotes as of May 23, 2002 those checks had not been remitted.
Q. So it is pretty evident then that DTDF and USA Commercial Mortgage were not hiding the fact from the auditors that they were holding checks payable to DTDF, correct?
A. I think that the auditors of DTDF became aware of this, and that's why they disclosed it, and that doesn't mean that there wasn't some attempt on the part of the management to hide it. All this reflects is the fact that at some point in time DTDF's auditors became aware of the fact that

Page 78

these four checks at that time had not been remitted.
Q. Are you aware of any attempt by USA Commercial Mortgage or DTDF to hide the existence of these held checks from the auditors?
A. I think at least when you get to the transactions that occur in December 2002 and January 2003, the way that those transactions is structured in my mind were done to avoid significant questions being raised in the minds of the auditors as of the end of 2002 and to avoid something similar to this occurring as of that date.
Q. I am asking about with regard to the 2001 audit, are you aware of any attempt by either USA Commercial Mortgage or DTDF to hide from the auditors the fact that there were these held checks that had not been given over to DTDF?
A. I am not aware of any specific action taken to hide these checks, but all of the checks I could say were dated subsequent to the end of 2001, therefore wouldn't typically be part of the information that was the focus of the 2001 audit.
Q. So even though it is not the focus of the 2001 audit, evidently it was somehow disclosed to the auditors, correct?

Page 79

A. It was somehow discovered by the auditors of DTDF.
Q. Now were all of these checks ultimately paid?
A. These particular checks do end up being released, and they end up being replaced by other checks that are held in their place.
Q. You are saying that other checks were issued and held in place of these checks?
A. Yes.
Q. Is that -- are they part of the 11.425 million in transfers?
A. As of the end of 2002, the amount that has accumulated that is being held at that point in time has grown from this 7 million to 11.2 million roughly.
Q. Why do you say that the second series of checks were held in place of these? I am missing a connection between the two.
A. It is only by holding subsequent checks that the money -- sufficient money is available to allow these checks to be released.
Q. These particular checks?
A. Yes.
Q. Well, these particular checks were

Page 80

released and paid in June and July of 2002, correct?
A. Correct.
Q. The other held checks didn't occur until when?
A. I believe the -- we can -- I think I have information, but most of that -- the checks that were part of the January transaction were actually related to activity sometime in the last quarter of 2002.
What happens here is in order to release these checks, you need to hold other checks. In order to release those checks, you need to hold subsequent checks. So it is a sequence of checks, and what you end up with at the end of the day, at the end of 2002, at that point in time you have 11 million of checks or other monies that have come in have been used to provide the money to allow these checks to be paid.
Q. Are you aware -- other than the checks that were held in December of 2002, are you aware of any other held checks involving -- and I am sorry, let me start over.
Other than the checks identified on pages 8 through 10 and the held checks in December of 2002 that were deposited, are you aware of any other held





123122e3-7412-4f0b-8142-c981c6b7887f

checks for any other entity or person or investor?

A. The only people that I am aware of where checks were actually held and not remitted were checks to DTDF. However, there are payments that come in that are repayments of loans where the principal amount is not recorded or is not paid through to the investors, and those principal funds are used for other purposes, partly to cover shortfalls, partly for other uses as part of the fraud.

Q. I guess what I am concerned with is your attempt to connect the payments on the first set of held checks in June and July of 2002 with the held checks that were "paid" in December of 2002.

I am not seeing the connection in that the held checks -- the second set of held checks came out of the payment of a loan in September and a payment of a loan in October of 2002.

A. Correct.

Q. I am missing the connection between the June and July payment of held checks and how the holding of September and October payments covered those checks.

A. I am not saying that the September and October checks directly allowed -- clearly they



didn't hold a check in September or October of 2002, does not allow a check to clear in July or June of 2002. But what I am saying is this is a continuation of the efforts by the culpable insiders to cover up the shortfall that existed. The shortfall didn't just go away.

So either there are other checks in the interim that were due to DTDF that were held and released later to be replaced by subsequent checks, culminating in the checks that were held back in late 2002 or other funds are being used inappropriately to cover that shortfall and allow these checks to be replaced.

Q. I guess what I was challenging was your statement the payments made in June and July of 2002 resulted in other held checks which then were paid off with the Double Diamond and the Red Hills loan payments. I am not seeing where these other held checks occurred.

A. What I am saying is I think -- the shortfall doesn't just disappear. The shortfall grows over time because the extent of the fraud has grown over time. To the extent additional or over time there have become more non-performing loans within the portfolio, to the extent payments are



being made as if those were performing loans, the shortfall grows.

What I am saying is a combination of using monies that come into pay off the loan or -- and treating that loan as if it is still outstanding and using those principal payments to cover the shortfall and eventually at the end of 2002 not remitting additional checks to DTDF, those are all part of the culpable insiders method of covering up that shortfall.

You cannot take the October, November DTDF checks that were not paid at that time and say those being held directly allowed these checks to be released. There are other things that happened in between.

Q. The financial statement that -- let me back up.

The financial statement notes that the amount represents unsecured advances that mortgage has committed to repay the fund with an interest at an annual rate of 20 percent.

Were they in fact paid with 20 percent interest?

A. It is my understanding that they did not get paid interest, certainly not at 20 percent.



But again, that is not something that I have specifically analyzed, but it is my understanding they did not receive 20 percent interest, if any interest.

Q. And was this December 31, 2001 financial statement attached to any offering memoranda or prospectuses for DTDF?

A. I believe this financial statement -- I say in paragraph 13, in fact, those financial statements were included in at least the May 2002 prospectus for DTDF.

