# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
--oOo--

| | | |
|---|---|---|
| In re: USA COMMERCIAL MORTGAGE COMPANY, et al., Debtor, | ) | BK-S-06-10725LBR |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, Plaintiff, v. WELLS FARGO BANK, NA, Defendant. | ) | 08-01135-LBR |

DEPOSITION OF COLIN A. JOHNS, CPA

Thursday, May 6, 2010

VOLUME II

REPORTED BY: DENISE A. FORD, CSR 7525

# I N D E X

## INDEX OF EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MR. FLEMING | 137 |


## DEFENDANT'S EXHIBITS MARKED FOR IDENTIFICATION


| No. | Description | Page |
|---|---|---|
| Exhibit 4 | Letter dated November 16, 2009 and attachments | 138 |
| Exhibit 5 | Hemming Morse documents | 139 |
| Exhibit 6 | Summary of Professional Fees and Expenses | 141 |
| Exhibit 7 | Borrower (Non-Affiliated) document | 145 |
| Exhibit 8 | Breakdown of DTDF's Loan Portfolio as of 2003 | 146 |
| Exhibit 9 | Rebuttal Report | 148 |
| Exhibit 10 | Exhibit 1 to the rebuttal report of Colin A. Johns | 208 |
| Exhibit 11 | Exhibit 2 to the rebuttal report of Colin A. Johns | 227 |

APPEARANCES

FOR THE PLAINTIFF: REID DAVIS, 4301 Westbank Drive, Suite B230, Austin, Texas 78746, JOSHUA J. BRUCKERHOFF, ESQ.

FOR THE DEFENDANT: FULBRIGHT & JAWORSKI, 300 Convent Street, Suite 2200, San Antonio, Texas 78205, DEAN FLEMING, ESQ.

ALSO PRESENT: Jennifer McKay, video operator. Andrew Safir, Recon Research Corporation.

--oOo--

--oOo--

BE IT REMEMBERED that pursuant to Notice and on Thursday, May 6, 2010 commencing at 9:05 a.m. thereof, at the Offices of Hemming Morse, 160 Spear Street, San Francisco, CA 94105, before me, Denise A. Ford, a Certified Shorthand Reporter, personally appeared

COLIN A. JOHNS, CPA

called as a witness herein, who, having been first duly sworn, was examined and testified as follows:

--oOo--

Page 137

EXAMINATION BY MR. FLEMING
VIDEO OPERATOR: Today's date is May 6, 2010, and the time is 9:05.
This marks the beginning of videotape no. 1 Volume no. II in the deposition of Colin A. Johns in the case of USACM, et al. v. Wells Fargo.
The videographer today is Jennifer McKay of Merrill Legal Solutions in San Francisco, California.
The Court Reporter today is Denise Ford of Merrill Legal Solutions.
Would all counsel present please identify yourselves and state whom you represent?
MR. BRUCKERHOFF: Joshua Bruckerhoff with Reid Davis for USA Capital Diversified Trust Deed Fund.
MR. FLEMING: Dean Fleming with Fulbright & Jaworski here on behalf of Wells Fargo Bank. Also attending is Andrew Safir, S-a-f-i-r.
VIDEO OPERATOR: Would the court reporter please re-swear the witness?
(Witness sworn.)
VIDEO OPERATOR: Please begin.
MR. FLEMING: Q. Good morning, Mr. Johns. We have been introduced before. I am Dean

Page 138

Fleming. I am with Fulbright & Jaworski representing Wells Fargo Bank in this matter.
We are here to take your supplemental deposition with respect to the rebuttal report that you issued and signed on February 26, 2010.
When we got here this morning, I was handed some additional documents which I understand to be additional production from your records; is that correct?
A. That is correct. I pulled together some documents that I thought were responsive to your notice of deposition.
Q. We will go through those documents at this time.
(Whereupon Exhibit 4 was marked for identification.)
Q. Mr. Johns, what is Exhibit 4?
A. Exhibit 4 contains correspondence, primarily e-mails, that I had received from counsel since the date of my last deposition.
Q. Is this the totality of correspondence between your firm and counsel for DTDF since November of 2009?
A. I believe so, yes.
Q. What have you done to make sure of that?

Page 139

Have you checked your e-mail in-box and saved files and all of that?
A. My typical procedure is when I receive an e-mail I print a copy, and if you remember at my last deposition I had my binder 1, which is a general binder, and within that there is a tab for correspondence. So when I print an e-mail that I have received, I put a copy in that binder.
I reviewed that binder and pulled out all correspondence contained therein since the date of the last deposition.
Q. Do you print out all correspondence between yourself and counsel?
A. Generally, yes.
(Whereupon Exhibit 5 was marked for identification.)
Q. Mr. Johns, what is Exhibit No. 5 that I have handed you?
A. Exhibit 5 is a copy of the covers of the various binders that have been created relative to this matter since the date of my last deposition.
Q. So since your last deposition then you have created binder numbers 19, 20, 21, 21A and 21B; is that correct?
A. That is correct.
Q. Now these binders appear to be -- they

Page 140

are all titled Opposing Expert Reports and Expert Depositions, and then you have binder 21 through 21B which appears to be the binder containing the deposition of Joseph Milanowski; is that correct?
A. That is correct.
Q. In these binders called Opposing Expert Reports and Expert Depositions, do you have notes?
A. No, I do not.
Q. Are you telling me they strictly contain the reports and depositions themselves?
A. Yes, they do. I actually have those with me today. I do note there is one binder missing from this, and that is a binder that I have with me that contained a copy of my rebuttal report and supporting documents for that.
Q. And what's the binder number for that one?
A. Binder 2D.
Q. I am sorry?
A. 2D.
Q. And so binder 2D contains the rebuttal report and supporting documentation?
A. That is correct.
Q. When you read through an expert





cfc575ce-2688-46e8-99a1-59218b3ffd46

deposition -- let me back up.
Do you personally read through the depositions, for example, of experts and fact witnesses or do you have staff that do that for you?
A. Typically all what I view as significant depositions I read myself. In the case of the depositions that are contained in these binders, I personally read the deposition of Dr. Safir. I personally read my own deposition. And although I have not read the entirety of it at this point in time, I have read certain parts of Mr. Milanowski's deposition.
Q. When you read through a deposition, how do you notate the important parts of the deposition?
A. Typically I highlight.
Q. So when we go through the depo or notebooks, we will see your highlighting?
A. Yes.
(Whereupon Exhibit 6 was marked for identification.)
Q. Exhibit 6 is what, please, sir?
A. Exhibit 6 is a copy of all of the invoices relative to the work performed on this case since the -- I believe the last one, based on my records, it was produced at my deposition -- my



prior deposition was up through September 30th of 2009. This is a copy of all of the invoices that have been generated since that time.
Q. As I look through each of the invoices, it seems every invoice on every page has an entry that says "various discussions with counsel concerning this matter and work to be performed by HMI."
How are those discussions recorded in your records?
A. Typically they are not recorded. It is not my practice to take notes of conversations, and that -- to be honest, that is a description that I believe appears on every invoice on every matter. It is -- it is a standard description, and there is no detail maintained of that.
Q. So if you have a discussion with opposing counsel and opposing counsel gives you information in terms of assumptions to make, you don't record those?
A. No, I don't.
Q. How do you remember them?
A. It is my typical approach that that is just something I do remember, and there is not anything that is recorded beyond that.



Q. So -- go ahead, sorry.
A. No. I mean, in some cases if a matter is particularly complex or something like that, I may make notes to myself to do certain things, and those -- if I make those notes, which I don't believe I have in this case, would be discarded once I have done what I made a note to remind myself to do.
Q. If, for example, counsel points you to a particular aspect of a document or testimony that they would like you to look at, how is that recorded in your records?
A. That's not something that is typically done other than in conversation.
Q. That's what I mean.
A. That is not typically recorded.
Q. So counsel says I really would like for you to focus in on these six pages out of 800, you just remember which ones you need to look at?
A. That is not something that is typical in my experience. Generally when I have a document I read the entirety of the document.
Q. And counsel doesn't direct you to any part of it?
A. Rarely. In order to get the substance



of or the context of that, it is my practice, as with the case of Dr. Safir's deposition, to read the entirety of it, not just selected portions.
Q. I understand that, but wouldn't you agree with me that when you are presented with a massive document, sometimes counsel directs you to something that counsel believes is particularly important?
A. That can happen on occasion, yes.
Q. And I just wonder how is that recorded in your records?
A. Other than, like I say, I make a note at some point in time to remind me to do something. I don't recall making any such notes in this case, but once I have done that, then that is not something that I would typically retain.
Q. Do you keep time records?
A. I enter records into a computer system. That is what is used to generate the billings.
Q. And do you have coding for your time entries in terms of what it is you are doing?
A. No. It is -- well, there are different codes that we use, but with respect to any billable work, there is only one code.





cfc575ce-2688-46e8-99a1-59218b3ffd46

Q. Which is?
A. HO1.
Q. And do the computer records reflect who did work on a particular matter and what date and how many hours were spent?
A. Yes, they do.
Q. And you have those?
A. They are obviously within the system, yes.
MR. FLEMING: Have those been produced, Counsel?
MR. BRUCKERHOFF: I don't believe so. I will have to check with Colin and the staff.
(Whereupon Exhibit 7 was marked for identification.)
MR. FLEMING: Q. Mr. Johns, I have handed you what we have marked as Exhibit 7, which appears to be a document -- not appears, it is a document that we received from you this morning. What is Exhibit 7?
A. In reading back through my rebuttal report in preparation for today's deposition I noticed that the supporting documents that were being put in binder 2D, which I believe a copy of that was produced or the contents of that have been produced to you, I noticed that there was a



statement in my rebuttal report that referred to new loans that had been funded by DTDF during -- commencing in 2003, and it quoted a number of loans and the dollar amount and the support for the dollar amount. And those particular loans were not contained in the binders I printed or had a copy of this page printed out and informed counsel of that omission yesterday when we met.
(Whereupon Exhibit 8 was marked for identification.)
Q. Mr. Johns, I am handing you what has been marked as Exhibit 8. Again, that was handed to us this morning.
Would you please describe what Exhibit 8 is?
A. This is a schedule that I prepared yesterday. The detail included on here is just an extraction of data from the general ledgers that have been produced in this matter and shows the breakdown of certain numbers that are included in Exhibit 1 to my rebuttal report.
Q. What are these numbers?
A. The balances on notes receivable that are recorded in the general ledger of DTDF as of January 1, 2003 and December 31, 2003.
Q. And we will come back to this as we go through your deposition and look at Exhibit 1 so you



can show us -- and your report to show us where these tie in to your report in Exhibit 1.
Did you prepare -- I am sorry.
In terms of these loans that are listed here, are these all of the loans included related party loans and the 1090 loan?
A. All of the loans reflected in the 2003 general ledger are included in this.
Q. Did you prepare similar breakdowns for 2004, 2005 and 2006?
A. No, I did not. I prepared this for my own purposes, like I say, yesterday and double-checked a couple of the numbers on Exhibit 1. It is really -- it is just a question that the general ledgers have been produced. And if you go through line by line through the general ledger and note them down, that's what those numbers represent. This was more for my own purposes to double-check and as an example of how those numbers were generated.
Q. When you say for your own purposes, what purposes did they serve?
A. I was going back and double-checking for another time the accuracy of the numbers in Exhibit 1.