Q. Now I want to talk about the $11.425 million transfer.

Would you agree with me that the transactions that occurred with regard to this 11.425 were essentially circular?

A. Yes.

Q. In essence $11.425 million went out from DTDF and came back to DTDF?

A. The money -- yes. It goes around in a circle where you want to pick the starting point for that circle, it has to be the complete circle or it doesn't work.

Q. And the -- if I understand at least the allegations, the money going out from DTDF was





123122e3-7412-4f0b-8142-c981c6b7887f

booked by DTDF as the 10-90 loan, correct?
A. That's correct.
Q. Do you think anyone in management believed that that was a legitimate loan, that 10-90 loan?
A. I can't talk to the belief of people. I know certain people within management, if you are talking to culpable insiders, clearly knew that was not a legitimate loan.
Q. The money that came back, if you will, was basically checks that supposedly represented payoff of these two loans, correct, the Double Diamonds?
A. The amount of the payments that were received by DTDF were the amounts that were payable to them based on payments received on these loans, and there may have been an element of interest in there as well that may or may not -- the detail I have seen isn't sufficient to say whether that was purely interest on these two loans or whether that was an accumulation of interest that was due on all loans DTDF had an interest in and had been paid.
Q. But you are saying that in truth and fact what happened was the payoff of these, let's say two loans, the ones you have referenced here,



Double Diamond and Red Hills at Pueblo, that those funds were actually used by USACM for other purposes?
A. That's correct.
Q. They were not used to pay back DTDF?
A. That is correct. At the time that those payments should have been made to DTDF, there wasn't sufficient funds in the collections account to make those payments. So clearly that money or prior money has been used for other purposes, and when this money comes in, it is used to cover the shortfall, and it is not remitted to DTDF.
Q. Have you traced where that money went from the payoff of the Double Diamond and the Red Hills loan?
A. No. What I have seen is -- and I believe I reference it here -- I have looked to see the fact that those checks, when they were generated, could not have been presented for payment because there weren't sufficient funds left in the account.
Q. I understand, but I guess my question is, did you seek to determine where the money went through from the payoff of those two loans?
A. No. The money comes into the account.



Money is funded -- it isn't possible in my mind to trace where those funds went. They go into the account, and to a large extent given that there isn't a sufficient balance left, that could in part be due to the fact that other monies have been diverted prior to that, and therefore when payments are made relative to those other monies, typical to a Ponzi scheme you are paying prior obligations with new money that comes in.
Q. But I guess my question though is, obviously the money that was collected there between September and October 2002 and December of 2002 was part of funds that went elsewhere?
A. That is correct.
Q. Have you undertaken to determine who makes up the elsewhere?
A. No, I don't believe it is possible to trace that. I don't believe that's possible to do.
Q. Well, you could --
(Noise outside.)
A. I don't believe -- I don't believe there is any reason to be alarmed. There is a construction site, or the bridge just fell down.
Q. Has anyone attempted to determine between September and October of 2002 and



December of 2002 what accrued obligations existed but had not yet been funded from loan proceeds and therefore would have been a use of DTDF's funds?
A. I have not attempted to do that analysis. I know during the course of the bankruptcy that there have been a number of attempts to analyze the activity within the loan portfolio not just for this period of time but for other periods of time. But generally it is my opinion that it becomes such a convoluted thing because of the length of time that the fraud goes on that it is not possible to trace those funds.
Q. In terms of the amount of these payoffs, $10,000,000, let's just focus on the Double Diamond payoff, how does that amount compare with other loan payoffs that were received by USACM during that time frame?
A. I would have to look at the accounts to see what wires were coming in. I think generally you can at least speculate as to whether they are principal payoffs or not by the size of wire transfers coming in as opposed to an interest payment being made.
But there is a fairly large variety in terms of the size of loans that were being made by USA





123122e3-7412-4f0b-8142-c981c6b7887f

Capital. 10,000,000 certainly wouldn't be the smallest. I don't believe it was anywhere near the largest either.
Q. In terms of a loan payoff, $10,000,000 in and of itself would not appear unusual in terms of USACM, correct?
A. Depending on the point in time, I don't believe so.
Q. Well, this particular point in time.
A. Yes. I would have to go back and look. That isn't something that I place particular focus on. I was looking specific to this transaction when I reviewed those records, but I would have to verify the relative magnitude of this by looking at the bank statements.
I don't have any reason to believe, as I sit here, that this would be an unusually large amount.
Q. Let's go to Exhibit 2 of your report. This exhibit summarizes amounts that were paid out from DTDF under what is called the 10-90 loan, correct?
A. These are monies that were taken from DTDF and were recorded as representing funding of a loan to an entity called 10-90.
Q. This document summarizes the totality



of the funds that left DTDF and were recorded as the 10-90 loan, correct?
A. At least what this does is, because of the structure of these exhibits, it indicates effectively how much went out after the date indicated.
So, for example, on the first line, March 31, 2001, this $46,153,252 went out and was recorded as part of the 10-90 loan after March 31, 2001.
Q. When did the banking relationship with the entity 10-90, Inc. actually begin?
A. I will find that section in my report. I believe those accounts were established by Mr. Fogg. The 10-90 and Mountain Vista accounts were established in March 2003.
Q. Obviously there had been activity prior to March 31 of 2003 that was booked as a 10-90 loan; is that correct?
A. I believe the first transaction that I include in my exhibits here would be as of April 15, 2002.
Q. Right. And those were part of what you call the direct transfers; is that correct?
A. That is correct.