Q. Did you find any inaccuracies?
A. No, I did not.
(Whereupon Exhibit 9 was marked for identification.)
Q. Before we get to Exhibit 9, I have a question about your electronic documents. We have received copies, I believe, electronically of all of the exhibits to your original report.
Other than the exhibits to your original report, do you have any other electronic documents such as spreadsheets or Word documents or anything of the like?
A. It is my understanding that my staff have worked with counsel to produce all of that information to you. So to the extent that there are electronic spreadsheets, it is my understanding that you should have received them.
Q. All of the spreadsheets is -- my recollection is that all of the spreadsheets I received are simply the exhibits to your report.
I am just asking you do you have other exhibits -- would you have other worksheets that are -- other than what are exhibits to your report?
A. My recollection is that most of the exhibits are simply an extraction of data from the general ledgers and were prepared just by typing in

numbers as you go through the general ledgers, so I have not myself double-checked all of that, but it is my understanding to the extent that it was anything other than that it would have been produced, but it wouldn't surprise me if there were no other spreadsheets.
Q. Or any other electronic data?
A. Right.
Q. Other than your exhibits?
A. And the report itself.
Q. And the report itself?
A. Yes.
Q. So if we go through your binders and find work papers that are not included as an exhibit, such as spreadsheets and the like, are you saying you discarded those?
A. No. It is my understanding that any spreadsheets that we have would have been produced to you.
Q. We have talked about the general ledger, and I know that a copy -- I guess portions of the general ledger at least are included in your binder 2D. I am sure there are some in other parts of your binders.
Do you have an electronic copy of the



general ledger?
A. I believe the copy that we have, if you want to call it an electronic copy, is a pdf file. We do not have anything that is manipulatable or sortable in my way. I believe the only copy we have is a pdf copy.
Q. Have you attempted to convert the data in the pdf file into some other workable format such as a spreadsheet?
A. Not to my knowledge. Like I said, most of the schedules that we have prepared have been by hard input from those general ledgers.
Q. So you are telling me then that anytime you extracted data from the general ledger, you just manually extracted it in terms of having it retyped into a spreadsheet?
A. That's my understanding, yes, and clearly my staff has done most of that work, not me.
Q. But you do have the general ledgers in pdf format?
A. Yes.
Q. How did you acquire those?
A. Well, we have acquired different copies of the same general ledgers over time because as you are aware I have worked on other cases



involving USACM. So within the files relative to the other cases, I think there are copies of the same general ledgers. The document itself is exactly the same other than it may have different Bates numbers on it.
Q. The source though of the general ledgers have been from whom?
A. From counsel, is my understanding.
Q. And you received it in pdf format?
A. That's my understanding, yes.
Q. Have you received other documents and records in pdf format?
A. I would think, yes, because to the extent that some of it has been -- a document may have been attached to an e-mail that would be reflected in the correspondence that we produced to you, that would indicate that some of those probably were pdf files.
Q. Have you received copies of records from pdf in native format electronic records?
A. Not from DTDF itself. I think I explained last time there might have been some schedules that we received from FTI that may have been electronic spreadsheets that we took as a starting point and adapted.



Q. Do you still have those electronic spreadsheets?
A. To the extent that we did, I believe we would have produced those.
Q. Do you have a listing of electronic spreadsheets and other type of similar data that you receive from FTI?
A. No.
Q. How do you know if a particular document would have been received from FTI?
A. Typically those have not come in direct to me, but I have talked to my staff and asked them to review the files. To the extent there was something that had been produced by FTI, if we had a copy of what was produced, we would have produced that.
Q. I understand, but I guess what I am saying is -- or asking is how do you record what you receive from FTI versus what you have created yourself?
A. I don't believe there is a mechanism for maintaining a listing of what we have received from anybody other than through the transmittal-type e-mails that I produced to you to the extent that I have received things.





cfc575ce-2688-46e8-99a1-59218b3ffd46

Q. In terms of spreadsheets, for example, how do you know whether a particular spreadsheet is work product from your firm as opposed to from FTI?
How are you able to make that distinction?
A. Well, there are no schedules that have been produced as support for my opinions that are somebody else's work product. To the extent that we may in certain cases have received a schedule from FTI, generally that has only been used as a starting point. We have done our own check and verification of the data on that, may have reformatted or come up with something which I view as being our work product, and that is what has been used as support for my opinions.
Q. So somewhere in your computers you would have the original data that you would receive from FTI in native format?
A. Not necessarily. It may have been reworked or changed in some fashion since it was received so --
Q. So you would not have kept an original copy of what you would receive from FTI?
A. That wouldn't be important to me. What would be important to me would be the data that has been verified by me and/or my staff and is being



used at the end of the day.
Q. So the answer is no?
A. I don't know one way or the other, but as I have said a number of times, to the extent that we did have any of those -- any such files, I believe they have been produced.
Q. When counsel asked you for your electronic work papers, what efforts did you make to make sure that he received all of your papers, including things that weren't on an exhibit?
A. Personally I have not been involved in that process, but I have directed my staff to work with counsel to produce that data.
Q. For the record, I have handed you Exhibit 9 which is a copy of your -- I believe a copy of your rebuttal report. I want you to verify that.
This came out of, I guess, your binder 2D. And so let me just ask you, is this a true and correct copy of your rebuttal report as contained in binder 2D?
A. The ones that I do note here is this copy does not include any of the exhibits.
Q. Right.
A. Which are also included within binder



2D.
Q. But they are not attached to the copy of your report in binder 2D, correct?
A. They are in a different tab section.
Q. That's the reason I am making this distinction because the report that was produced to us had Exhibits 1 and 2 attached. I just want to make a note that what I am giving you here is without Exhibits 1 and 2 attached.
A. That is correct.
Q. That's as contained in your binder, correct?
A. As there is a copy that is in the same -- the same pages that you have marked as Exhibit 9 are in front of the first tab in binder 2D. The exhibits are elsewhere in the binder.
Q. I just want to make that point so for the record we understand later on if the exhibits aren't attached, why they are not attached, because they aren't attached in your binder directly, they are back behind the report, correct?
A. That is correct.
Q. If you would, please turn to page 2.
A. Are we talking the second page of the Exhibit 2 or --



Q. Numbered page 2.
A. Okay.
Q. If you look at paragraph 5, you state as follows, "As I testified at my deposition, I have not been asked to speculate as to whether or not another bank somewhere in the country would have provided the same services as WFB. In my analysis I am dealing with the specific services that WFB did provide to USACM, 1090, Mountain Vista."
Did I read that correctly?
A. Yes, you did.
Q. You have not attempted to tie any specific action of Wells Fargo to any specific loss to DTDF in terms of your damage calculations, correct?
MR. BRUCKERHOFF: Objection, to form.
THE WITNESS: That's not correct.
MR. FLEMING: Q. Why is that not correct?
A. I believe there is an element of damage here that refers specifically to the monies that went through the 1090 and Mountain Vista accounts.
Q. Other than the 1090 and Mountain Vista, have you attempted to identify or tie any





cfc575ce-2688-46e8-99a1-59218b3ffd46

specific action of Wells Fargo to any specific loss of DTDF?
MR. BRUCKERHOFF: Objection, to form.
THE WITNESS: In terms of specific action, I believe what I have testified to and what I have laid out in both my original report, and to the extent it is addressed here as well, is the linkage that I see between the actions of Wells Fargo, which is a provision of various services to USACM, that allowed either the concealment or enabled the continuation of the fraud, and that would be the linkage in my mind between the actions of Wells Fargo and the damages that have been calculated.
MR. FLEMING: Q. The answer to my question, other than the 1090 transfers, you have not specifically linked any action of Wells Fargo to any specific damage by DTDF, correct?
MR. BRUCKERHOFF: Objection, to form.
THE WITNESS: Other than in the sense that I have just described, I believe, again, that I testified that I have not traced every one of the amounts that are included in my damages to see whether they did or did not go through a Wells Fargo account, but I believe that the linkage is as I just



stated.
MR. FLEMING: Objection nonresponsive.
Q. Again, my question is other than the 1090 loan, have you specifically tied any damage to DTDF to any action of Wells Fargo?
MR. BRUCKERHOFF: Objection, to form, vague, ambiguous, asked and answered.
THE WITNESS: I believe I covered this in my earlier deposition, and whether a particular transaction went through a Wells Fargo account is not something that I looked at in all cases because in my analysis that is not the linkage that I was looking for.
I believe that the damages are premised on the general services provided by Wells Fargo. And so no, I have not attempted to trace every item of damage that was included in my original report to a specific action of Wells Fargo.
MR. FLEMING: Again I am going to object as nonresponsive. It is a "yes" or "no" answer.
Q. Other than the 1090 loan, have you tied any specific action of Wells Fargo to any specific loss or damage, rather, to DTDF, "yes" or