Q. And is a direct transfer a transfer directly from DTDF's account at Nevada State Bank to another account for another entity or a person?
A. It is a transfer that went direct to USAIP, one of the entities that USAIP had an interest in. I think there may be one or two other entities beyond that that are described in my report, but those were the entities that all of this money eventually gets funneled to.
These are amounts that went direct to one or other of those entities without going through the Wells Fargo accounts that were set up in the name of 10-90 and Mountain Vista.
Q. Did they go through any of the Wells Fargo accounts involving USA Commercial Mortgage?
A. Not -- well, included within this amount is the 11.4 million transfer in January '03, so clearly that impacts Wells Fargo's account. I am referring to Exhibit 3 that summarizes these amounts. That appears in the column headed Collection Trust.
I am not aware -- it doesn't appear looking at this that any of the others were amounts that went to a USA Capital account at Wells Fargo.
Q. And looking at Exhibit 3, Exhibit 3 is



the detail of the direct transfers from DTDF; is that correct?
A. That's correct.
Q. We have talked about Collection -- the Collection Trust account that is at the top of the exhibit.
Ashby Fiesta, is that an entity that is owned by or related to USAIP?
A. It is an entity that was involved in various projects where I believe USAIP had some interest, and it involved another entity that I believe the Ashby relates -- I am struggling to remember his first name -- I believe it is Richard Ashby. That is a group of entities effectively that were doing some real estate developments that USAIP either directly or indirectly had an interest in.
Q. Was that considered a fraudulent loan?
A. It was considered a diversion of DTDF's funds because it is not documented -- the way that DTDF's governing documents -- all of these in my mind are fraudulent because they are recorded as being funding of a 10-90 loan, that the 10-90 loan was fraudulent. This was just where the money really went to.
Q. Was any part of Ashby Fiesta used to





123122e3-7412-4f0b-8142-c981c6b7887f

Page 93

secure the 10-90 loan?
A. At some point there is some discussion of there being security given by USAIP to 10-90 in terms of their interests in various projects. I don't remember the details of that, but I don't believe -- I think it was a pledging of an equity interest rather than a deed of trust which was what was called for. And again, the fact that it was USAIP involved made it a prohibited transaction anyway.
Q. What would you -- what level of ownership by USAIP would make it, according to your mind, a related-party transaction?
A. Well, I think what the -- that is not specified in the governing documents. I believe what it says is that loans -- other than in very limited circumstances, loans to USACRA, the manager of DTDF or entities affiliated with it are not to be made.
Q. How would you determine that Ashby, for example, is affiliated with USACRA?
A. At least in my mind, my interpretation of that, and I think one common within accounting circles, is some element of common ownership, and so the involvement of these entities with USAIP or

Page 94

USAIP having an interest in the underlying project, USAIP I believe is an affiliate of USACRA.
Q. Even if USAIP owned as little as 5 percent interest, that would be affiliate?
A. Technically, yes. I don't believe in these particular instances you are going to get examples where the interest is 5 percent. I think typically it tends to be closer to 50 percent, but I think financial interest in the underlying entity or underlying project that goes to one of the insiders or one of the affiliated companies I believe makes that an affiliated project.
Q. And is there a particular accounting standard you are referring to?
A. No. I mean, the accounting standards is talk in terms of disclosure in the financial statement. So they would talk in terms of what method of accounting -- if you are doing things for a financial statement, what method of accounting you would use in certain circumstances. So if it is a majority-owned entity, typically that is consolidated with -- or the entities are consolidated in the financial statement.
If you have an interest less than a majority interest but over a certain amount, then maybe you

Page 95

account for it on the equity level. They are different accounting. That doesn't give you per se a definition of affiliate. It is looking at the percentage relationships if they are a broad guideline as to how to treat those entities in a financial statement.
Q. Well, and that's why I was asking you. I think you indicated in your earlier answer that you look at what is an affiliate more from an accounting standpoint, if I thought I understood your answer correctly.
A. From my viewpoint, all of my viewpoints are as an accountant, and so if I see a financial interest, and like you say, if not all of these cases, the vast majority of them the involvement of USAIP tends to be somewhere in the 50 percent range. I don't think at that point there is any question that that becomes an affiliated entity or that USAIP itself is an affiliate.
So if USAIP has a financial interest, then that is effectively a loan of some kind to an affiliated entity.
Q. And that was why I asked you is there a particular standard you are referring to within the accounting industry to say that that is an

Page 96

affiliate, but there isn't?
A. No. I mean, it was just my general background as an accountant. That's how I view things.
Q. Has any recovery occurred with respect to the monies that were put into Ashby Fiesta?
A. Not the monies that are reflected here. It is my understanding that there has been no recovery of those monies.
Q. Is there a prospect of recovery of any funds from Ashby Fiesta by DTDF?
A. That I am not aware of. I have made -- I believe I referred earlier to the fact I have made inquiries as to whether recoveries had actually been made, and the only one that I am aware of related to the entity a couple of columns to the right of Ashby HMA.
Q. USAIP, these are direct advances made from DD -- I am sorry -- from DTDF directly to USAIP outside of 10-90; is that correct?
A. No. The ones that are included on here --
Q. We are looking at Exhibit 3?
A. Yes. Well, let me make sure I understand your question.

Page 97

The way I was about to answer that was that these are amounts that did not go -- none of these amounts on Exhibit 3 went through the 10-90 and Mountain Vista accounts. These are all amounts that either went directly to USAIP and on to these other entities or went to USAIP and we haven't identified it going on from there or went direct to the entities that are shown on the column heads. But they did not go through the 10-90 and Mountain Vista accounts.
Q. The funds that you have listed under the USAIP column went to USAIP but you couldn't identify it as going to any other persons or entities listed?
A. That is correct.
Q. Were you able to determine what happened to the money then after it arrived at USAIP?
A. No, other than it did not come back to DTDF.
Q. Well, how do you know it did not come back to DTDF?
A. We have looked to identify what payments, if any, were made on the 10-90 loan and have not identified any.