"no"?
MR. BRUCKERHOFF: Objection, form. He has answered the question.
THE WITNESS: The reason I have answered the question the way I have, I think we went through this at length in my earlier deposition, is there are a lot of items of damage that were laid out in my original report. And I don't want to give you the impression sitting here today without reviewing every one of those as to whether there isn't somewhere in there that does have a direct linkage to the provision of services by Wells Fargo.
MR. FLEMING: Q. When you say "provision of services," what are you talking about?
A. The general services that were provided by Wells covered a lot of different things: The provision of regular checking accounts, the provision of whether -- two trust accounts that were maintained. I think there is no dispute there are many accounts that USACM had with Wells Fargo. There are other accounts in the name of 1090 and Mountain Vista that were with Wells Fargo. They also provided various credit services, ACH Services, a number of different services which, again, I



believe have been covered in my original report and in my earlier deposition.
Q. I don't recall in your original report your pointing out -- let me just back up.
In terms of the services provided and in terms of the accounts, are you saying that the services that Wells Fargo provided were the transactions that took place in those accounts?
Is that what you are saying?
A. No. They provided the ability of USACM to transact certain transactions, for instance, through the provisions of ACH Services or wire transfer services.
Q. You -- in your original report though you referenced a number of specific transactions that you indicated, I guess, helped conceal the fraud, I think is your way of describing it. Some of them included transfers from the Investor Trust Account to the Collection Trust Account and then back from the Collection Trust Account to Investor Trust Account.
Do you remember those?
A. Yes, I do.
Q. You also mentioned -- I think you mentioned some negative balances that took place in





cfc575ce-2688-46e8-99a1-59218b3ffd46

the Collection Trust Account?
A. Yes.
Q. You mentioned the transfer of funds, the $11.425 million transfer that went around in a circle from the Collection Trust Account to the DTDF account back to the Investors Trust Account and back to the Collection Trust Account.
A. That's correct.
Q. And you have also mentioned the wire transfers from DTDF to 1090 to Mountain Vista to USAIP?
A. That is correct.
Q. In your report did you identify any ACH transfers or transactions that in any way contributed to the fraud?
A. I identified certain ACH transactions that could not have been processed had it not been for some of the other actions.
Q. The ACH transfers, of course, were all done on a paid-up basis. In other words, they had to be collected funds in the account before the ACH was released, correct?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: That is my understanding, yes.



MR. FLEMING: Q. In terms of the credit services, did you identify any credit service that had anything to do with the concealment of the fraud, as you call it?
A. Not that I can recall as I sit here today.
Q. So basically what you are talking about is transactions that occurred between and among and within these accounts that you say helped conceal the fraud; is that correct?
A. That is certainly a major part of what I covered in my original report, yes.
Q. Other than allowing transactions or allowing accounts to exist, is there anything else you have identified that Wells Fargo did that somehow aided or helped conceal the fraud?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: I believe I laid out in my original report the examples of the types of transactions that Wells Fargo allowed to occur that helped to conceal the fraud, yes.
MR. FLEMING: Q. And these were all transactions occurring within various accounts, correct?
A. Within and/or involving Wells Fargo



accounts, yes.
Q. Now paragraph 8, I will read it, it says, "However, that is not the situation I am dealing with in my analysis. WFB, and not some other hypothetical bank, did in fact provide those services and my analysis calculates the damages that were suffered by DTDF that resulted from the actions of WFB."
Other than the 1090 loan, what actions of WFB can you point to that calculate -- that cause damages to DTDF?
A. Well, I believe that -- and what I refer to here is the fact that the actions of Wells Fargo Bank by helping to conceal and allow the Culpable Insiders to perpetuate the fraud that was being done on USACM and DTDF resulted in the continuation of that fraud. And as a result of the continuation of the fraud, DTDF suffered damages.
Q. As you have done with your work in this case, and it looks like you have reviewed a volume of materials, have you come across anything that would suggest that Wells Fargo at any time knew that it was helping to conceal fraud by engaging in a transaction?
MR. BRUCKERHOFF: Objection, form.



THE WITNESS: I have seen some testimony that would indicate knowledge on the part of Wells Fargo that certain actions were improper.
MR. FLEMING: Q. And what testimony have you seen?
A. I am thinking in terms of there was a declaration filed by Mrs. Loeb that reflected conversations that she said she had had and details that she had provided to Wells Fargo Bank. I don't recall specifically, but I think there would have been some similar type discussion in her deposition.
Q. What declaration are you referring to?
A. It was a declaration that was provided yesterday that was, I believe, filed in support of the response to your Motion for Summary Judgment.
Q. Looking at Exhibit 5, where would we find that response?
A. It is not included in a binder. I have copies with me today in terms of I was just handed that yesterday.
Q. So when did you read all of it? It is a pretty big filing.
A. I didn't read the entirety. What I read last night -- or yesterday afternoon and last night was your actual motion, the response to the





cfc575ce-2688-46e8-99a1-59218b3ffd46

Page 165

motion and the declaration of Mrs. Loeb.
Q. And of all the declarations that were filed, how is it that you chose Mrs. Lobe's to review?
A. I did not choose it. I was provided it by counsel.
Q. Did he ask you to review it?
A. Yes.
Q. What did he tell you in connection with that?
A. Just that there would be -- there was information in there relative to some of the arguments that were being put forward by counsel for DTDF.
Q. So other than receiving this declaration yesterday, at the time you wrote your report, what evidence would you have had that Wells Fargo had knowledge that transactions at the time they were commencing were being used to conceal a fraud?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: I believe that the area as to the knowledge of Wells was being covered by another expert rather than me.
MR. FLEMING: Q. I understand that.

Page 166

I am just asking from your perspective, as you read through all of these materials, all of the depositions, all of these documents, is there anything that you can point to today that -- setting aside this declaration that was filed, is there anything that you can point to today in your materials that would in any way indicate that Wells Fargo knew that the processing of any particular transaction was helping to conceal a fraud?
A. I think it is my recollection from the testimony of Mrs. Loeb in particular relative to the $11.4 million transaction that the nature of that transaction, there were indications that somebody at Wells Fargo realized what was happening there.
I believe that -- it is certainly my understanding, and I can't point you to it as I sit here now, to exactly a specific document where I got this understanding from, but they were aware of the fact that the Investor Trust Account and Collection Trust were intended to segregate different types of funds. And as a result of that, they shouldn't have been commingled.
Q. So Wells Fargo -- you have some indication Wells Fargo knew there was a perpetration of a fraud by transfer of these funds?

Page 167

A. That there were in fact trust accounts and that the nature of the trust account that -- A, there shouldn't be negative balances in those accounts if they have been operated correctly, and B, that the monies are specifically being segregated based on the nature of those funds.
Q. What leads you to say that these are in fact trust accounts?
A. That is a technical issue that I believe will be addressed by somebody other than me, but the fact that they are titled Trust Accounts.
Q. So any time there is a regular checking account titled Trust Account, that means it is a trust account?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: That is not part of my expertise, and I don't have an opinion on that.
MR. FLEMING: Q. So you are not opining as to whether these are or are not trust accounts, correct?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: No, I am not.
MR. FLEMING: Q. Let's go to page 3 of your report. Question -- or excuse me, paragraph 10.b, I am not sure if this may be a typographical

Page 168

error, I am reading the first sentence, it says, "The potential for losses within DTDF's portfolio that would be attributable to the damages that I have calculated in this matter presupposes that once the fraud perpetrated by the Culpable Insiders was discovered, that DTDF would continue to fund new loans."
Did you mean would continue or would not continue?
A. No, if they did not continue there would not be potential for losses.
Q. I am just trying to see --
A. There are no typos there.
Q. So you meant to say that DTDF would continue to fund new loans?
A. No. What I am saying is exactly what it says there, that for there to be a potential for losses attributable to the damages that I have calculated, that presupposed that DTDF would have used that money to fund new loans.
Q. After the fraud was discovered?
A. No. If the fraud had not -- had been discovered and had been discontinued, then some of these amounts that were lost as a result of the fraud that I am saying would not have been lost but





cfc575ce-2688-46e8-99a1-59218b3ffd46

for the continuation of the fraud. If rather than being diverted as part of the fraud those monies had been invested in new loans, that would be the instance where this supposed potential for losses would occur.

Q. I am not really following this sentence then.

"The potential for losses within DTDF's portfolio would be attributable to the damages that I have calculated in this matter presupposes that once the fraud perpetrated by the Culpable Insiders was discovered, that DTDF would continue to fund new loans."

So you are meaning to say that your damage analysis assumes or presupposes that once the fraud was discovered, legitimate loans would be made?

MR. BRUCKERHOFF: Objection, form.

MR. FLEMING: After that fact.

THE WITNESS: No, that is not an assumption I am making. I am making a statement here in response to some of the comments made by Dr. Safir where he alleges damages that I have failed to take into account, losses that would have been incurred anyway had the fraud been stopped. And what I am laying out here is that there are



different directions that could have been followed by DTDF upon the discovery of the fraud. One of those options would be to continue to operate in some fashion either with new managers or presumably if you discovered the fraud, you would not have the same managers and to continue to fund loans. That is just one possible action that could have been taken upon the discovery of the fraud.

I said at my last deposition that it is my understanding that other witnesses are going to address what actions would have been taken upon discovery of the fraud. But I am saying that the potential for losses that Dr. Safir claims I should have considered an offset against the amount of damages that I have calculated, those losses would only occur if you took that money and instead of losing it through the fraud, you invested it in loans that went bad.

MR. FLEMING: Q. Now looking at page 4, paragraph 12.a, I will start with the first of the sentence, "However, nowhere in his report does Dr. Safir acknowledge either: a. Had the fraud been discovered, DTDF would not necessarily have continued to fund new loans and would not therefore be exposed to potential losses."



Doesn't a but-for analysis evaluate an alternative to the fraud? In other words, if the fraud had not occurred, what would have happened with the funds had the fraud not occurred?

MR. BRUCKERHOFF: Objection, form.

THE WITNESS: Well, the first part of that but-for analysis is the fact that those monies would not have been stolen in the first place and would have been available to DTDF and/or its members. There are a number of different outcomes or actions, as I have said, that could have been taken by the members of DTDF when or if the fraud was discovered.

One of those options might be to continue in some fashion to operate as they had but with new management and making new loans. Another might be to wind down DTDF and effectively close it down. There are a range of different possibilities there.

What I have presented in damages is the amount that would not have been lost had the fraud been stopped. And I think we talked at my last deposition about the fact that I had not included in my calculation any additional amount over and above the actual dollars that were taken in terms of lost potential earnings on those funds that would have



been earned by DTDF.

You will notice my calculation is a conservative one.

MR. FLEMING: Q. That assumes that had the funds been invested in the so-called legitimate loans, there would have been a positive result, correct?

A. That is correct.

Q. And your Exhibit 1 undertakes to show at least in your mind that it would have been a positive result, correct?

A. Yes.

Q. And your but-for analysis assumes that there are no problems with existing transactions, correct?

A. No.

MR. BRUCKERHOFF: Objection, form.

MR. FLEMING: Q. Why not?