Page 98

Q. But is it possible that that money that was sent to USAIP came back to DTDF in some other form?
A. I am not aware of payments being made by USAIP to DTDF. So that we -- I have analyzed at least what is reflected on the general ledgers, and I see no indication that these monies were repaid.
Q. Well, have you attempted to determine where the monies went after they arrived at USAIP?
A. Yes. And unless there was a transaction for the same or very similar amount within a short period of time, I have not attributed that money as being used for a specific purpose. These particular items that total 1,775,000, I have not been able to identify a transaction that occurred within a short space of time where I would feel comfortable saying these are the monies going on somewhere else.
Q. Well, what happened to the money, do you know?
A. It could -- it goes into USAIP's account and could be used for general operating purposes or anything else. It could end up going to some of these entities. It is just the trail becomes very difficult, and I have not been able to

Page 99

identify that money going to one of these other entities.
Q. Did USAIP have any operating expenses?
A. I believe it had some operating expenses, but it was primarily an investment vehicle.
Q. Did USAIP have any employees separate and apart from USA Commercial Mortgage?
A. That I don't recall. I mean, I believe I have looked at their general ledger a lot of times over the last couple of years, but I don't remember that detail.
Q. HMA, was that also an entity affiliated with USAIP?
A. That was an entity that USAIP had an equity interest in.
Q. Do you recall how much?
A. I am tempted to say 50 percent, but I would have to -- for all of these I would feel more comfortable referring back to the actual documents that reflect that.
Q. And those would be in your binders?
A. I believe so.
Q. HMA did have a recovery, and you have noted the offset in the next to last column of

Page 100

Exhibit 3, correct?
A. That is correct.
Q. And then Twelve Horses, what is Twelve Horses?
A. Twelve Horses was another entity that USAIP had an equity interest in.
Q. What was the business of Twelve Horses?
A. I believe it was some kind of high-tech company, but -- I believe it was in some way high-tech related. It was one of the ones that was not real estate related.
Q. And the money that was put into Twelve Horses, is there any prospect of any recovery of any of that money?
A. Not that I am aware of.
Q. I mean, have you checked to see if there is going to be any recovery?
A. In terms of prospect, no, I haven't inquired as to prospect. What I have -- until something happens, you don't know. What I have inquired as to is whether any of this money has been recovered, and that is -- that was the focus of my inquiry, not somewhere down the road is there any chance you are going to get any of this back.

Q. Have you looked, for example, as to whether US -- or DTDF has allowed claims with respect to any of these companies?
A. I believe their -- most of these companies the interest is held by USAIP, and I believe there is certainly a claim -- I shouldn't say that.
I believe there is a claim that DTDF has in the USAIP bankruptcy, but that depends on obviously the trustee of USAIP being able to realize something on the investments.
Q. Obviously USAIP at the end of the day had some assets, correct?
A. It had some assets. What they were worth is I believe what was recoverable from those assets is more the issue.
Q. S. Fulton, what was that advance for?
A. I don't know what the specific advances were for. It is my understanding I believe when you look at Fulton and Peterson, those are individuals that were involved in various transactions with USAIP.
Q. What makes these related or affiliated transactions?
A. The fact that these are people that



were involved in transactions with USAIP.
Q. Do you know whether there is or has been litigation against Fulton and Peterson?
A. There has been litigation involving the Peterson family, but involving USACM. I am not aware of what litigation there has been involving DTDF, if any, relative to these people.
Q. Or USAIP?
A. USAIP, I have no involvement with any lawsuits or legal actions that have been taken by USAIP.
Q. And so you don't know whether there has been any settlement or prospect of recovery with respect to Fulton or Peterson, correct?
A. No, that's not correct. It is my understanding, as I said, based on my discussions with Mr. Tucker that there has not been any recoveries. Whether there is a prospect, again, I testified a few minutes ago that I did not inquire as to whether there is some prospect remote or otherwise. There is some potential recovery at some stage in the future.
Q. What is BIP?
A. That to be honest I do not recall, and I would have to go to the binders to identify that.



Q. How about Roripaugh?
A. Roripaugh I believe was a real estate investment that USAIP was involved in. There are a number of real estate investments that they had involvement on that include Roripaugh in the name.
Q. Did USA -- eventually the 10-90 note was transferred -- let me back up.
As you understand it, there was a note from USAIP to 10-90 and then there was a note from 10-90 to DTDF in roughly the same amounts; is that correct?
A. At some stage there is notes that were generated not at the time that these transactions were occurring I believe in roughly August of 2004, I believe -- whatever the actual date -- yes. Basically August 2004 there was a promissory note that was prepared and signed from 10-90 to DTDF. Now I believe I referenced earlier on the fact that at some point it is my understanding that there was supposedly a pledge of some equity interest by USAIP to 10-90, and it is my understanding that those were supposed to be back to back. They ignored the fact that the money actually went from -- well, they ignored the fact that some of the money didn't go anywhere near 10-90 itself, ignored the fact that



whatever money did go to 10-90 went to Mountain Vista and from there to USAIP, and these were just notes that were generated after the fact and back-dated. They covered supposedly the entirety of this.
Q. And eventually 10-90 assigned its rights in USAIP's note to DTDF, correct?
A. That I am not sure of. I know there was talk that -- I believe it was Mr. Fogg that testified at his deposition that he thought the whole thing ought to be transferred to USAIP. That 10-90 had no role in that or that the money clearly wasn't still a 10-90, but whether that was actually assigned or not, I don't recall.
Q. So therefore you don't know what efforts, if any, are being made by DTDF to collect on any note against USAIP, correct?
A. All I know is what they have been successful in recovering as a totality of the monies that were recorded as being this supposed 10-90 loan.
Q. And so the only recoveries that you are aware of are what is listed as the HMA offset?
A. That is correct.
Q. In assessing damages in this case,