A. Whatever happened with existing transactions, the only amount I am asking for as of the dates that have been laid out in my report are items that would have been avoided, i.e., the transaction -- the transaction in terms of the diversion that DTDF's monies had not occurred, and therefore that transaction that looting or a





cfc575ce-2688-46e8-99a1-59218b3ffd46

Page 173

diversion of funds would not have occurred.
With respect to any other loans that had already been made that were legitimate loans, then those are whatever they were, and I have not asked for any damages relative to those. I have calculated -- I have performed the calculation as to what the incremental results would have been had the diverted monies been invested in new loans.
Q. I am intrigued by your use of the term stolen and looted.
What funds are you claiming were stolen?
A. From DTDF?
Q. Correct.
A. I believe the amounts that constitute the 1090 loan is money that was looted from DTDF and diverted for other purposes.
Q. Because it was a related party loan and because it wasn't secured by a first lien deed of trust?
A. It certainly was a prohibited loan in terms of the governing documents of DTDF.
Q. So you read the prospectus as absolutely prohibiting those loans?
A. I think it allows loans to the manager only in cases where there are foreclosed loans. I

Page 174

think there are other provisions within those governing documents in terms of the restrictions on what can be loans -- the 1090 loan would also violate.
Q. So you read the prospectus as prohibiting those loans, saying you can't do it?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: It certainly is a violation of the operating agreement of DTDF to make that loan.
MR. FLEMING: Q. Every trans- --
A. Assuming that you accept the fact that just because it is recorded as being a loan that it was in fact a loan.
Q. Every transfer out of DTDF through 1090 is recorded on the books of DTDF, correct?
A. Yes.
Q. It is recorded as a 1090 loan advance; is that correct?
A. That is the manner in which it was recorded.
Q. If you will look at the bottom of page 4 going into page 5, paragraph 15, "In fact, during 2003, DTDF invested in 24 new loans to non-affiliates of the Culpable Insiders. Between

Page 175

2003 and 2005 DTDF made cash advances of approximately $90.3 million on these 24 loans."
Let me just stop right there.
Is that what you are tying to Exhibit 7, that statement?
A. Exhibit 7 is the loans that are being referred to in that statement, yes.
Q. I mean, is this where we plug this document into your report?
A. Yes. That is the statement I referred to earlier that when I was going back through binder 2D in preparation for today's deposition, I noticed that no support for those numbers had been included in the binder, and so I made sure that it was produced.
Q. And then you go on to say, "As of the date of DTDF's bankruptcy only one of these loans, the CloudBreak Loan, reflected an outstanding balance."
Reflected an outstanding balance where?
A. In the general ledger of DTDF.
Q. Are you saying then that all of the loans identified on Exhibit 7 were 100 percent paid off?
A. It is my understanding certainly they

Page 176

were -- from reading Mr. Milanowski's deposition, he stated that if it did not appear as of the day of the bankruptcy, it would either have been paid off or sold in some fashion.
Q. Did you go through the documents of DTDF to confirm that in fact these loans were collected and paid?
A. I have not performed that analysis.
Q. So you are relying on then the veracity of DTDF's accounting records to make this statement?
A. And the testimony of Mr. Milanowski I believe supports that.
Q. And the veracity of his testimony?
A. Yes.
Q. Why don't we just take a break?
VIDEO OPERATOR: Going off the record. The time is 10:05.
(Break taken.)
VIDEO OPERATOR: Back on the record. The time is 10:17.
MR. FLEMING: Q. Mr. Johns, going to -- on page 5, paragraph 16 of your rebuttal report, you are talking about the loans that are referred to in the DTDF prospectus that Mr. Safir





cfc575ce-2688-46e8-99a1-59218b3ffd46

Page 177

made reference to in his report about either impaired or non-performing loans.
In your last sentence of that -- paragraph 16 you say, "Dr. Safir offers no analysis as to the subsequent outcome, or any other details, with respect to these loans."
Have you done any such analysis?
A. Other than reviewing -- not specific to the loans that were reflected as of December 31, 2002 that are referred to here. The analysis that we talked about over the -- earlier I have referred to what was reflected as being loans at the end of the day and the bankruptcy filings that I believe were summarized in one of Dr. Safir's exhibits.
Q. But you yourself have not gone back to analyze whether those loans were actually collected, and if so, whether there was any deficiency or anything of that nature?
A. Not the specific loans, no.
Q. Paragraph 17 you say, "I have also performed an analysis of the performance of DTDF's portfolio during the period 2003 through 2005."
Why did you start with 2003 instead of some earlier time?
A. I think the -- that was a period in

Page 178

time we had -- there were financial statements prepared and audited for the period ending 2002, and I have looked at the activity or performed an analysis of the activity from that date forward.
Q. With respect to the DTDF loans from the period 2003 through 2005, when you say you have done an analysis of that performance, did you -- are you looking at loans initiated in 2003 or loans already pending in 2003?
A. The analysis that I have performed has looked at when you exclude certain loans we know were affiliated, what the performance of the portfolio other than those loans was during the period 2003 through 2005.
Q. What I am asking is, for example, if a loan had been made in 2001 but interest was paid on that in 2003, is that included in your Exhibit 1 analysis?
A. Yes, it would be because we -- the analysis reflects all loans with the exclusion of two or three that I backed out, all loans that were on the books of DTDF as of the starting point in our analysis which was December 31, 2002.
Q. With respect to those loans, have you gone through the loans on a loan-by-loan basis to

Page 179

determine the actual collection of interest and principal on those loans?
A. No, I have not, but what I did do was I converted -- I looked at the data and I converted rather than -- the financial statements are prepared on an accrual basis.
So if interest on those loans had been recorded as being receivable but had not actually been received, that would still be reflected in the income within the general ledger. So part of my analysis and in order to cover the potential that certain interest income may not actually have been received, my analysis converts the accrual basis interest income to a cash basis interest income. So it would only reflect interest actually received by DTDF.
Q. Does your calculation -- excuse me.
Does your analysis include payments that were included within that $11.425 transfer?
A. To the extent that any of that 11.42 million was recorded within DTDF's general ledgers as interest income, then yes, it would be reflected there. To the extent that that cash obviously was "received" and immediately went back out again, but the outflow would have been recorded

Page 180

or was recorded as a new loan.
So to the extent that any portion of that 11.42 million was recorded as having been interest on other loans that had been made, yes, it would be included in my numbers.
Q. As I understand it, some of DTDF's funds were used by USA Commercial Mortgage to cover either late or defaulted interest and principal owed to other direct lenders; is that correct?
A. There are certain amounts that were otherwise due to or that were due to DTDF that were not remitted to DTDF by USACM, and some element of those may have been used to make what are referred to as pre-payments of interest on other loans.
Q. Just -- I think we are on the same wavelength. Let me just make sure.
As I understand from Mr. Milanowski's testimony, the overriding business goal, if you will, of Commercial Mortgage was to make sure that the investors and direct loans or these direct lenders, if you will, were all paid interest and principal when due on loans even if it wasn't collected when due; is that your understanding?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: I believe



cfc575ce-2688-46e8-99a1-59218b3ffd46

Mr. Milanowski testified that that was the business philosophy of his partner Mr. Hantges.
MR. FLEMING: Q. And that they carried out that business philosophy by what I would call robbing Peter to pay Paul.
Is that your understanding?
A. Well, the fact that you make payments of interest to direct lenders when the underlying borrower has not paid the interest into the Collection Trust has to by definition be other people's money that is being used to make that payment.
Q. Sometimes was it the case that DTDF's funds were used to cover these unpaid or uncollected interest to principal payments?
A. That's my understanding. I mean, the reason that you have the 11.4 million transaction occurring at the end of 2002 is because certain amounts that had been collected in the Collection Trust that should have been paid through DTDF had not been paid through, and that money wasn't really available. If you looked at the balance in the Collection Trust, you didn't have 11.4 million sitting there, that they have just been holding on to and not paid the money being used for other



purposes.
So yes, there were amounts earlier than that as well where funds that should have been paid to DTDF were used for other purposes by the Culpable Insiders. And one element of damage is that at the end of the day there are 18-million plus that were similar that when the fraud was discovered and they filed bankruptcy, that money was not available to make payments that were due to DTDF.
Q. In terms of actual -- I might be getting ahead of myself here a little bit, but in terms of actual distributions to the DTDF members, were any of the funds that made up those distributions receipts that were supposed to be collected funds from borrowers but in fact were funds from some other source?
MR. BRUCKERHOFF: Objection, form.
MR. FLEMING: Q. Do you understand my question?
A. Let me tell you what I think you are asking, and you tell me if I am misinterpreting your question.
At the end of the day, as part of the bankruptcy filings and as part of the reorganization, that the plan that was adopted by



the bankruptcy court, it was identified that there was a certain amount of prepaid interest that had been paid to DTDF. That would suggest that that amount had been identified as having been paid to DTDF when it had not been received from an underlying borrower.
Q. And we will get to that when we look at your Exhibit 1.
Was that an actual amount that was prepaid to DTDF as opposed to an allocated amount, do you know?
A. I don't know how that number was calculated, but I have used in my analysis the number that was cited in the plan document.
Q. In terms of -- let me just back up.
If I didn't ask -- if I have asked you this, I apologize, but in terms of the actual non-affiliated loans that were made from DTDF, have you been able to get records that would verify that there were actual -- what the actual collections were from those borrowers and, therefore, what the recovery rate was on those loans?
A. There are records that are available that reflect that. In fact, in connection with the 18 million that is unremitted, at the end of the day



I have gone back to records for the Collection Trust and verified that payments had been received from the underlying borrower on the loans that 18 million is identified as being in relation to.
Q. That the money had been received from the borrower?
A. The money had been received by the Collection Trust from the underlying borrower but had not been remitted to DTDF.
Q. What I am asking is, for example, did you take -- if we look at Exhibit 7 or Exhibit 8, we have a list of loans here, did you take these loans and go to records to see if and to what extent there were actual collections made from the borrowers on these loans?
A. I have not gone to the Collections Trust documents for every one of those loans and traced all of the activity on that. In the course of the work that I have performed on this matter and others, I have had reason to look at at certain times records of the Collections Trust, and I have not found any instances where cash was recorded as having been received when it was not actually received.
Q. From a borrower?