123122e3-7412-4f0b-8142-c981c6b7887f

Mr. Johns, have you assumed that if hypothetically DTDF had invested these funds strictly in accordance with the terms of the prospectuses, there would have been 100 percent recovery of the amount invested?
A. No, I haven't assumed that at all. I mean, on its face the 10-90 amount could not have been done in -- or I don't believe could have been done in accordance with the terms in the prospectus. There were dollar limits on the amounts that could be loaned to any individual entity, and this was in excess of that.
So even -- well, that could be why you said hypothetically. They would not -- the reason that these amounts are included within the damages that I have calculated are because they were part of the fraudulent transactions that were done by the culpable insiders, and DTDF incurred losses as a result of that fraud.
If they were totally legitimate loans -- the only loans that I have included here where they lost money are the ones that I believe were fraudulent and were not in accordance with the prospectus. So if you complied with the prospectus in every respect and these were all legitimate loans and had nothing to do with the fraud, they wouldn't be part of my



damages.
Q. I understand. To me damages would be the difference between what you made under the fraudulent scheme versus what you would have made had the funds been used in accordance with the prospectus.
I guess my question to you is, isn't there some amount of credit that you should assess against damages to account for the relative risk of compliant investments?
A. No, I don't believe so because if anything there would be an element that would be included if you had made legitimate loans and followed all of the provisions.
Q. Not me but DTDF, if they had made legitimate loans.
A. If DTDF -- and DTDF did make legitimate loans, and those aren't part of what I have included here, and they -- those loans complied and the loans were secured by deeds of trust and they recovered those monies, they would not only recover the principal, but they would recover or earn interest.
So there is an element of this where I said I believe my calculations are actually conservative



because I include nothing here for the loss of use of funds or the earnings that DTDF could have made had they put this money into legitimate interest-earning investments.
Q. Or in all likelihood reasonable probability would have made?
A. That's right.
Q. Not what they could have made, but within reasonable probability would have made?
A. Exactly, and you could look at the portfolio as to what the return was on the legitimate side of the portfolio.
Q. You have not done that?
A. No. I have chosen to limit what I have included in damages just to the actual cash that went out, and I have not added to that any element for loss of use of those funds during the time after they were disbursed.
Q. You would agree, though, that even if legitimate loans had been made it would be unreasonable to assume that there would be 100 percent recovery on all legitimate loans, correct?
MR. BRUCKEROFF: Objection, calls for speculation.
THE WITNESS: That depends on whether



you believe Mr. Milanowski's and Mr. Hantges' publicity in terms of USA Capital.
MR. FLEMING: Q. Do you believe it?
A. I think what you would look at would be the portfolio as a whole, and there is going to be some kind of performance for the portfolio as a whole where you are likely in total to make money, but there are very few lenders that I am aware of that don't have any bad loans.
Q. This would be a good point for a break.
VIDEO OPERATOR: Going off the record.
The time is 12:00.
(Break taken.)
VIDEO OPERATOR: Back on the record.
The time is 12:38.
MR. FLEMING: Q. Mr. Johns, I want to look at Exhibit 4 to your report, which I understand to be the detail of the indirect transfers.
Just to make sure I understand, the monies that -- all the funds listed here went from Mountain Vista to USAIP, and to the right of that it shows where the funds went from USAIP; is that correct?





123122e3-7412-4f0b-8142-c981c6b7887f

A. That's correct.
Q. And the first question I had was with regard to Bank of Commerce, it shows 150,000 in April of '03.
Were you able to determine what that was for?
A. I don't believe there is any explanation provided in the documents I have seen as to what these monies get used for. We have indicated -- to the extent I was able to trace them going somewhere, that I have indicated that, but what those monies get used for afterwards, no, it is impossible to identify that.
Q. The next column is B. Stupak, S-t-u-p-a-k.
What is that, or who is that?
A. I can't tell you who this specific individual is, but I believe that is an individual, and that would be a notation or it would be identified through the general ledger review of USAIP as being the recipient of a transfer.
Q. And in terms of Stupak, Fulton and Peterson, do you know if any of those were investors in DTDF?
A. I do not know. I haven't looked at



who the individual investors in DTDF are.
Q. We have talked about HMA. The next one in the column on Exhibit 4 references Oak Valley.
What is Oak Valley?
A. Oak Valley, I believe, is a real estate development.
Q. Did USAIP own an interest in it?
A. I believe USAIP was involved in that project, yes.
Q. And have you attempted to determine what happened to the money after it went to Oak Valley?
A. No.
Q. Or whether there has been any recovery from Oak Valley?
A. I -- similar to my answers earlier on, I have asked Mr. Tucker as to whether any monies that were taken from DTDF that were included within the 10-90 loan had been recovered and Oak Valley -- well, HMA is the only one where there has been an indication of a recovery.
Q. Now we have talked about Twelve Horses. The next column says Collection Trust.
A. Correct.