Page 185

A. Yes.
Q. But at the end of the day, though, there is -- there are some funds though that you show from the bankruptcy filings that were paid to DTDF that were not actual receipts though, correct?
A. Yes. Well, what I will say is that is where cash -- depends where you are looking. I think we need to be careful -- to be careful here in terms of if you look at DTDF's general ledger, if that general ledger reflects the receipt of cash from the Collection Trust, there have been no instances that I have identified where cash was not actually received from the Collection Trust.
Q. Well --
A. If I go to the records of the Collections Trust and see an entry that indicates cash was received from a borrower, I have not seen any indication in the work I have done that that cash was not received.
What happens, there are some cash disbursements from the Collections Trust that occur even though money hasn't been received from an underlying borrower.
Q. I guess from a forensic standpoint I am wondering if through the records of DTDF and the

Page 186

Collection Trust, whether you had been able to reconstruct or attempted to reconstruct the actual collections on, for example, the loans that are listed on Exhibits 7 and 8.
A. That is not something I have attempted to do by specific reference to actual cash receipts from the borrower.
Q. Has FTI, to your knowledge, attempted to do that?
MR. BRUCKERHOFF: Objection, to form, calls for speculation.
MR. FLEMING: Q. I said to your knowledge.
A. My understanding is that there was a lot of work done very early in the bankruptcy by an entity called Mesirow Financial that attempted to piece together what had actually occurred on those loans, on all of the loans within CM, and that was the process that generated, it is my understanding, the numbers that have been identified as prepaid interest.
Q. Have you relied on Mesirow's work to any extent in your Exhibit 1?
A. Only to the extent that I use the number that is cited in the plan document with

Page 187

respect to what has been identified as being prepaid interest received by DTDF.
Q. Now under paragraph 17.a you say, "The interest income actually collected on DTDF's loan portfolio approximated $8.7 million in 2003, $11.9 million in 2004, and $7.6 million in 2005."
What is the source for determining the income actually collected?
A. If you refer to Exhibit 1 to my report, I testified earlier today that I had gone through a process where I adjusted the accrual basis interest income reflected in the general ledger of DTDF for interest that was recorded as income but was receivable either at the beginning or end of the period. And by making the adjustments that are reflected in the top section of Exhibit 1 by effectively backing out from the accrual basis interest income, the change in the interest receivable, that gives you a cash basis interest.
Q. I understand your methodology.
Is the source of this information the general ledgers?
A. Yes.
Q. One question I had is why was there such a sharp decline from $11.9 million in 2004 to

Page 188

$7.6 million in 2005?
Do you have any explanation for that?
A. You will see that, again, reflected on Exhibit 1. You have the balance outstanding on the loan portfolio of DTDF as of the end of 2002, '3, '4 and '5. When you exclude 1090 and the EPIC and Sheraton loans, at the end of the day in 2005, excluding those loans, the portfolio is just over $50,000,000, and at its high point at the end of 2003 the portfolio is 90.2 million.
So that would reflect that the interest income that is being earned, it's on a lower value of loans.
Q. And the reason there is lower value of loans is that money that had previously been paid out or loans had been collected and then diverted perhaps to 1090?
A. Certainly one element that occurred during the period 2003 through 2005 is there are a lot of advances on the 1090 loan on which no interest is ever collected. So to the extent that you have a large portion of your loan portfolio in this supposed loan to 1090 and you are not collecting any interest on that, then that is going to obviously impact what interest is collected.





cfc575ce-2688-46e8-99a1-59218b3ffd46

Q. Under paragraph 17.b you say, "After adjustment for amounts potentially prepaid," I was curious about your word "potentially."
Could you explain that for me?
A. The only information that we have with respect to the amount of the prepaid interest -- interest is what was identified as being prepaid interest in the plan document which was as of the end of the day.
So what I have done here, because I don't know the date on which that prepaid interest actually occurred, I have allocated the amount identified in the plan document over these three years. So the potential just reflects the fact that that's an allocation on my part rather than any specific identification in each of these years as to how much had been prepaid.
Q. Can you show me where in your exhibit or the back-up documents you have that allocation?
A. It is just reflected in Exhibit 1 itself. It is a formula in the cell. If you look -- the manner in which it is calculated is if you take the total amount of prepaid interest, which I believe was noted down in footnote 2 to Exhibit 1, as being 4.6 million, that has been spread over



these three years in relation to the ending loan portfolio balance for each of the three years.
Q. So you just -- you took a known number and just allocated over those three years based on the loan balance then basically?
A. Yes, I did. To the extent I believe that may be a conservative way of doing it because I am allocating the entirety of that 4.6 million just to these three years where some portion of it may relate to an earlier period as well.
Q. And so that's why you would use the word "potentially" because it is an allocation of that known number?
A. That's right, as described in footnote 2 to Exhibit 1.
Q. Then item c, you say, "Deducting from these amounts an estimate of loan losses each year, results in an annual" -- excuse me -- "an average return on a loan portfolio of approximately 9.4 percent."
When you say an estimate of loan losses, is that because you are using the 75 percent interest for FTDF?
A. No.
Q. What do you mean when you say "an



estimate of loan losses"?
A. Again, if you refer to Exhibit 1 and look at footnote 3, that indicates that the amount that is in here for an assumed loan loss provision has been based on the rate of the provision that was recorded by FTDF with respect to its own portfolio during the normal operations.
It does not relate to the eventual recovery of less than 100 percent through the bankruptcy proceeding, which is where the 75 percent comes from.
Q. Why didn't you use DTDF's loan loss figures?
A. Because I was -- what I am attempting to reflect here is what would have happened had the amounts that are included in my damages calculation gone through the process of being used to fund new loans. And the best proxy I have as to what untainted operations would be for a portfolio like that is the actual results from FTDF.
Q. Well, in terms of the legitimate -- the so-called legitimate loans, couldn't you calculate the actual loan losses from that?
A. I think there are a lot of different loans that may have elements of legitimacy or



illegitimacy. So what I have chosen to do, and again, this I think is also covered by the testimony of Mr. Milanowski, that if he wanted to look at what the results of operations would have been without any of the fraudulent activity, that FTDF's performance would be a good proxy for that.
Q. Well, I understand that's what you have done, and thank you for telling me that you are relying on Milanowski.
I guess my question, though, is can you with DTDF's records form an actual determination of loan loss with respect to the actual non-affiliated so-called legitimate loans?
MR. BRUCKERHOFF: Objection, form.
MR. FLEMING: Q. For DTDF.
A. In terms of the last financial statement that was audited for DTDF was for 2002, I believe, and that my recollection is that that financial statement, that audited financial statement, reflected zero loan loss provisions against portfolio that was outstanding. So without tracing every individual loan, I would not have a basis for that, which is why given my understanding that FTDF was not impacted, certainly not to the same degree as DTDF by the fraudulent scheme that





cfc575ce-2688-46e8-99a1-59218b3ffd46

was being perpetrated, I have used the performance of FTDF as a proxy for if you took these incremental funds and invested them in loans, what kind of loan losses you would have experienced.
Q. Have you -- well, let me start over.
Were you aware that the Beadle, B-e-a-d-l-e, McBride firm had almost completed an audit of DTDF's 2003 financial statement?
A. I have seen reference to that. I certainly have not looked at anything relative to Beadle McBride, in recent times anyway.
Q. So you haven't looked at their work papers or anything of that nature that would go behind the audit work they did for 2003?
A. No.
Q. Now at the bottom of page 5 going into page 6 there is further discussion about the assumed loan loss provision.
At page 6, the top of page 6, the last sentence you say, "As a result, FTDF represents a proxy for what performance results might have been expected had DTDF been operated in accordance with its governing documents and not been looted by the Culpable Insiders."
Why do you contend that FTDF represents a



proxy for this loan performance?
A. Well, what you are dealing with here is a hypothetical calculation as to if these monies had not been taken and DTDF had been invested in loans, what the performance would be.
To the extent that DTDF was investing in very similar loans, had the same types of restrictions on its activities as laid out in the operating agreement of DTDF, and you have actual performance that, as I state here, is, to my knowledge, not impacted, certainly not to the same extent by the fraud itself, then I believe you are looking at the actual results on a similar portfolio that would be a proxy for what is likely to have happened if you had invested these funds in new loans.
Q. Have you compared the FTDF offering versus the DTDF offering to see if in fact the loan restrictions as you call them were the same?
A. I think I did at one time, not recently. I know certainly that it was covered in the deposition of Mr. Milanowski where he confirmed that the same restrictions or largely the same restrictions were in both.
Q. Did you compare the quality of the



loans between FTDF and DTDF or did you just assume they were a similar quality?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: It is my understanding from reviewing the documentation as to FTDF and DTDF that the loans -- that it was intended that their funds be invested and were a very similar nature.
MR. FLEMING: Q. What documents were you looking at?
A. The operating agreement.
Q. I guess my question though is, did you assure yourself that there was a sufficient similarity between FTDF and DTDF to be able to use FTDF's loan loss as a proxy?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: I think you need to clarify the question in terms of when you are saying the closeness or the similarity of the loans, whether you are talking about actual loans or the loans that are described as being the loans that would be invested based on the operating agreement of the two funds.
MR. FLEMING: Q. That's a fair question. Let's sort of break that down a little bit.



For example, did you look at or compare the geographic dispersion of the loans for FTDF versus the geographic dispersion of the -- I lost my question. I will start over.
Did you, for example, compare the geographic dispersion of the FTDF loans against the geographic dispersion of the DTDF loans that were to unrelated entities and were the so-called legitimate loans?
A. In that you are referring to the actual loans made?
Q. Correct.
A. No, I don't believe that I have done that comparison.
Q. Did USA Commercial Mortgage act as the mortgage broker for USA -- for FTDF?
A. That is my understanding, yes.
Q. Did USA Commercial Mortgage use the same underwriting, if you want to call it underwriting, guidelines for FTDF that they used for the other direct lenders, or do you know?
A. If by "underwriting" you are talking about the restrictions on the concentrations of loans to a particular borrower or the size of loans or things like that, then I believe they are very similar. I have not looked at the actual policies





cfc575ce-2688-46e8-99a1-59218b3ffd46

Page 197

in place or the procedures in place for evaluating the creditworthiness of the underlying borrowers between the two entities, no.
Q. I am not sure there were any procedures in place but --
MR. BRUCKERHOFF: Objection, form.
MR. FLEMING: Q. Do you know whether USA Commercial Mortgage did anything differently with respect to evaluating either the creditworthiness of the borrower or the adequacy of the collateral or things of that nature with respect to FTDF than it did with respect to any of the other direct lenders?
A. I am not aware of any differences in the procedures followed by USACM with respect to the making or underwriting of the loans between the two funds.
Q. Have you done any kind of an evaluation comparing the loans made for FTDF versus any other direct lender of USA Commercial Mortgages?
A. No.
Q. Or with respect to the so-called legitimate loans for DTDF?
A. No.
Q. In his deposition Mr. Milanowski

Page 198

referred to -- I think he refers to a hole in Commercial Mortgage's collections, if you will.
If I understood his testimony, he was saying that the hole was widening. In other words, the gap between the actual collections versus the -- from borrowers versus the payments made to lenders was widening.
Did you see that in his deposition?
MR. BRUCKERHOFF: Objection, form.
MR. FLEMING: Q. Or did you understand his deposition to say that?
A. I do not remember the exact language he used with respect to that, but that would be consistent with my understanding.
Q. So would it appear to you that as time went on from, let's say, 2003 to 2006 that the gap between the amounts collected by Commercial Mortgage from its borrowers versus amounts paid by Commercial Mortgage to the lenders, the gap there was widening during that period of time?
A. That --
MR. BRUCKERHOFF: Objection, to form.
THE WITNESS: It would be consistent with my understanding that the shortfall would increase over time, yes.