Q. What is that intending to describe?
A. That is the Collection Trust account at Wells Fargo.
Q. These are funds that went from USAIP into the Collection Trust account?
A. Yes, they are, actually with one exception. The transaction that is shown on April 25, 2003 for $782,608, that one did not go to USAIP. That went to the 10-90 account, and directly from the 10-90 account at Wells to the Collection Trust account.
I think you can see that because the columns that are headed 10-90, Inc. to Mountain Vista and Mountain Vista to USAIP, those are blank in that instance. There is no number shown there, and elsewhere in the documents you will see reference to the fact, and in my report I believe that that particular transfer went direct from the 10-90 Wells Fargo account to the Collection Trust account.
Q. Now next to that -- well, let me back up.
With regard to the Collection Trust account, did you endeavor to see where the funds went with respect to the Collection Trust account and where --



what the money was used for?
A. All I was able to do in that instance was identify the fact that the money went into the Collection Trust account. Once it gets in there, it is not possible to trace it through to any ultimate use of those funds.
Q. Is it possible that any of these funds are returned to DTDF?
A. I have seen no indication in what I have looked at that there was a return of those funds to DTDF.
Q. The next column that you have listed is USACM.
Now where did those funds go if they didn't go into the Collection Trust account?
A. I believe those went into the operating account at USACM. They are the Wells Fargo operating account.
Q. USAIP made payments directly into USACM's operating account?
A. I believe that's the case. Again, we can look at the detailed support for that.
Q. Did you attempt to trace where the funds went out of the operating account?
A. We have attempted, but that is not

possible to identify.
Q. What is the next column entitled Investors VI?
A. Investors VI is another entity that was set up as, if you like, maybe an intermediate holding company for some real estate investments that USAIP was involved in, and there was just one transaction where we identified 150,000 going on from USAIP to the Investor VI account.
Q. And, again, you were not able to trace funds out of Investor VI, or did you attempt to do that?
A. Once it got to these various entities, I have not attempted to identify the particular use made. My assignment was to see where the money went, and the fact the 10-90 loan -- no recoveries or no re-payments were made on that 10-90 loan, effectively I have identified, to the extent that it is possible, where USAIP transferred those funds owed, but I have not gone beyond that.
Q. Have you attempted to identify any loan documentation or other documentation evidencing receipt of these funds by any of these persons or entities?
A. I don't believe that I have looked



for -- specifically looked for documentation with respect to amounts transferred by IP to any of these entities; that was not in my mind relevant to my assignment because I am looking at the fact that the money is being taken. I could have stopped at USAIP, and to the extent that the money had been taken from DTDF, went to USAIP and stopped there, that the net result would be the same, to the extent the money was not repaid to DTDF.
Q. Can you say with all assurance that the funds that were transferred from USAIP to these entities were not returned to DTDF?
A. I believe I can based on the documentation that I have seen there is no indication that this money was returned.
Q. In any fashion?
A. Correct.
Q. Evidently these entities will use different companies to funnel money through?
A. Most of the entities that I identified here like Oak Valley or HMA, those moneys I believe were being used to fund the operations of those entities rather than them being another conduit through which money was passing. HMA, for instance, operated a hotel, I believe.



And so no, I don't believe these entities were other pass-through type entities. These were the -- with the exception of the Investor VI, which did own interest in other entities, I believe that money would have in all likelihood would be used for -- these would be, in my mind, the likely ultimate recipients of the cash.
But that again, I don't believe that what they use the money for to the extent that it did not come back to DTDF is irrelevant. The damage has already been suffered by DTDF.
Q. To the extent the money didn't come back?
A. Which I believe I just said.
Q. So my question is, have you looked at the use -- I thought you said you hadn't looked at -- you had not looked at the use of funds by these entities?
A. But I have looked at the records of DTDF as to what happened with the 10-90 loan and have not identified any repayments of the 10-90 loan.
Q. Is it possible that some of the 10-90 loan funds came back in the form of payments of other non-performing loans?



A. I don't believe so, but I am not aware of any instances where that happened.
Q. Did you look, for instance, where that might have happened?
A. Well, typically -- not specifically, no, but I am not aware of any instances where that happened.
Q. Now the next item in your Exhibit 1 is disclosed or summarized on Exhibit 6, unremitted collections from borrowers.
How did you arrive at this particular listing of unremitted collections?
A. There was data that was available which, again, I believe is included in the supporting binders that have been provided to you that detailed what at the end of the day made up the amount that had not been remitted to DTDF by USACM, and that it is the individual items.
Q. Did you go to USACM's records to see if they showed these were amounts received on -- that the borrowers had actually made these payments and at no time were the payments remitted to DTDF?
A. I have looked at the records of USACM and have been able to identify the receipt of a payment from the borrower in the time frame





123122e3-7412-4f0b-8142-c981c6b7887f

Page 117

indicated here, and the fact that the check was generated -- the fact that these are unremitted amounts, there are checks below this which were generated based on that receipt but never were remitted to DTDF.
Q. These were more held checks?
A. That is effectively the same as unremitted collections in my mind.
Q. I understand. I could say unremitted collections where money just came in and nothing that documented it, but if a check was issued, that would to me be a held check.
A. I am using unremitted collections in this instance in the same manner as held checks where a check was duly generated but was not remitted to DTDF.
Q. Were these all -- which of these involve payments of interest and which of these involve payments of principal?
A. That I would have to go through the supporting documentation in the binder, and I can't tell you without referring to that, but I believe the majority of them represent payments of principal. But in all instances, it was amounts that had been collected by CM from an underlying

Page 118

borrower in a loan that DTDF had an interest, and the amount due to DTDF was not paid by CM to DTDF.
Q. So all of these funds then were received in the Collection Trust account?
A. Correct.
Q. And checks were issued to DTDF but held?
A. Checks were generated payable to DTDF -- saying "generated," in my mind, issued means you actually give something to somebody.
Q. That's delivered, but that's okay.
A. The checks were generated. The check was actually cut but was not given to DTDF.
Q. Has DTDF settled its claim against USA Commercial Mortgage in the bankruptcy?
A. Settled -- I am not familiar with the details. I believe there has been some agreement reached between DTDF and USACM. The details of that I am not aware of, but it is my understanding that these particular amounts have not been paid to DTDF.
Q. Or any portion of those amounts?
A. Correct.
Q. What is the causal connection to Wells Fargo Bank and these held checks?
A. Causal connection is that the services