Page 199

MR. FLEMING: Q. Do you know why that was?
A. Every time you make a prepayment of interest that gap is going to increase.
Q. Was the gap also increased because of an increase in uncollectability with respect to some of those loans?
A. Potentially.
Q. Now in your Exhibit 1 you have what is called DTDF's actual historical earnings distributions.
Is this also based on what you see in the general ledger?
A. I believe that is from the financial statements of DTDF.
Q. Their internal financial statements?
A. No, this is based on 2002 and 2001. To my recollection, it would be based on their audited financial statements.
Q. Going to part f on page 6, you say in the second sentence, "As evidenced in FT-" -- I am sorry, let's start over.
Part f, the second paragraph, first sentence, it says, "When applying FTDF's 75 percent recovery rate as a conservative estimate of

Page 200

anticipated loan losses, the growth in DTDF's portfolio between 2002 and 2006, including estimated member distributions, would have more than offset the losses suffered in the bankruptcy proceedings."
Now I will look at footnote 18 where you talk about this being a conservative estimate. And if you look down at footnote 18, it says, "This estimate is conservative for a number of reasons, including the fact that none of the loans in which DTDF invested in 2003" -- or -- "during 2003 were shown as still being outstanding as of December 31, 2006."
Are you implying there that 100 percent of the loans that DTDF invested in in 2003 were fully paid?
A. That is my understanding. That's what we talked about earlier in respect to the new loans that were funded or the new loans in 2003 that over the period 2003 through 2005 DTDF funded $90 million as reflected on --
Q. Exhibit 7.
A. Yes, 6 or 7.
At the end of the day -- or as of the date of bankruptcy, there is only one of those loans that is shown as having an outstanding balance, and that

Page 201

one, the CloudBreak loan, is shown as having been repaid after the date of bankruptcy and prior to December 31, 2006.
So at least with respect to those loans that were funded, new loans, and we are talking here about a hypothetical, that if you had not lost this money as a result of the fraud and you had invested it in new loans, at least those that were in -- that were new loans in 2003, that the record indicates that those were paid.
There are other reasons why I believe it is a conservative estimate as well.
Q. What are those other reasons?
A. The principal one would be that the 75 percent that was recovered for the members of FTDF also is after the payment of all of the costs associated with the bankruptcy.
Q. So for some reason then although FTDF had loan losses and although USACM was experiencing this widening gap, or hole I think as Mr. Milanowski called it, you have reached the conclusion that DTDF somehow with its loan starting in 2003 collected everything?
A. Only with respect to -- well, it depends on where you are saying -- I am assuming

Page 202

that. I am saying that the records indicate that the new loans funded in 2003 were in fact collected. I am not saying that that is -- that is not the bottom line in terms of my analysis and my conclusions that are reflected on Exhibit 1.
Q. But getting to the point, though, that I made earlier, the implication from Exhibit 18 is that 100 percent of these loans noted on Exhibit 7 were collected in full, correct?
MR. BRUCKERHOFF: You are referring to footnote 18?
MR. FLEMING: Yes.
THE WITNESS: For those specific loans, yes.
MR. FLEMING: Q. And these are the loans in Exhibit 7 from -- that were made between 2003 and when?
A. Those new loans that originated in 2003, although there may have been additional funding of those loans that occurred in 2004 and 2005.
Q. So Exhibit 7 are only loans that were originated in 2003?
A. That's correct.
Q. There are other loans that were

Page 203

originated in 2004 and 2005?
A. I would expect that to be the case, yes.
Q. You evaluated those loans? I am talking about legitimate --
A. No, I have not.
Q. Going to the last page of your report item 3 says, "To the extent there are additional recoveries with respect to specific transactions that comprise my damage calculations, I will consider whether an offset will need to be applied."
Since the time of your first report, have there been any other recoveries on any of these transactions?
A. Not that I am aware of.
Q. Are you counting on counsel to make you aware of that or is there something that you do to monitor that?
A. I have no information other than what is provided to me with respect to any recoveries.
Q. I understand. I am just wondering --
A. I do not have the ability to identify that myself. That would have to be information that was provided to me presumably through counsel.
Q. What if there are recoveries against

Page 204

third parties such as accounting firms or law firms or that sort of thing, would those be part of the offset or would you even consider that as part of your offset?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: I believe that my understanding of that aspect of this is that that is a legal determination as to whether there is a right of offset, and certainly to the extent that such a determination is made, any amounts that are identified that should be offset then I would adjust my calculations accordingly.
MR. FLEMING: Q. So would you just count on counsel to tell you whether it should or should not be used as an offset?
A. No, but what I have done up until now is I have inquired as to whether any of the specific amounts that I had included or identified as being an element of damage suffered by DTDF, whether any of those funds had been recovered. And to the extent that I was made aware of the one instance where that had occurred, I applied an offset.
To the extent that when I say a legal determination, I am not talking about a legal determination made by DTDF's counsel. I am assuming





cfc575ce-2688-46e8-99a1-59218b3ffd46

Page 205

that that is a determination that will be made by the court.
Q. For example, I understand there was a settlement with the -- if I can say this right -- Kummer, K-u-m-m-e-r, Kaemper, K-a-e-m-p-e-r, law firm.
Have you been made aware of that settlement?
A. I am aware of the fact that there was a settlement. I am not aware of the terms of that settlement.
Q. And I also understand there has been a settlement with the Piercey Bowler accounting firm, P-e-a-r-c-y?
A. P-i-e-r-c-e-y B-o-w-l-e-r.
Q. As I understand, there has been a settlement with that firm.
Have you been made aware of that?
A. I am aware of the fact that there was a settlement, but again, I don't know the details of that.
Q. Do you know whether DTDF received any funds as a result of that settlement?
A. I don't know.
Q. Would that be important for you to know?

Page 206

A. No. Well, at this point I have attempted to identify recoveries that have been made as to the specific items that I have included in my report. I have made inquiries of Mr. Tucker with respect to that, and to the extent that that information was provided in the case of HMA, I have certainly attempted to include that in my calculations.
To the extent that there are any other settlements that the court decides that there is a right of offset, clearly then I would do what the court directs, but I believe whether or not there is a right of offset, like I say, it is my understanding that will be a determination made by the court.
Q. So in terms of your damage calculations, you would only reduce the damages by actual collections made on -- from borrowers on actual loans; is that correct?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: I am sorry, I do not understand that question.
MR. FLEMING: Q. For example, there was an HMA loan, correct?
A. There were amounts that went to HMA.

Page 207

You are characterizing that as a loan.
Q. I will rephrase.
There were amounts that went to HMA that were included in your damage figure, correct?
A. Correct.
Q. There are amounts collected from collateral, I guess, sold of HMA, correct?
A. It is my understanding that there was an actual payment made by HMA.
Q. So there is an actual payment by HMA and that was -- included in an offset?
A. Yes.
Q. The only offsets that you will make without a legal determination are specific recoveries on specific transactions that are listed in your report; is that correct?
A. At this point I believe that I would make -- to the extent that I am made aware of any recoveries of a specific amount that I am identifying as being an element of damage to DTDF, clearly if those amounts or some portion of them have been recovered, then I believe that I would consider that as to whether it is appropriate for offset.
To the extent that there are other potential

Page 208

recoveries that are more general in nature, I would certainly need guidance from the court or somebody -- I am assuming the court -- as to whether there would be a right of offset and would act accordingly.
Q. We will change the tape and then when we get back on tape we will start with Exhibit No. 1.
VIDEO OPERATOR: This mark the end of tape no. 1, volume no. II, in the deposition of Colin A. Johns.
Going off the record. The time is 11:09.
(Break taken.)
(Whereupon Exhibit 10 was marked for identification.)
VIDEO OPERATOR: This marks the beginning of tape no. 2, volume no. II, in the deposition of Colin A. Johns.
Back on the record. The time is 11:21.
MR. FLEMING: Q. Mr. Johns, we have handed you what has been marked as Exhibit 10.
Does this appear to be a true and correct copy of the documents behind tab no. 1 in your binder 2D?
A. Yes, it does with the exception of the

Page 209

two schedules that I produced to you today which are from my tab 1 of binder 2D.
Q. So Exhibits 7 and 8 have been added to Exhibit 1 or tab 1 of your binder?
A. Yes.
Q. And you would put them right behind the first yellow sheet?
A. The three-page schedule -- I don't remember the exact number, but the three-page schedule that showed the breakdown of DTDF's loan portfolio as of 2003, certainly that would be an appropriate place for it.
The rest of this binder is set up where there is a footnote reference to something in my rebuttal report. The 90.3 million was not footnoted. I put it in here.
Q. And that document is Exhibit 7, correct?
That's what we previously marked as Exhibit 7?
A. It looks like it, yes.
Q. The only other question I had is -- I want to make sure I don't have a copy problem here --
A. Yes, it is Exhibit 7, and the other