Page 119

provided by Wells Fargo to USACM assisted in the continuation of the fraud to a point where these checks or these amounts were not remitted to DTDF, and had the assistance not been provided and the fraud ended, then at various points -- at any point in time prior to February 29, 2004 these amounts wouldn't have been held by USACM. The loss would not have been incurred.
Q. USACM wouldn't have been able to receive the funds, correct?
A. That depends on what happens, when the fraud is discovered.
Q. If USACM ceased to do business, they wouldn't be able to receive the funds, would they?
A. That's one possible scenario. I haven't been asked to speculate on what would have happened when the fraud was discovered other than the fraud would not have continued.
Q. You are not suggesting, are you, that the bank has some obligation to say, okay, well, Santa Rosa Plaza received a payment here, I need to see the check from the Collection Trust account to DTDF?
A. No, I am not making that linkage at all. What I am saying is that had the fraud ceased

Page 120

prior to February 29, 2004 and payments had been made by the borrower subsequent to that, then they would have gone through to the people that they -- those borrower payments to the investors that those borrower payments were due to.
Q. Now one question I had is you have Colt Gateway on this list?
A. Correct.
Q. $542,365. Is that also included in the Colt Gateway damage part or not?
A. I don't believe so. I believe we have eliminated any duplication there, but to the extent that there are some payments that are reflected in the Colt calculations, and to the extent that there was an amount due that had been received from the underlying borrower, that should not be included in the Colt balance.
Q. Do you know whether this Colt --
A. It should not be in both places, obviously.
Q. Do you know if this Colt payment was a payment of interest or a payment of principal or both?
A. That I would have to look at the underlying documentation.

Q. Now moving on then to the Colt loans, Exhibit 7, did I understand you to say that this is only showing advances of principal on the Colt loans?
A. I believe that is the case, yes.
Q. Now I believe you testified earlier you have no knowledge of whether these advances touched a Wells Fargo account or not?
A. I have not looked -- to the extent that the loan was funded through the Investors Trust, then obviously a Wells Fargo account would have been involved in the transaction, but I have not looked to see whether all of these particular amounts went through a Wells Fargo account or not.
Q. The fact whether it did or did not go through a Wells Fargo account is not a basis for the causal connection between Wells Fargo and --
A. No, it is not.
Q. As I understand your testimony, the causal connection is simply that Wells Fargo provided services and thus the fraud was allowed to continue?
A. The services provided by Wells Fargo assisted in the perpetuation of the fraud, yes, and this was a fraudulent transfer in terms of DTDF.



Q. Why was it fraudulent in terms of DTDF?
A. Because it was a prohibited loan.
Q. Other than the fact that there is or was some ownership by USAIP and Colt Gateway, what makes this a prohibited loan?
A. Well, I think that in and of itself makes it a prohibited loan. I believe when you look at what I referred to as the other purported loans, that there is a lack of documentation of those loans. You do not have deeds of trust that are called for under the agreements that -- the governing documents, if you like, DTDF.
There are a number of the requirements that these particular purported loans do not make.
Q. And just to continue to confirm your opinion on causation, you are not saying or suggesting that Wells Fargo has a duty to investigate the ownership of Colt Gateway, are you?
A. No.
Q. And you are not saying or suggesting that Wells Fargo has some obligation to check to see whether the loan meets the requirements of the prospectus, are you?
A. No, I am not.



Q. Have you undertaken to find loan documentation for the Colt loans?
A. I have attempted to identify and I have worked with Mr. Tucker and his organization to gather whatever documentation they have been able to identify relative to these loans, yes.
Q. That leads to another question. As I was reviewing the correspondence in binder 1, I noted that there were at least two, maybe more, people at FTI that have been involved in this engagement; is that correct?
A. There are -- well, depends on what you mean by "involved." In my mind they are -- FTI, Mr. Tucker individually, is a trustee, is my client. To the extent that they represent the plaintiff or are the plaintiff, then clearly they are involved in this case. They have been a source of some information that I have utilized in the analysis that I performed.
Q. Understandably you have turned to them for information.
Have they done any of the analysis or work that is contained in your report?
A. They have provided some initial analyses, but anything that I have received from



them I have gone through, validated and satisfied myself through work done by myself and my staff here as to whether it was appropriate or to be included in my analysis and my calculations.
Q. Any of these exhibits, were they prepared by FTI?
A. No. These exhibits are my work product.
Q. How can we determine what was -- what work product was the work product of FTI versus your work product?
A. To the extent anything that is included in the final calculations, it is my work product in as far as I have not taken anything from FTI and just accepted at face value. I have verified any data that they have given me in the way of preliminary calculations and formulated my own calculation.
Q. My question though is if I wanted to go find the preliminary calculations that were done by FTI, how would I do that?
A. I would have to look within our electronic files to see whether there is an earlier version.
MR. FLEMING: And that presumably is





123122e3-7412-4f0b-8142-c981c6b7887f

what is going to be produced as all of his electronic files; is that right, Counsel?
MR. BRUCKEROFF: We will be producing his electronic files.
MR. FLEMING: You will?
MR. BRUCKEROFF: Yes.
MR. FLEMING: Q. The Epic loan I believe you said was a legitimate loan, at least at the inception, correct?
A. That is my understanding, yes.
Q. But that some of the collateral was transferred from DTDF to someone else, to another entity?
A. Yes.
Q. Who was it transferred to?
A. To an entity called Tree Moss.
Q. And then did Tree Moss continue to make payments on the loan, the Epic loan?
A. To the extent that -- I believe there may have been some payments made by Tree Moss, and to the extent they had made payments, those have been netted against the outstanding amount that I have included here.
Q. Did Tree Moss undertake to perform the obligations under the Epic note?