Page 210

schedule that I referred to which is in here is Exhibit 8.
Q. The other thing I want to inquire about, just to make sure I don't have a copy problem, the document I handed you, the very last page of the document is just a single page out of some pleading it looks like.
Is yours more than just one page? I just want to make sure I didn't copy this or miss something in the copying.
A. No. That is one page of -- I believe it is out of Third Amended Joint Plan of Reorganization which is referred to in footnote 2 on Exhibit 1. And rather than include the whole document, I included the one page in my binder that had the dollar amount of the prepaid interest.
Q. I just want to make sure we -- I didn't have a copy problem there.
A. No.
Q. Now it appears that the bulk of the documents that make up Exhibit 10 that we have marked here are -- what are these, general ledgers of DTDF?
A. That is correct.
Q. As you mentioned earlier, these are

Page 211

actually hard copies that you had to go through and manually place over on to whatever makes up Exhibit 10, correct?
A. Yes.
Q. Are there spreadsheets that would -- that you have created, for example, that would show the first number on the first line of Exhibit 10, the same being Beginning Interest Receivable, let's say you have 2003, 1,638,211.68.
Is there some spreadsheet that lists all of the general ledger entries that make up that?
A. No, there isn't.
Q. There is not?
A. No. You may need some help on this. I thought you might need some help on this.
If you refer to -- starting in the column headed 2003, the very first number is $1,638,211.68.
Q. Right.
A. If you go to the general ledger for 2003, which is the first of the general ledgers that appears in here, and you go to page -- there is a page number in the top right-hand corner, you go to page 20, the printed page 20.
Q. Correct.
A. You will see towards the bottom of

Page 212

that page there is an account headed AR Accrued Interest, and the beginning balance in that account is $1,638,211.68. So that number comes straight out of page 20 in the general ledger.
Q. I am just going to make sure I am looking at the same page as you.
Am I looking at the right page?
A. Yes, the number is right there.
Q. All right. Now --
A. Maybe I can help you a little bit on this because I believe you have been given the electronic copies of Exhibit 1 and Exhibit 2.
Q. Yes.
A. If you look at the electronic copy, to the extent that the number reflected on Exhibit 1 is a compilation of different numbers, you will see all of the individual numbers contained within the cell. So you will see 200,000 plus 500,000 plus 100,000, whatever.
So you will see where there is a combination, and in this instance where it is just one number, all you see is the hard input of that one number. But if it comes from a number of different accounts within the general ledger, all of the individual balances making up that total are

reflected in the electronic spreadsheet.
Q. I haven't -- trust me, I am horrible with Excel. I barely even type stuff into it.
If you click or put your mouse over that or your cursor over that cell, will you be able to see where those account -- where the accounts are that make up those numbers when you do that?
A. No, you wouldn't because all you have is the dollar amounts, but in the description item, say the loan portfolio as of December 31, 2003, if you look at the general ledger and look at all of the loan accounts, you will see -- and they appear in order within the general ledger, you should be able to identify and just check them off if you are going through the general ledger itself.
The Exhibit 8 that I gave you was an example as to how that works because that gives you -- on Exhibit 1, if you go to the beginning balance, All Loans Excluding 1090 EPIC and Sheraton, and the ending balance, the 71 million and the 90 million --
Q. Right.
A. -- Exhibit 8 reflects all of the individual numbers that you will find in the general ledger that make up those amounts, and they appear at the end of page 2 of Exhibit 8. And shown below



that, obviously there are three loans that I excluded from those totals, and those are what are shown on Exhibit -- on page 3 of Exhibit 8.
Q. I see now that you can tie the beginning balance at least for 2003 and 2004 from the bottom of page 2 of Exhibit 8; is that right?
A. That is correct, because the beginning balance for 2004 is simply the ending balance for 2003.
Q. Do you have a similar work paper for 2005?
A. No. I prepared that one, as I said earlier, yesterday when I was just going through for my own purposes just double-checking a couple of numbers on the spreadsheet. And because there is a long stream of numbers included in that cell, I found it easier to just go through and create Exhibit 8. But the others have just been hard input into there, which is why you see them all as individual numbers.
Q. If you can just help me out here and let's take this first entry, Amesbury/Hatters Point on Exhibit 8 and show me where in tab 1 or Exhibit 10 of this deposition, I can get that first number, that 4,801,000.



A. If you go to page 26 of the general ledger for 2003.
Q. Just a second. Let me catch up with you.
All right, sir.
A. About 2 inches from the top you will see an account 1000-12410 with a description Note Receivable Amesbury/Hatters Point, beginning balance 4,801,000. All of them, if you start from that point going forward, should track; however, you have to bear in mind that this shows all of the activity on those loans. So the only numbers that I am pulling out of the beginning balance, the beginning of the year and the ending balance which for that particular loan would be on page 28 down towards the bottom, and it shows an ending balance of $397,211.
Q. Right.
You basically go through that process then for every loan?
A. And they should be in the same order for 2003 as appears on Exhibit 8 with one exception, and there was one additional amount that I included right at the bottom of page 2 which has a title I believe of Unsecured Advances.
Q. Correct.



A. That I noted it appeared that that related to some activity on some kind of loan, and that actually appears on page 25 of the general ledger.
So given that its inclusion lowers the effective interest rate that I calculate, because you are using more principal on which to calculate the interest as a percentage, I included that. But everything else you will find in order starting on page 26 and just working your way through the general ledger.
Q. Now do the figures on Exhibit 1 include the non-performing loans that were listed in the prospectus of June of 2002?
A. These -- I have not checked specifically whether those loans are included, but the only loans that are not included in the two rows showing the beginning and ending balance of the loans outstanding, the only loans that are not included in there are 1090, EPIC and Sheraton.
So if there are any other non-performing loans, whether they are affiliated or not, they should be included in those balances if they are reflected on the general ledger, which I would assume they are.





cfc575ce-2688-46e8-99a1-59218b3ffd46

Q. How do we know, for example, that the -- I am looking again at the first line of Exhibit -- your Exhibit 1, that is Exhibit 10 to this deposition, how do we know that that 1,638,000 figure for 2003 on the first line excludes EPIC and Sheraton?
How do we get there?
A. Because, again, the reason I added that notation was just to highlight that point, and there are separate accounts within the general ledger for the interest receivable on the EPIC loan and the Sheraton loan, and there are also allowance accounts within the general ledger which have a corresponding but negative balance. So they were totally offset.
Those two, for whatever reason, would track separately and are not included in that $1,638,000 number.
Q. So you didn't have to do any backing out?
A. No.
Q. That's the way it is recorded in the books?
A. As I showed you a few minutes ago, the 1,638,000 comes straight from the general ledger



with no adjustment by me. I am just highlighting the fact that there are other separate accounts that reflect interest receivable for the EPIC and Sheraton loans.
Q. This wasn't anything you did, it was just the way it is recorded in the books?
A. That is correct.
Q. Now, with regard to the line items that say Beginning Balance, all loans excluding 1090, EPIC and Sheraton, did this first figure, let's say for 2003, of 71,206,000, did you have to back those loans out of what the books showed, or is this a calculation you made, or is it in the books or records -- excuse me -- the ledger this way?
A. As reflected on Exhibit 8 and I think we just looked at the first of the loans that are included within that total, each loan has its own separate account within the general ledger. So these numbers are calculated by just adding up all of the individual loans.
When I have done that addition, and you will see if you look at the numbers that are included in that spreadsheet electronically, you will see that the individual balances are added together, but we don't include 1090, EPIC and Sheraton.



Q. Does this create any kind of a problem in terms of consistency when you don't include 1090 here, but I am sure there is zero interest paid on 1090, but you don't include it up in your interest payments or interest receivable?
A. It does not create a problem for exactly the reason that you have just identified. What I am using as the interest income for purposes of my calculation is only where DTDF actually received interest payments. No interest was ever paid on the 1090 loan.
Q. Was interest accruing on the 1090 loan on the books?
A. I don't believe it was, but even if it was -- I have looked and I don't see any indication of that, but even if it was, by making the calculation I do to adjust a cash rather than accrual basis interest income, it would exclude it.
Q. And we know -- I believe it is probably correct, but we know for certain that nothing was ever paid on the 1090 loan?
A. Principal or interest.
Q. Is that correct?
A. Correct.
Q. In terms of the average earnings rate,



as I understand it, this is simply a division of the assumed cash earned divided by the estimated average loan balance outstanding; is that correct?
A. You are referring to the 9.4 percent?
Q. Well, actually the 8 percent, 11 percent, 9 percent figures for each of those three years.
A. Yes. That would be the assumed cash earned from performing loans, the 6,591,000 in 2003 divided by the average loan balance outstanding for that year of 80,702,455.
Q. And looking at these first set of numbers which would be the earnings rate, these are all DTDF numbers except for the assumed loan loss provision which is an FTDF figure; is that correct?
A. Yes, and the allocation of the DTDF number for prepaid interest that we talked about earlier on which you will not find obviously in the general ledger.
Q. Point well taken. And I am just trying to make sure that the only FTDF number that we see in here is just in that first calculation is the assumed loan loss provision; is that correct?
A. That is correct.
Q. Now going down to where it says DTDF





cfc575ce-2688-46e8-99a1-59218b3ffd46

Page 221

analysis of an assumed return (loss), let's start with where it says Beginning Principal Balance.
Where do we get that figure?
A. That is based on the damages that I have calculated and were reflected in my original report. So for 2002, if you look I believe at -- I can refer to it if you have it there, but the difference between the -- I believe it is a difference if you take avoided damages as of 12/31/02 and back out avoided damages as of 12/31/2001, the difference between those two numbers, but I can refer to the schedule if you want.
Q. Do you have it in front of you?
A. No, I don't.
Q. Which schedule should you look at?
A. My original report, if you just give me the one that you have in your hand.
Q. Exhibit 1.
A. I think that is the one I need, yes.
If you refer to the dates that are on the left-hand side of Exhibit 1 to my original report and -- you will see that I am identifying an amount of damage that would have been avoided had the fraud been cut off or stopped as of 12/31/2001, which I

Page 222

believe is approximately 82 million.
Q. 82,329,443?
A. Okay. If you go to the row that indicates the amount that would have been avoided had the fraud been stopped as of 12/31/2002, that is approximately 78 million.
Q. 78,578,471?
A. If you take the difference between those two amounts, that would be the amount included within my damage that went out the door from DTDF during 2002.
Q. Right.
A. And would therefore had the fraud not been occurring would have been funds that would have been available for investment in new loans. If you follow through the other years, you would take the difference between the opening and closing total for damages for each of those years, and that would give you the amount of additional principal shown on the second row of the section you are referring to on Exhibit 1 to my rebuttal report.
Q. So we -- let's say for -- again, we are looking at Exhibit 10, the first line, Beginning Principal Balance.
A. Sorry, I keep calling it Exhibit 1 to

Page 223

my report.
Q. Exhibit 1 to your rebuttal report. This is going to be fun reading.
A. That's right.
Q. We start with 0 and then the 3,750 -- the $3,750,972 which is called additional principal -- is it p-a-l or p-l-e? We have got it both ways here.
A. P-a-l.
Q. That figure then is this number derived by subtracting 12/31/02 damage figure from 12/31/01 damage figure?
A. Correct, which indicates that the difference between those two numbers represents the amount that was lost by DTDF -- that the amount of damage suffered by DTDF during 2002 as a result of the fraud.
Q. So then that -- and then below that we have average balance which is -- where is that number derived?
A. That is just the average of the beginning and ending principal balance. For purposes of this calculation, I have assumed that that money is available over the year, so I use a midpoint.