A. I am not aware of that being -- let's see, I have seen reference that that at least at one point in time was the intent. Whether that was actually done, I don't believe so. But again, I would have to look at the underlying documentation.
Q. Is it your understanding that by virtue of the quitclaim that the loan went from being a secured loan to an unsecured loan?
A. It was my understanding that the quitclaim -- basically at the point that the quitclaim occurred, DTDF actually had title to the property. They had foreclosed on the property as a result of a default on the original loan with Epic, and what the quitclaim did was take the property that had been obtained and transferred that to Tree Moss with, to my understanding, no consideration being received by DTDF for that transfer of the property.
Q. Such as a promissory note from Tree Moss to DTDF?
A. Correct.
Q. So Tree Moss paid -- made payments on a purported loan but not one that you have been able to find documentation on?
A. There are different elements of what



is included here. There is the original loan for which DTDF got the property which was then transferred away from them. They also made other advances at the direction of the culpable insiders over and above the original loan, and those are -- you will see here there is a column on Exhibit 8 that reflects subsequent advances.
So to the extent that there were any payments received, I would attribute those to be repayments of some of the advances that had been made subsequent to the property being taken.
Q. So you credited the subsequent payments to those -- to the subsequent -- so you attributed those payments to the Subsequent Advances column?
A. In my mind, it doesn't matter whether they are attributed specifically to that or not, but I have given credit in my calculations for all payments received.
Q. It seems to me that if you have got a legitimate loan that goes into default and you collect against that loan, you foreclose, then the question becomes what losses occurred as a result of fraudulent activity, correct?
In other words, if there was a loss as a



result of the non-performing Epic loan, are you counting that in these damages?
A. No, I am not.
Q. So the damages make up the -- make up what?
A. The fraudulent event in my mind is the transfer of the property from DTDF to Tree Moss with no consideration being received by DTDF. So the culpable insiders caused DTDF's asset to be taken by Tree Moss.
Q. Has DTDF gotten that asset back?
A. No, it has not.
Q. Do you know what the status of that asset is?
A. To some extent, yes.
Q. What do you know?
A. That it is being -- there are efforts, and this, I believe, is again referred to in my report by the trustee of Tree Moss to sell the property. And to the extent that that is successful, some portion of the proceeds are realized from that sale would flow through to DTDF.
Q. Do you know why not all of the proceeds of that sale?
A. I believe there are other creditors in





123122e3-7412-4f0b-8142-c981c6b7887f

the bankruptcy estate that potentially would share in whatever recovery is made.

Q. What is the Flatly payoff in this column in this exhibit?

A. There are certain payments that have been received by DTDF from Mr. Flatly who was connected with the original borrower. I believe he had some personal guarantees on the original Epic loan, and there have been some recoveries received from him. And again, I have given credit for those in my calculations.

Q. Needless to say, to your knowledge, Wells Fargo had absolutely nothing to do with the transfer or quitclaim deed from DTDF to Tree Moss, correct?

A. Correct.

Q. Why don't we take a break?

VIDEO OPERATOR: Going off the record. The time is 1:11.

(Break taken.)

VIDEO OPERATOR: The time is 1:23.

MR. FLEMING: Q. Mr. Johns, has -- Mr. Johns, have you ever been excluded or disqualified as a witness under a Daubert-type motion?



A. No, I have not.

Q. Has any part of your testimony ever been excluded under a Daubert-type motion?

A. No.

Q. Are you currently the subject of any Daubert-type motions?

A. No.

MR. FLEMING: Pass the witness.

MR. BRUCKEROFF: Okay. We reserve the questions for trial.

VIDEO OPERATOR: This marks the end of tape no. 2 in the deposition of Colin Johns.

Going off the record. The time is 1:24.

(Whereupon, the deposition was adjourned at 1:24 p.m.)

--oOo--





123122e3-7412-4f0b-8142-c981c6b7887f

# CORRECTIONS & CHANGES

| | PAGE | LINE | CHANGE | REASON |
|---|---|---|---|---|
| 1. | 19 | 11 | "new opinions" should be "the opinions" | |
| 2. | 39 | 11 | "similar" should be "somewhere" | |
| 3. | 44 | 9 | "there would be" should be "there to be" | |
| 4. | 62 | 20 | "we used" should be "were used" | |
| 5. | 62 | 23 | "two investors" should be "to investors" | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |
| 15. | | | | |
| 16. | | | | |
| 17. | | | | |
| 18. | | | | |
| 19. | | | | |

I declare under penalty of perjury the foregoing is true and correct. Subscribed at SAN FRANCISCO, California, this 25th day of NOVEMBER 2009.

COLIN A. JOHNS, CPA

# JURAT

State of California

County of SAN FRANCISCO

Subscribed and sworn to (or affirmed) before me on this 25th day of NOVEMBER 2009, by COLIN A. JOHNS, proved to me on the basis of satisfactory evidence to be the person~~(s)~~ who appeared before me.

GLADYS BAUTISTA
Commission # 1633444
Notary Public - California
San Francisco County
My Comm. Expires Jan 25, 2010

Signature ______________________

DESCRIPTION OF THE ATTACHED DOCUMENT

ERRATA SHEET OF COLIN JOHNS

Number of Pages ____________ Document Date ____________

CERTIFICATE OF REPORTER

I, DENISE A. FORD, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: November 12, 2009.

DENISE A. FORD, CSR No. 7525