Page 224

Q. And then Earnings at DTDF, average rate of return, is that simply applying a 9.4 percent rate to the average balance?
A. Yes, it is.
Q. Less assumed distributions, and that's again using an average rate of distributions?
A. That's using the actual average rate of distribution made by DTDF during 2002 and 2001 as an estimate as to what the rate of distribution would be in the following years had this additional money been available for distribution.
Q. Because -- I assume that you put that in there because some people would choose to receive a distribution and some would choose to reinvest?
A. Yes. So to the extent that I am calculating how much would be earned on these funds, then obviously to the extent that it is distributed to the members, you don't earn anything from that point forward.
Q. And then you also deduct the incremental management fee on re-invested earnings of 1 percent per the prospectus?
A. That's correct.
Q. And that's -- then that gives you the assumed ending balance, correct?

A. Yes.
Q. And then for 12/31/2003, you carry that ending balance as new beginning principal balance, correct?
A. Correct.
Q. And then what -- if I understand what you are telling me then, I can subtract for the next line, additional principal, I can subtract the 12/31/04 figure of Exhibit 1 to your original report from the 12/31/03 figure and that gives you that 38,119,000, correct?
A. I believe it is calculated by taking the 12/31/03 number and deducting that from the 12/31/02 number.
Q. Okay. I am sorry, you are right.
A. Okay.
Q. We just keep that process going all the way through to the end of your calculation then; is that correct?
A. That is correct.
Q. Now if we go down to the summary of DTDF estimate of return, the assumed return on ending balance of 75 percent is based on the FTDF number; is that correct?
A. Correct.



Q. Have you analyzed how sensitive the total estimated gain or loss is to incremental changes in that figure?
A. No.
Q. Would it be surprising to you if the net return or loss is almost corollary to 1 percent -- in other words, a 1 percent increase in the assumed rate of return on ending balance would almost yield a 1 percent increase in your net gain? Would that seem right to you or wrong?
A. Could you repeat that?
Q. Sure.
Let's say if you had a 76 percent assumed return on ending balance instead of 75 percent, would that -- would you expect that the total estimated gain on the bottom line would accordingly increase almost 1 percent?
A. Well, clearly if you recover at the end of the day, 1 percent more of the closing balance I have here of 87,571,000, then the math is going to work out that 1 percent of that 87 million is going to drop to the bottom line, which is the total estimated gain.
Similarly, if you assume that the recovery was 74 percent, the estimated gain would be lower by



1 percent, and I am not second-guessing that number. What I am saying is that what we have in FTDF is I believe a reasonable proxy for what would have happened with DTDF, and that takes into account not only the downturn in the market but the cost of bankruptcy and the actual amounts that they disclose to their members that they recovered was 75 percent, which is why I use that number. It is not a calculated number by me. It is a reflection of the actual recovery achieved by FTDF on behalf of its members.
(Whereupon Exhibit 11 was marked for identification.)
Q. Mr. Johns, I have handed you what has been marked as Exhibit 11 to your report and just ask you if that appears to be a true and correct copy of the contents behind tab 2 of your binder 2D which contains Exhibit 2 and the supporting documentation?
A. It appears to be, yes.
Q. Why don't we take about a ten-minute break and see what I need to do to finish up?
VIDEO OPERATOR: Going off the record. The time is 11:54.
(Break taken.)



VIDEO OPERATOR: The time is 12:07.
MR. FLEMING: Q. Mr. Johns, going back to the first part of Exhibit 1, which is the portfolio return, your earnings rate determination from the DTDF portfolio analysis, this is Exhibit 10 to this deposition, Exhibit 1 to your rebuttal report, in terms of the beginning balance and ending balance of all loans, does this include some of the loans that you have singled out such as Colt, Gateway and Ashby Fiesta?
A. Yes, it does. To the extent that certainly with respect to at least one, I believe the original Colt loans, there were some interest amounts received by the Collection Trust, and therefore even though that may not be a full payment of interest because the interest income is included in my assumed cash collected, I also included the principal balance of those loans, the only loans that I have excluded of the three that I identified to you before.
Q. Why did you include the Colt loans in these calculations?
A. To be conservative to the extent that there was some element of interest income included within my assumed cash collected, it would --





cfc575ce-2688-46e8-99a1-59218b3ffd46

without backing that interest out, it would overstate the earnings rate if I included the interest but did not include the principal balance.
Q. So a Colt loan is not a loan to an affiliated party by your calculation -- by your analysis?
MR. BRUCKERHOFF: Objection, form.
THE WITNESS: For purposes of this analysis, I have included that even though I do believe it is an affiliated loan.
MR. FLEMING: Q. The reason I ask is because you have a figure called Assumed Gain from 2003 Loan Activity to Non-Affiliates of DTDF.
A. That is correct, and that strictly speaking is not an accurate description to the extent that there are some loans included within those principal balances and to the extent that they actually paid any interest on the loan included within the assumed cash collected.
Q. Now the upper part of this document, is this only an analysis of 2003 loans? I am sure you have told me, and it has probably gone way over my head.
Is this only an analysis of 2003 loans?
A. No. It is an analysis of all loans



that were reflected in DTDF's portfolio with the exception of the three loans that I did not include. So every other loan that was in place and recorded on DTDF's general ledger during this time frame 2003 through 2005, all of those loans are included.
Q. The reason I say is because this title is Assumed Gain from 2003 Loan Activity to Non-Affiliates on this -- the middle line on the top part of Exhibit 1 to your report.
A. Yes, but -- yes. That, again, is -- for another reason, that isn't an accurate description. What this reflects is the assumed gain for calendar years 2003 through 2005 on all loans with the exception of the three identified that were in place during those time frames.
Q. So we should probably, just to be accurate, strike out the word 2003 off of that line?
Would that be correct?
A. I would -- if I was re-titling that line now I would say Assumed Gain from Loan Activity.
Q. Period?
A. Yes.
Q. So if any of the loans paid interest with the exception of EPIC and Sheraton, they were



included in your calculations?
A. Yes. They were also included in my calculation if they didn't pay interest. So the loan balance would be included in these numbers, but clearly if they didn't pay any interest, no interest received is reflected in my numbers for those loans. So that would force the earnings rate and the assumed gain artificially lower.
Q. But when you take out 1090, though, there is a loan where there was no interest payments, correct?
A. Correct.
Q. But we didn't include 1090?
A. No. What I am saying is that if any of the other loans within this portfolio were not paying interest, I am still including the loan balance in the calculation as to what the percentage gain was. It is not just a calculation based only on those loans that actually paid interest.
Q. And why would you exclude 1090 from that figure?
A. Because 1090, I think everybody is aware of the fact, that that is not a real loan.
Q. If you will look in the middle part of this Exhibit 1 to your report, there's a figure



called Less assumed distributions, and you put in parentheses (DTDF average rate of distribution during 2002 and 2001).
Do you see that?
A. Yes.
Q. Where do you get that average rate of distribution?
Is that strictly off the financial statements?
A. Yes, I believe I testified earlier on that that would be from the audited financial statements of DTDF.
Q. Do you have the portions of those financial statements that you are looking at as part of the back-up here or do you just have to independently go to that?
A. You would have to independently -- I believe that was produced separately as part of the earlier production of documents. Those numbers would come from there -- or at least the average rate was calculated based on those.
Q. So basically you would just take the number on the financial statement as distributions for those two years and then add them up and divide them by 2 and come up with an average?





cfc575ce-2688-46e8-99a1-59218b3ffd46

A. Come up with an average rate of distribution as we discussed indicating that some people chose to take distributions rather than reinvest whatever the earnings were.
Q. That would be basically a cash outflow to the members of DTDF as payment on their portion of the ownership of the company?
A. That is correct, or a return on their investment in DTDF, yes. And it is excluded in that -- in this portion of my analysis because obviously if you can make those distributions that money is not available to reinvest in a loan in a subsequent year.
Q. And then the -- on the management fee, just walk me through how you would calculate that 1 percent figure? Let's just take 2002. 12/31/2002 you have incremental management fee of $1,565.
How would you come up with that number?
A. Well, it will show in the electronic version of my spreadsheet.
Q. What are you multiplying 1 percent to or against?
A. I don't recall as I am sitting here today, but I believe it is calculated based on the earnings net of the distributions.



MR. FLEMING: Can we do this, just to be absolutely sure so we don't have to follow up on this in any fashion, can we just agree to have him when he does his errata just to check on that? If his answer is different than what you put on the errata, just tell us in writing how you came up with that on your errata sheet.
THE WITNESS: So long as you agree not to question me on that at trial.
MR. FLEMING: I am not going to agree to that.
MR. BRUCKERHOFF: Of course we will.
MR. FLEMING: I want to make sure that we get the right figure, that we know your methodology.
THE WITNESS: Right.
MR. FLEMING: That's all -- we want to make sure, you know.
THE WITNESS: We have got that.
MR. FLEMING: We will pass the witness.
MR. BRUCKERHOFF: We will save our questions for trial.
VIDEO OPERATOR: This marks the end of tape no. 2, volume no. II, in the deposition of





cfc575ce-2688-46e8-99a1-59218b3ffd46

Colin A. Johns.

Going off the record. The time is 12:18.

(Whereupon, the deposition was adjourned at 12:18 p.m.)

--oOo--

I declare under penalty of perjury the foregoing is true and correct. Subscribed at ______________________________, California, this _____ day of ______________ 2010.

______________________________________

COLIN A. JOHNS, CPA

CERTIFICATE OF REPORTER

I, DENISE A. FORD, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [✓] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: May 12, 2010

[signature]

DENISE A. FORD, CSR No. 7525